RYAN H. WEINSTEIN (Cal. Bar No. 240405)
ryan.weinstein@ropesgray.com
ROPES & GRAY LLP
10250 Constellation Boulevard
Los Angeles, California 90067
Tel: +1 310 975 3310 | Fax: +1 310 975 3400

AMY JANE LONGO (Cal. Bar No. 198304)
amy.longo@ropesgray.com
ROPES & GRAY LLP
Three Embarcadero Center
San Francisco, California 94111-4006
Tel: +1 415 315 2301 | Fax: +1 415 315 6350

Attorneys for Plaintiffs

* pro hac vice application pending

LORI LOWENTHAL MARCUS*
lorilowenthalmarcus@deborahproject.org
JEROME M. MARCUS*
jmarcus@deborahproject.org
THE DEBORAH PROJECT
P.O. Box 212
Merion Station, Pennsylvania 19066
Tel: +1 610 880 0100 | Fax: +1 610 664 1559

GREGG L. WEINER*
gregg.weiner@ropesgray.com
ALEXANDER B. SIMKIN*
alexander.simkin@ropesgray.com
ELANA M. STERN*
elana.stern@ropesgray.com
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, New York 10036
Tel: +1 212 596 9000 | Fax: +1 212 596 9090

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SAM and ANDREA KASLE, as Guardians ad Litem for L.K., a minor; IGOR and MARINA BERSHTEYN, as Guardians ad Litem for S.B., a minor; MARGARETTE KESSELMAN, as Guardian ad Litem for W.K., a minor; SCOTT and LORI LYLE, as Guardians ad Litem for A.L., a minor; DANIEL and JENNIFER REIF, as Guardians ad Litem for O.R., a minor; and LISA JOY ROSNER, as Guardian ad Litem for D.B., a minor,<br><br>       Plaintiffs,<br><br>       v.<br><br>KAREN VAN PUTTEN, CHARLES VELSCHOW, WENDY PORTER, GREGORY S. GRUSZYNSKI, KARL LOSEKOOT, CRYSTAL LEACH, BONNIE HANSEN, TODD BEAL, CARRIE DU BOIS, RICHARD GINN, AMY KOO, SATHVIK NORI, and SHAWNEECE STEVENSON, each in their official and personal capacities,<br><br>       Defendants. | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs SAM and ANDREA KASLE, as Guardians ad Litem for their daughter, L.K., IGOR and MARINA BERSHTEYN, as Guardians ad Litem for their daughter, S.B., MARGARETTE KESSELMAN, as Guardian ad Litem for her son, W.K., SCOTT and LORI LYLE, as Guardians ad Litem for their son, A.L., DANIEL and JENNIFER REIF, as Guardians ad Litem for their daughter, O.R., and LISA JOY ROSNER, as Guardian ad Litem for her daughter, D.B. (collectively, "Plaintiffs") bring this action against defendants KAREN VAN PUTTEN, CHARLES VELSCHOW, WENDY PORTER, GREGORY S. GRUSZYNSKI, KARL LOSEKOOT, CRYSTAL LEACH, BONNIE HANSEN, TODD BEAL, CARRIE DU BOIS, RICHARD GINN, AMY KOO, SATHVIK NORI, and SHAWNEECE STEVENSON (collectively, "Defendants," "SUHSD," or the "District"), each in their official and personal capacities, and allege as follows:

## NATURE OF THE ACTION

1.      This lawsuit stems from the egregious failures of Sequoia Union High School District ("SUHSD") to address an alarming surge of antisemitism within its schools, creating a hostile learning environment for its Jewish students.  The District's trustees, administrators, and certain teachers have repeatedly demonstrated a deliberate indifference to the problem, denying Jewish students their right to participate fully in the educational process, free from discrimination and harassment, as guaranteed by the U.S. Constitution, the California Constitution, and state and federal law.

2.      SUHSD has a long history of tolerating casual antisemitism on its campuses.  Students and faculty have openly joked about Nazis and the Holocaust, while certain teachers have peddled antisemitic falsehoods about Middle East history without facing consequences.  District leadership has consistently turned a blind eye to such behavior.  SUHSD's antisemitism problem worsened significantly after October 7, 2023, when Hamas—a U.S.-designated terrorist organization—invaded southern Israel and then mutilated, raped, and murdered more than 1,200 people.  Although quick to address other global injustices, SUHSD remained conspicuously silent about this historic massacre of Jews, contradicting the District's professed commitment to equity.

3.      SUHSD's tepid response to the October 7 attacks exacerbated the already pervasive antisemitism within its schools.  Jewish students faced a barrage of taunts, slurs, and hateful remarks, culminating in the appearance of two giant swastikas on campus grounds.  Rather than addressing the

escalating incidents, SUHSD officials shifted blame onto the victims, refused to engage with concerned parents, and used superficial "investigations" to whitewash legitimate concerns. Jewish students were even advised by teachers to conceal their religious identity to avoid becoming targets. Tragically, SUHSD leadership's primary concern seemed to be protecting its reputation, rather than safeguarding the well-being of Jewish students and their families. District administrators discouraged public disclosure of antisemitic incidents at their schools, citing concerns about negative publicity.

4.     Emboldened by a lack of accountability, certain SUHSD teachers compounded the District's antisemitism crisis by infusing their lectures and course materials with antisemitic and ahistorical pro-Hamas narratives. Jewish students who dared to challenge these falsehoods were often targeted and harassed. To achieve academic success, Jewish students were forced to endorse skewed historical narratives that undermined Jewish sovereignty and concealed atrocities committed by Israel's adversaries. Even seemingly unrelated subjects, such as ethnic studies and geometry, were tainted with anti-Jewish propaganda, often echoing the dark rhetoric and imagery of Nazi Germany.

5.     When SUHSD parents and students raised concerns—through emails, petitions, and formal complaints—the District responded with bureaucratic obfuscation and outright denial, demonstrating a deliberate indifference to SUHSD's Jewish students. Emails were ignored, and meetings were canceled, without explanation. The District's administrators and trustees have consistently and deliberately refused to take concrete action to stem the scourge of antisemitism on their campuses, to the detriment of Jewish SUHSD students who, subjected to harassment and ridicule from both peers and teachers, have been forced to endure an increasingly hostile learning environment. Left with no other recourse, Plaintiffs have filed this action to protect their Constitutional and statutory rights.

## **JURISDICTION**

6.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under the laws of the United States, and pursuant to 28 U.S.C. § 1343, in that the claims concern deprivation of rights or privileges of United States citizens and secured by the Constitution and laws of the United States providing for equal rights of citizens or of all persons. This

COMPLAINT

Court has supplemental subject matter jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

## VENUE

7.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1), in that Sequoia Union High School District resides in this judicial District and all defendants reside in California, and pursuant to 28 U.S.C. § 1391(b)(2), in that a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## DIVISIONAL ASSIGNMENT

8.    Assignment to the San Francisco Division is proper under Civil L.R. 3-2(c) & (d) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within San Mateo County, and because Sequoia Union High School District is located there.

## THE PARTIES

9.    **Plaintiffs SAM KASLE** and **ANDREA KASLE** are the parents of L.K., who was at all relevant times a 10th-grade student at Woodside High School, one of four comprehensive high schools within the Sequoia Union High School District.  SAM KASLE, ANDREA KASLE, and L.K. reside in Redwood City, California.  For SAM KASLE and L.K., support for the right of Israel to exist as a Jewish State is both a religious imperative and an integral component of their ethnic cultural identity.

10.    **Plaintiffs IGOR BERSHTEYN** and **MARINA BERSHTEYN** are the parents of S.B., an 11th-grade student at Woodside High School.  IGOR and MARINA BERSHTEYN and S.B. reside in Redwood City, California.  For the BERSHTEYNS and S.B., support for the right of Israel to exist as a Jewish State is both a religious imperative and an integral component of their ethnic cultural identity.

11.    **Plaintiff MARGARETTE KESSELMAN** is the mother of W.K., a 10th-grade student at Menlo-Atherton High School.  Menlo-Atherton High School is one of four comprehensive high schools within the Sequoia Union High School District.  KESSELMAN and W.K. reside in Menlo Park, California.  For KESSELMAN and W.K., support for the right of Israel to exist as a

Jewish State is both a traditional and historical component of their ethnic cultural identity. KESSELMAN is also an Israeli citizen.

12.    **Plaintiffs SCOTT LYLE** and **LORI LYLE** are the parents of A.L., a 12th-grade student at Woodside High School.  SCOTT LYLE, LORI LYLE, and A.L. reside in Woodside, California.  For SCOTT LYLE and A.L., support for the right of Israel to exist as a Jewish State is both a religious imperative and an integral component of their ethnic cultural identity.

13.    **Plaintiffs DANIEL** and **JENNIFER REIF** are the parents of O.R., who was at all relevant times an 11th-grade student at Woodside High School.  DANIEL REIF, JENNIFER REIF, and O.R. reside in Redwood City, California.  For the REIFS and O.R., support for the right of Israel to exist as a Jewish State is both a religious imperative and an integral component of their ethnic cultural identity.

14.    **Plaintiff LISA JOY ROSNER** is the parent of D.B., a 12th-grade student at Woodside High School.  LISA JOY ROSNER and D.B. reside in Redwood City, California.  For ROSNER and D.B., support for the right of Israel to exist as a Jewish State is both a religious imperative and an integral component of their ethnic cultural identity.

15.    **Defendant KAREN VAN PUTTEN** is and was at all relevant times the Principal of Woodside High School.  VAN PUTTEN is sued in both her individual capacity and in her official capacity.  Upon information and belief, VAN PUTTEN is a resident of the San Francisco Bay Area.

16.    **Defendant CHARLES VELSCHOW** is and was at all relevant times Administrative Vice Principal of Woodside High School.  VELSCHOW is sued in both his individual capacity and in his official capacity.  Upon information and belief, VELSCHOW is a resident of the San Francisco Bay Area.

17.    **Defendant WENDY PORTER** is and was at all relevant times Administrative Vice Principal of Woodside High School.  PORTER is sued in both her individual capacity and in her official capacity.  Upon information and belief, PORTER is a resident of the San Francisco Bay Area.

18.    **Defendant GREGORY S. GRUSZYNSKI** is and was at all relevant times a teacher at Woodside High School.  GRUSZYNSKI was formerly president of the Sequoia District Teachers Association and is currently the Association's Bargaining Chair.  GRUSZYNSKI is sued in both his

individual capacity and in his official capacity.  Upon information and belief, GRUSZYNSKI is a resident of the San Francisco Bay Area.

19.    **Defendant KARL LOSEKOOT** is and was at all relevant times the Principal of Menlo-Atherton High School.  LOSEKOOT is sued in both his individual capacity and in his official capacity.  Upon information and belief, LOSEKOOT is a resident of the San Francisco Bay Area.

20.    **Defendant CRYSTAL LEACH** is and was at all relevant times Superintendent of SUHSD, having served in that position since March 2023.  LEACH is sued in both her individual capacity and in her official capacity.  Upon information and belief, LEACH is a resident of the San Francisco Bay Area.

21.    **Defendant BONNIE HANSEN** is and was at all relevant times Associate Superintendent of Educational Services of SUHSD, having served in that position since July 2014.  HANSEN is sued in both her individual capacity and in her official capacity.  Upon information and belief, HANSEN is a resident of the San Francisco Bay Area.

22.    **Defendant TODD BEAL** is and was at all relevant times Assistant Superintendent, Human Resources of SUHSD, having served in that position since January 2022.  BEAL is sued in both his individual capacity and in his official capacity.  Upon information and belief, BEAL is a resident of the San Francisco Bay Area.

23.    **Defendant CARRIE DU BOIS** is and was at all relevant times a member of the SUHSD Board of Trustees.  DU BOIS is sued in both her individual capacity and in her official capacity.  Upon information and belief, DU BOIS is a resident of the San Francisco Bay Area.

24.    **Defendant RICHARD GINN** is and was at all relevant times a member of the SUHSD Board of Trustees.  GINN is sued in both his individual capacity and in his official capacity.  Upon information and belief, GINN is a resident of the San Francisco Bay Area.

25.    **Defendant AMY KOO** is and was at all relevant times a member of the SUHSD Board of Trustees.  KOO is sued in both her individual capacity and in her official capacity.  Upon information and belief, KOO is a resident of the San Francisco Bay Area.

26.    **Defendant SATHVIK NORI** is and was at all relevant times a member of the SUHSD Board of Trustees.  NORI is sued in both his individual capacity and in his official capacity.  Upon information and belief, NORI is a resident of the San Francisco Bay Area.

27.    **Defendant SHAWNEECE STEVENSON** is and was at all relevant times a member of the SUHSD Board of Trustees.  STEVENSON is sued in both her individual capacity and in her official capacity.  Upon information and belief, STEVENSON is a resident of the San Francisco Bay Area.

## OTHER RELEVANT PARTIES

28.    **Sequoia Union High School District ("SUHSD")** is a public union school district headquartered in Redwood City, California.  SUHSD includes four comprehensive high school campuses, Woodside High School, Menlo-Atherton High School, Sequoia High School, and Carlmont High School.  SUHSD's website touts its "vision" to become a "national and international beacon of equity and educational excellence."[1]

29.    **Middle East Children's Alliance ("MECA")** is a Berkeley, California-based advocacy organization whose stated goal is to "educate North Americans about children in the [Middle East] region and the brutal impact of US foreign policy on their lives."  In truth, MECA is an anti-Israel advocacy group with known ties to terrorist organizations[2] that spreads antisemitic tropes alongside false and incendiary allegations against Israel.  MECA regularly publishes editorials accusing Israel of "genocide," "apartheid," and "ethnic cleansing."  Its press releases celebrate antisemitic "victories," such as a vote by UC Berkeley's student government against the adoption of International Holocaust Remembrance Alliance's working definition of antisemitism.  Through

---

[1]    *District Profile*, Sequoia Union High School District, https://www.seq.org/ABOUT-US/General-Information/index.html.

[2]    MECA partners with the Union of Palestinian Women's Committee, a group formally affiliated with Fatah and designated by the United States Agency for International Development ("USAID") as the women's wing of the Popular Front for the Liberation of Palestine ("PFLP"), a notorious, U.S.-designated terrorist organization with a long history of violence targeting civilians, including suicide bombings, shootings, and assassinations.  The PFLP was the first Palestinian organization to hijack airplanes in the 1960s and 1970s.  *See Middle East Children's Alliance*, NGO Monitor (Sept. 23, 2023), https://www.ngo-monitor.org/ngos/middle_east_children_s_alliance_meca_/; *Union of Health Work Committees' Ties to the PFLP Terror Group*, NGO Monitor (Jan. 27, 2020), https://www.ngo-monitor.org/reports/union-of-health-work-committees-ties-to-the-pflp-terror-group/.

COMPLAINT

teacher trainings it calls the "Teach Palestine Project," MECA seeks to infiltrate Bay Area K-12 classrooms, and those throughout California and the rest of the United States, to indoctrinate students with its antisemitic and nakedly propagandist "lessons."  As alleged herein, SUHSD teachers use and distribute MECA instructional materials, without attribution to MECA and without state or district approval, to teach SUHSD students about the Israel-Palestine conflict.

30.    **Samia Shoman** is MECA's co-coordinator and a leader of the Liberated Ethnic Studies Model Curriculum Consortium.  In "Teach Palestine Project" teacher training workshops, Shoman regularly excludes Israel from maps of the Middle East—instead inserting "Palestine," which, at all times relevant to these matters, was not a country recognized by either the United States or the United Nations—and depicts alleged Palestinian suffering under purported Israeli oppression, all while concealing facts about Palestinian terrorism.  In 2021, Shoman lobbied the Board of Education to exclude Jewish-American studies from the San Mateo Union High School District's ethnic-studies curriculum, urging Board members "not to give in to the pressures and influences of . . . privileged white voices."[3]

31.    **Liberated Ethnic Studies Model Curriculum Consortium ("LESMCC")** is the source of a great deal of virulently antisemitic instructional material that has been introduced to a growing number of school districts.  These materials are in turn used to indoctrinate California school children into antisemitic beliefs about Jews and the Jewish State.  This entity encourages teachers using their antisemitic materials to "fly under the radar" and emulate others who "shut their doors and teach . . . liberatory curriculum" so that the inaccurate and incendiary materials it disseminates will not be detected by parents, responsible administrators, or other members of the public.[4]

---

[3]    Hope Solo, *California District Administrator Calls For 'Privileged White Voices' to be Banned from Influencing Ethnic Studies Curriculum and Fights Against 'Multiple Perspectives' in Email*, Daily Mail (Jan. 22, 2023), https://www.dailymail.co.uk/news/article-11664901/California-school-administrator-urged-state-not-privileged-white-voices.html.

[4]    Complaint, Ex. A ("Preparing to Teach Palestine: A Toolkit"), *Concerned Jewish Parents & Teachers of L.A. v. Liberated Ethnic Stud. Model Curriculum Consortium*, No. 22-cv-3243 (C.D. Cal. May 12, 2022), ECF No. 1-1.

COMPLAINT

32.  **Chloe Gentile-Montgomery** was at all relevant times a teacher at Menlo-Atherton High School.  Upon information and belief, at this time, Gentile-Montgomery is no longer employed by SUHSD.

33.  **Abdulhadi "Hadi" Kaddoura** is and was at all relevant times a teacher at Woodside High School.

## BACKGROUND

### A.  The Recent Rising Tide of Antisemitism

34.  Antisemitism is one of the world's oldest and most enduring forms of hatred.  It has persisted through the millennia by mutating according to the majority's prevailing ideologies, whether secular or religious, and the majority's need to scapegoat minority populations for complex and intractable societal problems.[5]

35.  In recent months, such Jew hatred has only intensified, including in the United States. Ironically, this rise in antisemitism has coincided with the deadliest day for Jews since the Holocaust, when 6 million Jews were systematically slaughtered as part of Hitler's "final solution."  Eighty years later, on October 7, 2023, Hamas—a U.S.-designated terrorist organization bent on the annihilation of Israel and its 8 million Jewish inhabitants—invaded southern Israel and proceeded to mutilate, rape, and murder more than 1,200 innocent people, many of whom had gathered to attend an outdoor music festival.  As documented by the terrorists' own body cameras, Hamas slaughtered Israeli babies, raped Israeli women, and burned whole Israeli families alive.  Hamas terrorists also kidnapped several hundred people to be used as human bargaining chips in negotiations with Israel for the release of convicted terrorists held in Israeli prisons.  The charred and bloodied bodies of the hostages—many alive, some dead—were paraded through ecstatic Palestinian crowds who groped and spat on the captives.  Over a year after the Hamas massacre on October 7, dozens of men, women, and children remain in Hamas captivity.[6]

---

[5]  Pamela Parensky, *Michal Cotler-Wunsh: "Jew Hatred Never Died, It Just Mutated"* (Apr. 5, 2024), https://quillette.com/blog/2024/04/05/michal-cotler-wunsh-pamela-paresky/.

[6]  *See, e.g.*, *Only 50 Hostages Still Alive in Gaza, U.S. Officials Say*, Jerusalem Post (June 20, 2024), https://www.jpost.com/breaking-news/article-806995; *Israel Says It Recovered 6 Hostages' Bodies in Gaza*, NPR (Aug. 20, 2024), https://www.npr.org/2024/08/20/nx-s1-5082334/israel-hamas-war-hostages-recovered-gaza.

36.     Hamas moved immediately from violence to deception and obfuscation to try to turn public opinion in its favor.  From the first hours of its attack, Hamas and its allies—led by Iran, the world's leading state sponsor of terrorism and longtime Hamas financier—waged a sophisticated misinformation campaign, inspired and supported by groups like the Islamic State, which had effectively exploited the world's major social networking platforms.  Hamas's efforts were aided by Iran, Russia and, to a lesser degree, China, all of which used state and social media to support Hamas and undercut Israel, while denigrating Israel's principal ally, the United States.[7]  Social media accounts were flooded with a barrage of false images, memes, videos, and posts intended to conceal Hamas's savagery, undercut Israel's right to self-defense, and otherwise mislead the public about the Palestinian cause.

37.     Hamas's misinformation campaign gained traction throughout the West, including in the United States, where the terrorist organization found a surprisingly receptive—if gullible and naive—audience among self-styled "social justice" advocates.  Almost instantly after Hamas's attack, pro-Palestinian advocates downplayed the slaughter, or denied the atrocities had even happened.  Western political leaders—including former British Prime Minister Rishi Sunak—appropriately dubbed these uncritical audiences Tehran's "useful idiots."[8]

38.     The result has been a staggering surge in antisemitism in the United States and around the world.  In the two weeks after Hamas's attack, the number of antisemitic incidents in America quintupled compared with the same period in 2022.[9]  The Anti-Defamation League ("ADL") reported a 360% increase in antisemitic incidents in the United States after the attack, with 3,283 incidents recorded from October 7, 2023, to January 7, 2024, a dramatic rise compared to the same period in

---

[7]     Steven Lee Myers & Sheera Frenkel, *In a Worldwide War of Words, Russia, China and Iran Back Hamas*, N.Y. Times (Nov. 3, 2023), www.nytimes.com/2023/11/03/technology/israel-hamas-information-war.html.

[8]     Dawn News English, *British PM Rishi Sunak Labels Who Chants 'From the River to the Sea' As 'Idiots'*, YouTube (Jan. 26, 2024), https://www.youtube.com/watch?v=94HMqOq02xU.

[9]     *What Is Antisemitism—And Why Do Differences in Interpretation Matter*? The Economist (Dec. 1, 2023), https://www.economist.com/the-economist-explains/2023/12/01/what-is-antisemitism-and-why-do-differences-in-interpretation-matter.

the previous year.[10]   The perpetrators deliberately targeted Jewish institutions and individuals, justifying their attacks with age-old antisemitic tropes and falsehoods that parroted Hamas's propagandist talking points.

39.     The problem was made worse by social media:  On X, formerly Twitter, antisemitic posts soared by an astounding 919% the week after Hamas's attack, compared with a week earlier.[11] TikTok also exhibited alarming increases in antisemitism, becoming the leading platform for antisemitic content in October 2023, with nearly half of all recorded incidents occurring there.[12] Overall, antisemitic content across social-media platforms surged five-fold after October 7, with an average of 145 new antisemitic posts per day, compared to 27 posts per day in the preceding months.[13]

40.     Even a year later, antisemitic incidents in the United States remain pervasive and violent.  Such incidents have included hoax bomb threats to synagogues;[14] antisemitic, pro-Hamas vandalism of Jews' homes splattered with red paint and inverted red triangles, echoing Hamas's use of the same symbol to identify its Israeli targets;[15] a deadly attack on an elderly Jewish man counter-

[10]   Nicole Chavez, *ADL Records More Than 3,200 Antisemitic Incidents Since Start of Israel-Hamas War*, CNN (Jan. 11, 2024), https://www.cnn.com/2024/01/10/us/adl-antisemitism-reports-soar-reaj/index.html.

[11]   *Id.*

[12]   *Online Antisemitism Has Increased and Become More Violent Since October 7 – Report*, Jerusalem Post (Feb. 29, 2024), https://www.jpost.com/diaspora/antisemitism/article-789504.

[13]   *Id.*

[14]   Marty Roney, *Six Jewish Sites Across Alabama Receive Bomb Threats Saturday*, USA Today (Dec. 16, 2023), https://www.usatoday.com/story/news/local/2023/12/16/six-jewish-sites-across-alabama-receive-bomb-threats-saturday/71946573007/; *US Jews Suffer Nearly 200 Swatting, False Bomb Threats Throughout Weekend*, Jerusalem Post (Dec. 17, 2023), https://www.jpost.com/diaspora/antisemitism/article-778427.

[15]   Artemis Moshtaghian & Zenebou Sylla, *NY Governor Calls Vandalism at the Homes of Jewish Board Members of the Brooklyn Museum 'An Abhorrent Act of Antisemitism,'* CNN (June 13, 2024), https://www.cnn.com/2024/06/12/us/nova-music-festival-exhibition-protest-in-new-york-called-heartbreaking/index.html.

COMPLAINT

protesting a pro-Palestinian demonstration in California;[16] and random assaults on Orthodox Jewish children playing on a sidewalk.[17]

### B.   Antisemitism at Educational Institutions

41.     Hamas's propaganda campaign found particularly fertile soil at U.S. universities and schools, turning campuses into hotbeds of antisemitism.  In the months following the October 7 attack, Hillel International, a Jewish nonprofit organization, tallied 38 antisemitic physical assaults at colleges, and 227 cases of vandalism.[18]  Those numbers have continued to increase.  The result has been a surge of congressional inquiries, over 65 Title VI complaints, and other civil rights litigation leveling charges of antisemitism.[19]

42.     A recent preliminary injunction issued by the United States District Court for the Central District of California underscored the alarming prevalence of antisemitic harassment at educational institutions, in particular at UCLA.  In that ruling, U.S. District Judge Mark C. Scarsi condemned UCLA for permitting the exclusion of Jewish students from campus activities for refusing to renounce their faith: "In the year 2024, in the United States of America, in the State of California, in the City of Los Angeles, Jewish students were excluded from portions of the UCLA campus

---

[16]   Marilyn Heck & Meredith Deliso, *Demonstrator to Stand Trial in the Death of Jewish Man at November Israel-Hamas War-Related Protest*, ABC News (May 16, 2024), https://abcnews.go.com/US/demonstrator-stand-trial-death-jewish-man-november-israel/story?id=110286757.

[17]   Michael Starr, *Jewish Children Savagely Beaten by Man in New York City Attack*, Jerusalem Post (May 16, 2024), https://www.jpost.com/international/article-801437#google_vignette.

[18]   *American Universities Face a Reckoning Over Antisemitism*, Economist (Dec. 12, 2023), https://www.economist.com/united-states/2023/12/12/american-universities-face-a-reckoning-over-antisemitism.

[19]   *See, e.g.*, Arno Rosenfeld, *Higher Education Investigations and Lawsuits Related to Antisemitism*, https://principled-haddock-800.notion.site/6db78055195b44c8b8e91ca8783534fc?v=3f1fb93547874803a9934b2e0da8da11 (last updated Mar. 28, 2024); Press Release, N.Y.U, *Joint Statement on Settlement of Suit* (July 9, 2024), https://www.nyu.edu/about/news-publications/news/2024/july/a-joint-statement-on-lawsuit.html; Kathryn Watson, *House Panel Opening Investigation into Harvard, MIT and UPenn After Antisemitism Hearing*, CBS News (Dec. 7, 2023), https://www.cbsnews.com/news/house-panel-antisemitism-investigation-harvard-mit-upenn/; Complaint, *Frankel v. Regents of the Univ. of Cal.*, No. 24-cv-4702 (C.D. Cal. June 5, 2024), ECF No. 1; First Amended Complaint, *Students Against Antisemitism, Inc. v. Trs. of Columbia Univ. in the City of N.Y.*, No. 24-cv-1306 (S.D.N.Y. June 17, 2024), ECF No. 39; *Jews at Haverford v. Corp. of Haverford Coll.*, No. 24-cv-2044 (GAM) (E.D. Pa. May 13, 2024); *Fiss v. Cal. Coll. of the Arts*, No. 24-cv-3415 (HSG) (N.D. Cal. June 6, 2024).

because they refused to denounce their faith.  This fact is so unimaginable and so abhorrent to our constitutional guarantee of religious freedom that it bears repeating, *Jewish students were excluded from portions of the UCLA campus because they refused to denounce their faith.*"  *Frankel v. Regents of the Univ. of Cal.,* No. 24-cv-04702, 2024 WL 3811250, at *1 (C.D. Cal. Aug. 13, 2024).  The court concluded that, "under constitutional principles, UCLA may not allow services to some students when UCLA knows that other students are excluded on religious grounds, regardless of who engineered the exclusion." *Id.*

43.    A recent decision by the United States District Court for the District of Massachusetts in *Kestenbaum v. President & Fellows of Harvard College* drew further attention to the troubling rise of antisemitism on American university campuses.  No. CV 24-10092-RGS, 2024 WL 3658793 (D. Mass. Aug. 6, 2024).  The lawsuit accuses Harvard of inadequately addressing a wave of antisemitic incidents after October 7.  The court denied Harvard's attempt to dismiss the case, finding that the complaint had documented several instances of "Harvard's failure to address what [Harvard administrators] repeatedly publicly recognized as an eruption of antisemitism on the Harvard campus. Indeed, in many instances, Harvard did not respond at all. . . .  In other words, the facts as pled show that Harvard failed its Jewish students." *Id.* at *6.  The complaint echoed concerns raised by Harvard's own leadership, who previously criticized the university for failing to issue a swift and unequivocal condemnation of the October 7 massacre.[20]   As alleged herein, SUHSD's administrators have perpetrated the same horrifying double standard, in violation of SUHSD students' civil rights.  *See infra* ¶¶ 55–58.

44.    In July 2024, New York University settled a lawsuit alleging a pervasive climate of antisemitism on campus in violation of Title VI of the Civil Rights Act of 1964.  In settling, NYU committed to implementing "groundbreaking measures to address antisemitism, including in the wake of the October 7, 2023 terrorist attacks . . . to safeguard its community's Jewish and Israeli

---

[20]   Statement from the Harvard Corporation: Our President, Harv. Univ. (Dec. 12, 2023), https://www.harvard.edu/2023/12/12/statement-from-the-harvard-corporation-our-president/.

COMPLAINT

students . . . ."[21]  Similar lawsuits remain pending against other schools, which have been publicly

encouraged to "promptly follow [NYU's] lead."[22]

45.    The tacit, if not overt, complicity of educators and administrators has undoubtedly

fueled antisemitism's surge on college campuses and in other educational institutions, such as SUHSD.

Leftist academics have forced the Israeli-Palestinian conflict into a simplistic Marxist "oppressor-

oppressed" framework, which casts Israel as an "imperialist-colonialist" force, Israelis as "settler-

colonialists," and Palestinians as victims who may justifiably murder their "oppressors."  This

ideology—a "toxic, historically nonsensical mix of Marxist theory, Soviet propaganda, and traditional

antisemitism from the Middle Ages and the 19th century"[23]— has gained widespread currency among

a growing battalion of Hamas apologists in academia.

46.    Especially in the United States, the ideology has been influenced by identity analysis,

a framework that views history through the lens of race in the American experience.[24]  The ideology

holds that Jews and Israelis are merely "privileged whites" incapable of being victims.  It falsely

portrays Jews as oppressors, engaged in "exploitive capitalism" in the West and or "colonialism" in

the Middle East.  This noxious ideology rests on an "ahistorical delusion"[25] that ignores the Jewish

people's indigenous roots in Israel as well as their historical persecution, including medieval

massacres by Christian and Islamic societies, the Russian pogroms, and the Holocaust.  As alleged

herein, despite its ahistorical foundations, certain SUHSD instructors—some of whom are open

Hamas apologists—actively teach this antisemitic ideology to SUHSD students under the guise of

history, ethnic studies, and even geometry.  *See infra* ¶¶ 72(b), 73–83, 102–10.  The result is not only

a reprehensible failure of pedagogy but a hostile learning environment for Jewish students.  By

---

[21]    *Id.*

[22]    *Kasowitz and NYU Announce Agreement on Settlement of Case*, Kasowitz Benson Torres (July 9, 2024), https://www.kasowitz.com/media/client-news/kasowitz-and-nyu-announce-agreement-on-settlement-of-case/; Jonathan Stempel, *Harvard University Must Face Lawsuit Over Antisemitism On Campus, Judge Rules*, Reuters (Aug. 7, 2024), https://www.reuters.com/legal/harvard-must-face-lawsuit-over-antisemitism-campus-us-judge-says-2024-08-06/.

[23]    Simon Sebag Montefiore, *The Decolonization Narrative Is Dangerous and False*, Atlantic (Oct. 27, 2023), https://www.theatlantic.com/ideas/archive/2023/10/decolonization-narrative-dangerous-and-false/675799/.

[24]    *Id.*

[25]    *Id.*

1  promoting a distorted view of history, SUHSD is perpetuating a dangerous ideology with grave
2  consequences for both Jewish students and the broader community.

3        C.   **Antisemitism Defined**

4        47.    In 2016, the International Holocaust Remembrance Alliance ("IHRA") promulgated a
5  widely accepted definition of antisemitism, often regarded as the global "gold standard" in the field.[26]
6  The IHRA Definition states that "[a]ntisemitism is a certain perception of Jews, which may be
7  expressed as hatred toward Jews.  Rhetorical and physical manifestations of antisemitism are directed
8  toward Jewish or non-Jewish individuals and/or their property, toward Jewish community institutions
9  and religious facilities."

10        48.    The IHRA Definition goes further by offering "contemporary examples of
11  antisemitism in public life, the media, schools, the workplace," which include "the targeting of the
12  state of Israel, conceived as a Jewish collectivity," and "[d]enying the Jewish people their right to
13  self-determination, e.g., by claiming that the existence of a State of Israel is a racist endeavor."[27]  The
14  IHRA Definition explains that "criticism of Israel similar to that leveled against any other country
15  cannot be regarded as antisemitic," but "[a]pplying double standards by requiring of it a behavior not
16  expected or demanded of any other democratic nation" is.[28]  The IHRA Definition acknowledges that
17  anti-Zionism—the belief that Israel should not exist as a Jewish state and that Jews lack self-
18  determination rights in their ancestral homeland—is often a manifestation of antisemitism.

19        49.    In line with the IHRA Definition, anti-Zionism has been recognized as the "newest
20  strain of Jew hatred."[29]  Anti-Zionism rejects Israel's legitimacy as a nation and denies the Jewish
21  people's right to self-determination.  This rejection is inherently antisemitic, often employing anti-
22  Jewish tropes, marginalizing Jews and those connected to Israel, exploiting Jewish trauma through
23  false comparisons to Nazis, and seeking to undermine Jews' right to nationhood and self-

---

24  [26] *What Is Antisemitism—And Why Do Differences in Interpretation Matter*? The Economist
25  (Dec.   1,   2023),   https://www.economist.com/the-economist-explains/2023/12/01/what-is-
26  antisemitism-and-why-do-differences-in-interpretation-matter (noting that the IHRA Definition "has
become the international gold standard.").

27  [27] Working definition of antisemitism, International Holocaust Remembrance Alliance,
https://holocaustremembrance.com/resources/working-definition-antisemitism.

28  [28] *Id.*

[29] Parensky, *supra* note 5.

COMPLAINT

determination.  As the Columbia University Task Force on Antisemitism recently explained: "[T]o advocate for the active dissolution of the world's only Jewish state is quite different from even the bitterest critique of its policies.  Given the absence of such a position in relation to virtually any other political state in the world, anti-Zionism . . . hews far more closely to antisemitism than to a simple critique of Israel."[30]

50.    The IHRA's definition of antisemitism has been adopted by over 1,100 institutions and governments around the world, including the United States.[31]  The Bush administration adopted the IHRA Definition as a guide for the United States Commission on Civil Rights in 2006,[32] and for the United States State Department in 2007.[33]  Similarly, the Obama administration used the IHRA Definition to develop the State Department's official working definition published in 2010,[34] and the State Department later adopted the current version of the IHRA Definition when it was updated in 2016.[35]  The Trump administration continued the use of the IHRA Definition by the State Department[36] and issued Executive Order 13899, which mandated that the relevant federal agencies consider the IHRA Definition when enforcing Title VI.[37]  The Biden administration has followed suit, reaffirming the use of the IHRA Definition.[38]  The IHRA framework's utility in enforcing Title VI was recently highlighted in an October 2023 Department of Education action, in which a teaching

---

[30]  Columbia University Task Force on Antisemitism, Report #2, at 14-15 (2024), https://president.columbia.edu/sites/default/files/content/Announcements/Report-2-Task-Force-on-Antisemitism.pdf.

[31]  The White House, Exec. Order No. 13899, Combatting Antisemitism (Dec. 11, 2019), https://www.govinfo.gov/content/pkg/DCPD-201900859/pdf/DCPD-201900859.pdf.

[32]  *See* U.S. Comm'n on C.R., Findings and Recommendations of the United States Commission on Civil Rights Regarding Campus Anti-Semitism (2006), https://www.usccr.gov/files/pubs/docs/050306FRUSCCRRCAS.pdf.

[33]  *See* U.S. Dep't of State, Bureau of Democracy, H.R. & Lab., "Working Definition" of Anti-Semitism (2007), https://2001-2009.state.gov/g/drl/rls/56589.htm.

[34]  U.S. Dep't of State, Defining Antisemitism, https://www.state.gov/defining-antisemitism/.

[35]  U.S. Dep't of State, Off. Special Envoy to Monitor & Combat Antisemitism, Defining Anti-Semitism, https://www.state.gov/defining-antiSemitism/ (last visited Aug. 20, 2024).

[36]  *See id.*

[37]  The White House, Exec. Order No. 13899, *supra* note 31.

[38]  Am. Jewish Comm., *AJC Praises Biden Administration for Support for IHRA Working Definition of Anti-Semitism* (Feb. 2, 2021), https://www.ajc.org/news/ajc-praises-biden-administration-support-for-ihra-working-definition-of-anti-Semitism.

COMPLAINT

assistant's taunts toward Zionist students at the University of Vermont were deemed discriminatory acts.[39]

51.    The IHRA Definition has also been adopted by 37 states across the political spectrum, such as the Dakotas and Texas on the one hand to New York and Massachusetts on the other.[40] Multiple U.S. government departments and agencies, including the Office of Civil Rights in the Department of Education, have cited the IHRA Definition with approval.[41]  It is also used by special envoys combatting antisemitism worldwide.[42]

52.    Under the IHRA's definition of antisemitism, and as clarified by the examples set forth therein, all of the conduct at issue in this Complaint is antisemitic, including, but not limited to:

(a)    Presenting the war between Hamas and Israel as one-sided Israeli aggression without acknowledging Hamas's attacks on Israel or Hamas's internationally recognized status as a terrorist organization;

(b)    Singling out a Jewish student for her support of the existence of the State of Israel as a Jewish state, and urging her classmates to conclude that she is wrong in her beliefs;

(c)    Attacking Israel's conduct and its policies on the enforcement of its borders by invoking standards to which no other country in the world—including Israel's neighboring states—is held;

---

[39]    Letter from U.S. Dep't of Education to Univ. of Vermont re Compl. No. 01-22-2002, April 3, 2023, https://ocrcas.ed.gov/sites/default/files/ocr-letters-and-agreements/01222002-a.pdf.

[40]    *See* CAM Information Hub Database of IHRA Antisemitism Definition Adoptions by US States, Combat Antisemitism Movement (June 23, 2023), https://combatantisemitism.org/government-and-policy/cam-information-hub-database-of-ihra-antisemitism-definition-adoptions-by-us-states-2/.

[41]    *See, e.g.*, U.S. Dep't of State, Office of the Special Envoy To Monitor and Combat Antisemitism, https://www.state.gov/bureaus-offices/under-secretary-for-civilian-security-democracy-and-human-rights/office-of-the-special-envoy-to-monitor-and-combat-antisemitism/; U.S. Dep't of Educ., Questions and Answers on Executive Order 13899 (Combating Anti-Semitism) and OCR's Enforcement of Title VI of the Civil Rights Act of 1964 (Jan. 19, 2021), https://www2.ed.gov/about/offices/list/ocr/docs/qa-titleix-anti-semitism-20210119.pdf; The White House, The U.S. National Strategy To Counter Antisemitism at 13 (May 2023), https://www.whitehouse.gov/wp-content/uploads/2023/05/U.S.-National-Strategy-to-Counter-Antisemitism.pdf.

[42]    *See* Global Guidelines for Countering Antisemitism, U.S. Dep't of State, July 17, 2024, https://www.state.gov/global-guidelines-for-countering-antisemitism/.

(d)     Requiring Jewish students to disregard their sincerely held religious beliefs and adopt a teacher's ahistorical, biased views on Jews and Israel in order to obtain a good grade in that teacher's class;

(e)     Promoting and repeating tropes of Jews as "puppet masters";

(f)     Excusing the display of Nazi symbols—and explaining them away as Buddhist Manji depictions from anime;

(g)     Making remarks about Jewish physiognomy and jokes about the Holocaust and dead Jews;

(h)     Denying the indigeneity of the Jewish people to, and other facts of Jewish history and Jews' ancestral relationship with, the land of Israel; and

(i)     Refusing to meet with Jewish parents to discuss the content of instructional materials that bear on, and attack, the Jewish religious, ethnic, and ancestral commitment to the land of Israel, when other minority groups with similar concerns would be treated differently.

53.     As alleged herein, SUHSD trustees, administrators, and certain faculty have permitted antisemitism to take root and metastasize within SUHSD's schools, through both deliberate indifference and outright animosity toward Jewish students.  This has created a hostile educational environment for Jewish students at SUHSD schools, causing them to fear for their safety and depriving them of their right to participate fully in the educational process, free from discrimination and harassment, as guaranteed by the U.S. Constitution, the California Constitution, and state and federal laws.

# FACTUAL ALLEGATIONS

**A.**    **SUHSD Tolerates and Implicitly Condones Antisemitism in Its Schools**

54.    Even before the brutal Hamas attacks of October 7, 2023, Defendants knowingly allowed antisemitic sentiment to fester within SUHSD schools, demonstrating a widespread, de facto custom and practice of deliberate indifference to anti-Jewish harassment.  For example:

(a)    In or around 2022, the president of Menlo-Atherton's Jewish Student Union ("JSU") was called a "kike" by an older student who observed her wearing a necklace bearing the Star of David, the symbol of Judaism.[43]  No known action was taken by Defendants.

(b)    In early December 2022, Menlo-Atherton administrators found swastikas scrawled on bathroom walls.  In response, administrators encouraged Jewish "students to make appointments with social-emotional counselors."[44]  Defendants failed to investigate the incident appropriately, and no student is known to have been disciplined.

(c)    In or around September 2023, in the Woodside High School library, a group of students were engaged in a discussion of Anne Frank's memoir, *The Diary of a Young Girl*.  During the conversation, a student made a shockingly antisemitic remark, declaring within earshot of their Jewish classmates that all Jewish people should return to living in ghettos.  The statement was heard by S.B.  Despite the vile nature of the statement, no Woodside High School faculty or administrators intervened.

(d)    In or around the Fall of 2023, in the Woodside High School library, a student exclaimed, also within earshot of Jewish students, "Oh my God, I thought this was a swastika symbol, I got so excited!"  No SUHSD faculty or administrators intervened.

(e)    In or around the Fall of 2023, a Woodside High School student created a "meme" using a picture of another student along with the caption, "He thinks the Holocaust is funny!"  The picture was posted on Snapchat, a multimedia messaging application.  S.B. and others saw the picture.  Once again, no SUHSD faculty or administrators intervened.

---

[43]  Natalie Fishman & Sonia Freedman, *More Than Graffiti: Trolling and The Rise of Antisemitism*, M-A Chronicle (May 22, 2023), https://machronicle.com/more-than-graffiti-trolling-and-the-rise-of-antisemitism/#:~:text=After%20M%DA%20administrators%20found%%2020swastikas,appointments%20with%20social%2Demotional%20counselors.

[44]  *Id.*

(f)      In or around September 2023, at Menlo-Atherton High School, Zoe Wilson, a substitute biology teacher, asked W.K. about his family background.  W.K. mentioned that his family is Jewish and that his grandfather sought refuge in Bashkortostan during World War II.  Wilson proceeded to share jokes about the Holocaust with a group of students: "How do you fit 10,000 Jews in a Volkswagen?" she asked.  "In the ashtray."  Wilson continued: "What's the difference between a pizza and a Jew?  The pizza doesn't scream when you put it in the oven."  KESSELMAN and another Jewish student's mother reported Wilson's inappropriate and insensitive "jokes" to school administrators.  In response, LOSEKOOT told W.K. that LOSEKOOT could either instruct Wilson to apologize or transfer W.K. to another substitute, suggesting that W.K. was the only student offended or harmed by Wilson's remarks.  W.K. chose to receive an apology but was disappointed when Wilson's eventual apology was insincere and did not address the offensive and insensitive nature of her comments.  Despite this, Wilson continues to work as a long-term substitute teacher at Menlo-Atherton High School.

**B.      SUHSD Administrators Fail to Condemn Hamas's October 7 Massacre**

55.      In the deadliest day for Jews since the Holocaust, on October 7, 2023, Hamas invaded southern Israel and mutilated, raped, and murdered more than 1,200 innocent people, many of whom had gathered to attend an outdoor music festival.  Hundreds of civilians—including U.S. citizens—were taken hostage, their bruised and bloodied bodies paraded through rapturous Palestinian crowds.  Many hostages have since died—many brutally murdered—in captivity.[45]

56.      Despite their vocal advocacy on various political and social justice matters, SUHSD administrators, including Superintendent LEACH, remained conspicuously silent in the face of this massacre.  Their silence contrasted sharply with their swift condemnation of the deaths of people of color following George Floyd's demise.  In a mass email, District administrators described those

---

[45]   Most recently, six of the young Jewish people taken hostage—one of whom spent his early childhood in the San Francisco Bay Area—were murdered in captivity.  *See, e.g.*, Press Release, Governor Gavin Newsom, Governor Newsom Statement on Californian Hersh Goldberg-Polin (Sept. 1, 2024),  https://www.gov.ca.gov/2024/09/01/governor-newsom-statement-on-californian-hersh-goldberg-polin/; Alex Stambaugh, Nectar Gan & Jeremy Diamond, *Israel's Military Says Six Hostages 'Brutally Murdered' in Gaza, Including Israeli-American Goldberg-Polin*, CNN (Sept. 1, 2024),  https://www.cnn.com/2024/08/31/middleeast/israeli-american-hostage-hersh-goldberg-polin-death-intl-hnk/index.html.

COMPLAINT

events as "tragic" and expressed empathy for students, stating: "[I]t hurts us as parents because the thought of sending a young adult out into the world, not knowing if they will come back safe or alive, creates fear for our BIPOC community." Defendant LEACH issued similar, districtwide condemnations of violent acts targeting *other* minority communities, such as the January 2023 Monterey Park shooting, which devastated one of the nation's largest Asian American, Native Hawaiian, and Pacific Islander neighborhoods.[46]

57.     Such condemnations were noticeably absent, however, when the victims of tragic events happened to be Jewish or Israeli. SUHSD's response to the October 7 massacre was instead equivocal: On October 10, 2023, LEACH issued a tepid email offering "support and solidarity" to Jewish and Palestinian communities, along with mental health resources. While paying lip service to "shared values" of "respect" and "compassion," LEACH conspicuously avoided condemning the abduction, murder, and mutilation of thousands of innocent Jewish civilians. LEACH's inability to denounce such savagery undermined SUHSD's self-proclaimed "vision" to become a "beacon of equity," as well as LEACH's own hollow promises to create a school environment "where every student and family feels valued and respected."

58.     Jewish SUHSD students and their parents were understandably distressed and disappointed by LEACH's equivocal message. Several parents implored LEACH to issue a clear condemnation of Hamas's horrific actions and to reassure the community of SUHSD leaders' unwavering moral compass. These pleas were ignored, and no such firm message was ever sent.

**C.**     **After the October 7 Massacre, Antisemitism Surges at SUHSD Schools: Swastikas Are Discovered at Woodside High School, and Jewish Students Are Targeted with Antisemitic Slurs at Menlo-Atherton High School**

59.     Perhaps unsurprisingly given LEACH's failure to condemn the October 7 massacre, antisemitism—already a prevalent problem at SUHSD schools—intensified in the weeks following Hamas's terror attacks.

---

[46]  The White House, *Statement from President Joe Biden Marking One Year Since Shootings in Monterey Park and Half Moon Bay* (Jan 21. 2024), https://www.whitehouse.gov/briefing-room/statements-releases/2024/01/21/statement-from-president-joe-biden-marking-one-year-since-shootings-in-monterey-park-and-half-moon-bay/.

COMPLAINT

60.     On or about October 26, 2023, in the hallways of Woodside High School, a group of Woodside students yelled, "Go back to where you came from!" at S.B., a Jewish student.  Vice Principal PORTER, who witnessed the incident, did nothing.  Understandably alarmed, S.B. reported the incident to Principal VAN PUTTEN's office, but no disciplinary or remedial action was taken. Following the incident, Plaintiff MARINA BERSHTEYN advised her daughter, S.B., to stop wearing her Star of David necklace to school.  S.B. did so, fearing for her safety and recognizing SUHSD leadership's failure to protect her.

61.     Then, on November 1, 2023, two swastikas were discovered etched on the pavement at Woodside High School, as depicted below:



62.     The next day, Plaintiff LISA JOY ROSNER's daughter, D.B., found the swastikas and reported the incident in an email to Woodside High School administrators.  D.B. explained that "to all the Jewish students and staff on campus[,] this is horrifying and makes us feel unsafe."

63.     On November 3, 2023, Principal VAN PUTTEN emailed the Woodside community claiming that a purportedly "extensive investigation" by school administrators and the San Mateo Sheriff's Department had "confirm[ed]" that the swastikas were not, in fact, Nazi symbols but "spiritual symbol[s] from Japanese Buddhism known as Manji popularized by anime."  (Ex. 1.)

64.     In truth, the District's purportedly "extensive" investigation was a sham, concluded in under two days, and the "confirm[ation]" was merely a rubber-stamping of the perpetrator's own self-serving story, which SUHSD administrators quickly accepted, lest they be forced to confront the

growing tide of antisemitism within their schools.  Even worse, VAN PUTTEN lied.  Contrary to VAN PUTTEN's assertion that the San Mateo County Sheriff's Department participated in the "investigation," the Department has no record of receiving any reports about swastika incidents on or around November 1, 2023.  SUHSD administrators failed to take meaningful action to protect Jewish students in the wake of this overt hostility toward Jews.

65.    The discovery of swastikas, coupled with VAN PUTTEN's lie and her apparent credulity in accepting the perpetrator's flimsy and self-serving justifications, ignited alarm among Jewish SUHSD students and their families, especially given the close temporal proximity between the appearance of the swastikas and the October 7 Hamas massacre, an event that continues to reverberate.

66.    In early November 2023, A.L., then an 11th-grade student at Woodside, approached VAN PUTTEN about the incident and the school's lack of action.  VAN PUTTEN dismissed A.L.'s concerns, falsely claiming that the student-perpetrator was a recent immigrant to the United States unfamiliar with the swastika's meaning.  This lie contradicted both the student's five-year residency in the United States and VAN PUTTEN's prior statement that the symbol was intended to represent a Manji.

67.    Rather than acknowledging A.L.'s concerns or fulfilling her duties as an educator and administrator, VAN PUTTEN shifted the onus onto A.L. to educate his peers.  VAN PUTTEN insisted that A.L. address the entire school, explaining the effect of the swastika incident on him and other Jews.  Given VAN PUTTEN's conduct, A.L. understandably declined, pointing out that he was not about to put "a target" on his back by publicly announcing that he is a Jew.  When asked about antisemitic incidents at other SUHSD campuses, including Menlo-Atherton High School, VAN PUTTEN dismissively stated that she was unconcerned with events outside of Woodside High School.

68.    Parents' inquiries into VAN PUTTEN's purportedly "extensive" investigation were met with evasion.  Despite growing concerns about the increasingly commonplace antisemitic incidents at Woodside High School, VAN PUTTEN consistently failed to provide details or take meaningful action.  Jewish students and their parents found their pleas for assistance met with a familiar pattern of abdicating responsibility.

COMPLAINT

69.     For example, on November 3, 2023, Plaintiff ROSNER emailed Woodside administrators and specifically asked how the school would, among other things: ensure Jewish students' safety; educate students "that there is zero tolerance for hate crimes and hate speech"; address D.B.'s and other Jewish students' traumatic experience and help them heal from it; and punish the student responsible for the swastikas.

70.     In a clear and manifest dereliction of their duties, VAN PUTTEN and VELSCHOW again shifted responsibility onto D.B., a student, to "educate" the student who drew the swastikas about the symbol's malignant history.  Plaintiff ROSNER pointed out that it was not D.B.'s role, nor that of any student, to provide such instruction, but that of the administrators.  Despite ROSNER's expressed concerns for her daughter's safety and that of other Jewish students, neither VAN PUTTEN nor VELSCHOW addressed the substance of her complaints.

71.     During a meeting on or about February 15, 2024, SCOTT and LORI LYLE expressed their concerns to VAN PUTTEN and PORTER about the school's handling of the swastika incident. In response, PORTER admitted the truth and contradicted the District's public position by acknowledging that the student responsible for drawing the swastikas was likely aware of the symbol's actual meaning: a symbol of Jew hatred.

72.     Antisemitism also surged at the Menlo-Atherton High School in the wake of the October 7 attacks, prompting similarly weak and ineffectual responses from SUHSD administrators. For example:

        (a)     On or about October 16, 2023, at Menlo-Atherton High School, a group of Menlo-Atherton students accosted W.K., hurling antisemitic epithets and threats at him while he was on his way to English class.  The students called W.K. a "kike" and told W.K. they that they hope he and his family "burn in hell," that "all Jews should die," and that "all Israel supporters should get killed."  W.K. followed the school's procedures and filed an incident report.  In response, school administrators blamed W.K. for his own harassment and suggested he relocate to a different class to avoid "provoking" the main antisemitic perpetrator.  Later, Menlo-Atherton High School's principal, LOSEKOOT, cautioned an advisor of Club Z, a national Jewish youth organization to which W.K.

belongs, against publicizing W.K.'s incident report on social media, citing potential reputational damage to the school.

(b)    In or around Fall 2023, a Menlo-Atherton mathematics teacher distributed materials that gratuitously invoked anti-Israel headlines under the pretext of teaching a geometry exercise.  (Ex. 2.)  These materials included text from Naguib Mahfouz's Nobel Prize in Literature acceptance speech, which states: "In the West Bank and Gaza there are people who are lost in spite of the fact that they are living on their own land . . . .  Save the Palestinians from the bullets and torture!  Nay, save the Israelis from profaning their great spiritual heritage."  (*Id.*)  Despite contributing to the hostile environment for Jewish students, the teacher faced no repercussions for her actions.

(c)    In or around April 2024, at the Menlo-Atherton High School running track, a Menlo-Atherton student further harassed and taunted W.K. by repeating, "Free Palestine.  Go Hamas."

(d)    In or around May 2024, in the Menlo-Atherton High School weight room, a Menlo-Atherton student saw W.K. enter the room and exclaimed, "Oh my God, there's a Jew!  Don't let him in here!"  W.K. again submitted an incident report, and Menlo-Atherton teachers and administrators again did nothing.

**D.    GRUSZYNSKI Uses a "World History" Class to "Teach" Antisemitic Tropes and Hamas Propaganda**

73.    Against this backdrop, Defendant GRUSZYNSKI, a teacher at Woodside High School, exploited his position of trust to spread antisemitic and ahistorical pro-Hamas propaganda under the guise of teaching 10th-grade World History.  GRUSZYNSKI singled out and harassed L.K., the only openly Jewish student in his class, mocked her beliefs, undermined her attempts to provide factual information to classmates, and coerced her into endorsing his biased and ahistorical views to achieve satisfactory grades on exams.  Despite repeated complaints about GRUSZYNSKI's conduct, SUHSD administrators took no action.

74.    GRUSZYNSKI made his agenda clear from the outset.  Displayed prominently on GRUSZYNSKI's classroom wall was a "Free Palestine" bumper sticker that GRUSZYNSKI had received from the Middle East Children's Alliance, an openly antisemitic and anti-Israel advocacy

group with known ties to a terrorist organization that seeks to influence K-12 school curricula through its "Teach Palestine Project." *See supra* ¶ 29. Early in the 2023-2024 school year, GRUSZYNSKI was seen wearing a "Bike for Palestine" T-shirt at a school assembly.

75.    During the 2023-2024 school year, L.K., then 15 years old, was enrolled in GRUSZYNSKI's 10th-grade World History class, a mandatory course.

76.    Following Hamas's October 7 massacre, GRUSZYNSKI, Woodside's lead World History teacher, seized the opportunity to present antisemitic tropes and anti-Israel myths, creating a hostile educational environment for Jewish students at Woodside High School.    Immediately following Hamas's terrorist attack, GRUSZYNSKI introduced the topic of the Hamas-Israel conflict to his class by stating, "I want to talk about something happening now that is bad."  In an Orwellian inversion, GRUSZYNSKI then wrote on the chalkboard, "Israel's Attack on Gaza," and proceeded to criticize the Israeli Defense Force's defensive actions.  GRUSZYNSKI's unmistakable message to impressionable students was that the "bad" event was not Hamas's murder and kidnapping of innocent Israelis but the Israeli military's response in self-defense, which he falsely misrepresented as the initial act of aggression.  Denying Israel's right to self-defense, which effectively denies both Israel's statehood and the right of Israeli citizens to live free from terrorist murder and missile attacks, is inherently antisemitic.  *See supra* ¶¶ 48–49.

77.    GRUSZYNSKI then went on to falsely misrepresent Israel's response in self-defense as wanton military violence, while saying nothing about the 1,200 men, women, and children whom Hamas had just burned, raped, mutilated, and killed, or the hundreds of others who Hamas took hostage and then paraded, beaten and bloodied, before gleeful Palestinian onlookers.  Nor did GRUSZYNSKI mention that Hamas had launched its attack in violation of a cease-fire agreement, or that in clear violation of international law, Hamas seeks to hide and operate its military infrastructure, weapons, and combatants from beneath or within civilian infrastructure, including in homes, schools, mosques, and hospitals.  As a result, Hamas intentionally places civilians in the line of fire.

78.    Alarmed by GRUSZYNSKI's openly biased and antisemitic remarks, L.K. bravely raised her hand to ask rhetorically, "Who attacked first?" Only then did GRUSZYNSKI reluctantly admit that Hamas had attacked Israel on October 7.

79.    In reprisal for L.K.'s public dissent, GRUSZYNSKI redoubled his campaign of overtly biased and antisemitic lectures throughout the semester.  Mirroring propaganda disseminated by Hamas, Iran, and their allies (*see supra* ¶ 36), GRUSZYNSKI propagated ahistorical anti-Israel and anti-Jewish myths as irrefutable "facts," while ignoring—let alone condemning—Hamas's atrocities. For example:

(a)    Throughout the semester, GRUSZYNSKI urged students to draw a false equivalence between Hamas, a U.S.-designated terrorist organization, and the State of Israel.  Though conceding that the United States and Israel had "labeled" Hamas as a terrorist organization, GRUSZYNSKI asked students rhetorically, "How different is Israel from Hamas?" GRUSZYNSKI's obvious insinuation was that Hamas was no more a terrorist organization than Israel itself.  GRUSZYNSKI insisted that Hamas was a mere "political party that fights against Israel," when in truth and in fact, Hamas is a militant and internationally recognized terrorist organization whose own founding charter calls for the annihilation of Israel and the killing of Jews around the world.[47]  As explained in a criminal complaint filed by the United States Attorney's Office for the Southern District of New York against Hamas leaders Ismail Haniyeh, Yahya Sinwar, Mohammad al-Masri, Marwan Issa, Khaled Meshaal, and Ali Baraka, "Hamas's stated purpose has been to create an Islamic Palestinian state throughout Israel by eliminating the State of Israel through violent holy war, or jihad. . . .  Hamas has murdered and injured dozens of Americans as part of its campaign of violence and terror, and since 1997, Hamas has been designated as a foreign terrorist organization ("FTO") by the United States Government."[48]

(b)    GRUSZYNSKI repeatedly instructed students that Gaza is an "open air prison that Israel controls," when, in truth, Israel left Gaza nearly 20 years ago—forcibly removing every

---

[47]  *The Covenant of the Islamic Resistance Movement*, Yale L. Sch. (Aug. 18 1988), https://avalon.law.yale.edu/20th_century/hamas.asp; *Anti-Semitism in the Hamas Charter: Selected Excerpts*, ADL (Sept. 12, 2014), https://www.adl.org/resources/news/anti-semitism-hamas-charter-selected-excerpts; *Hamas in Its Own Words*, ADL Blog (Jan. 10, 2024), https://www.adl.org/resources/blog/hamas-its-own-words.

[48]  Complaint ¶ 18(a), *United States v. Haniyeh*, No. 24-mj-438 (S.D.N.Y. Feb. 1, 2024), ECF No. 1; *see also* Barbara McQuade, *Why the DOJ Filed Charges Against Hamas Leaders it is Unlikely to Ever Arrest*, MSNBC (Sept. 8, 2024), https://www.msnbc.com/opinion/msnbc-opinion/doj-charges-hamas-leaders-arrest-israel-rcna169910.

COMPLAINT

single Jew, living or dead—in 2005.  In 2006, Hamas defeated Mahmoud Abbas's Fatah party in the last elections ever held in Gaza.  In 2007, Hamas seized complete control of Gaza by killing or expelling its Fatah rivals.  Since then, Hamas has ruled Gaza without holding further elections.[49] Following its violent coup, Hamas misappropriated billions of dollars of international aid intended to benefit Palestinian citizens by using it to build an underground tunnel network more expansive than the London Underground from which to launch attacks on or abduct Israeli civilians.  Israel, like Egypt, has expended significant efforts to maintain a secure border with Gaza—in order to prevent Palestinian terrorists from murdering its citizens and destabilizing its own government.  Yet GRUSZYNSKI never once blamed Egypt for contributing to Gaza being a supposed "open air prison."

(c)     During the semester, GRUSZYNSKI falsely described legitimate Israeli border checkpoints as mere tools to humiliate Palestinians, rather than appropriate measures to prevent terrorist attacks.  L.K. bravely raised her hand to ask, "Isn't it the case that the checkpoints are there because of terrorism?"  Once more, GRUSZYNSKI was mocking and dismissive, responding, "That's the reason they [Israelis] give."  GRUSZYNSKI did not level similar charges against any other nation in the world that has border checkpoints.  Indeed, as of 2022, there was no country in the world that did not place at least some limitations on individuals' abilities to enter or exit its borders.[50]

(d)     During the semester, GRUSZYNSKI falsely instructed students that Palestine is a state recognized by the United Nations since 1947, when in truth and in fact, the United Nations has never recognized Palestine as a sovereign country, and Palestine's bid to become a full member of the United Nations has been routinely vetoed by the U.N. Security Council.  Even so, to "correctly" answer an "Israel Palestine Vocabulary Quiz," L.K. and other students were forced to furnish GRUSZYNSKI's false responses if they wanted to receive credit.  (*See* Ex. 3.)  In these and other ways, GRUSZYNSKI compelled L.K. to disavow not only facts and the truth, but her personally held world views and the religious commitments that form her ethnic identity.

---

[49]   *Israel's disengagement from Gaza*, Britannica (2005), https://www.britannica.com/event/Israels-disengagement-from-Gaza; *see also* Kali Robinson, *What is Hamas?* Council on Foreign Relations (Aug. 19, 2024), https://www.cfr.org/backgrounder/what-hamas.

[50]   Countries with Open Borders 2024, World Population Review (2024), https://worldpopulationreview.com/country-rankings/countries-with-open-borders.

COMPLAINT

80.    When L.K. attempted to challenge GRUSZYNSKI's overt bias and factual inaccuracies in class, GRUSZYNSKI doubled down with public taunts and ridicule.  For instance, when L.K. protested GRUSZYNSKI's anti-Jewish and anti-Israel sentiments, the instructor responded dismissively (and antisemitically) that he had "taught Jews in New York," as if this somehow excused his own naked antisemitism.  Later, in December 2023, GRUSZYNSKI began a World History lecture by asserting, "[L.K.] is someone who doesn't think Israel is an apartheid state," using a tone that implied L.K.'s position was preposterous.  GRUSZYNSKI continued, "Maybe now others will think differently," suggesting that he intended to prove L.K.'s purported error to the rest of the class.

(a)    Of course, the claim that Israel is an "apartheid" state is yet another antisemitic lie perpetuated by pro-Hamas advocates to undercut the Jewish State's legitimacy among the community of nations.

(b)    In truth, "apartheid" refers to the racist system that South Africa's white minority installed in the 1990s to repress Black and other non-white racial groups comprising more than 90% of the country's population.  No such system exists in Israel.  To the contrary, Israeli law guarantees the equal treatment of all citizens, Jewish, Christian, Arab, and others, and its democratic institutions, including independent courts and free press, serve to uphold and enforce those rights. Israeli Arab citizens represent over 20% of Israel's population and play prominent roles in all aspects of Israeli society, including as judges, ambassadors, legislators, journalists, and professors.[51] GRUSZYNSKI presented none of these undisputed facts to his World History class.  Indeed, Israeli Arabs were among those taken hostage by Hamas in the October 7 attacks; an Israeli-Arab man kidnapped by Hamas was recently rescued by the IDF.[52]

---

[51] *Allegation: Israel is an Apartheid State*, ADL (July 8, 2021), https://www.adl.org/resources/backgrounder/allegation-israel-apartheid-state?gad_source=1&gclid=EAIaIQobChMI-P-nk5fhhwMVaBAs%20StBh0rABbxEAAYASAAEgLL7fD_BwE&gclsrc=aw.ds.

[52] Paul Goldman, Chantal Da Silva & Daniel Arkin, *Hostage Held by Hamas in Gaza Rescued by Israeli Forces, IDF Says*, NBC News (Aug. 27, 2024), https://www.nbcnews.com/news/world/hostage-held-hamas-gaza-rescued-israeli-forces-idf-says-rcna168373.

(c)    GRUSZYNSKI's derision toward L.K. had its intended effect.    L.K. repeatedly returned home in tears after suffering through GRUSZYNSKI's classes.    The harassment and humiliation that GRUSZYNSKI inflicted upon L.K. caused her to think twice before challenging his misinformation and overt bias.    L.K. was appalled at GRUSZYNSKI's thinly veiled suggestion that her co-religionists were "monsters" deserving of mutilation, rape, and murder at the hands of Hamas militants.    Eventually, L.K. felt that she could not participate in classroom discussion without inviting further harassment by GRUSZYNSKI, who seemed to relish taunting her and exploiting his power to silence her questions.

81.    A hostile or traumatizing educational environment is one in which students feel marginalized or blamed for mistreatment targeting them based on their social identity group, or where they face a double standard regarding the protection of their social identity.

82.    For Jewish students like L.K., post-October 7 antisemitism has become a cudgel of identity-based trauma wielded by certain peers, teachers, and school administrators. GRUSZYNSKI's antisemitic conduct was particularly harmful because it came with the authority of a teacher and the inherent power imbalance of all teacher-student relationships.

83.    GRUSZYNSKI's unchecked antisemitic bias constitutes a traumatizing school environment and culture for Jewish students like L.K., undermining their ability to feel safe and to learn.    These institutional conditions foster a hostile learning environment for Jewish students, who are unfairly treated as "colonizers" even while being actively marginalized.

**E.    GRUSZYNSKI and SUHSD Administrators Conceal GRUSZYNSKI's Unauthorized Instructional Materials from SUHSD Parents**

84.    Similar to his lectures, the instructional materials distributed by GRUSZYNSKI during his World History class were filled with antisemitic misinformation and ahistorical claims.    For example, materials given to L.K.'s World History class repeatedly asserted that Palestinians were the sole indigenous people of Israel, ignoring the undisputed archeological and historical evidence of a continuous Jewish presence in the land of Israel for 3,000 years.    Jewish people ruled Judean kingdoms, prayed in the Jerusalem Temple for a millennium, and remained present in Israel for the next 2,000 years.    Jews were also indigenous to Egypt, Syria, Yemen, Turkey, Iran, and other Muslim

countries—before being expelled by Muslims.  GRUSZYNSKI's instructional materials failed to present these and other undisputed facts objectively or fairly.  Instead, the materials were purposefully assembled to "prove" that Israel and its Jewish inhabitants and supporters were evil "colonialists" on land rightfully belonging to others—the Palestinians.[53]

85.     The use of instructional materials containing such biased and ahistorical assertions creates a hostile learning environment for Jewish students, making it impossible for them to fully engage in or benefit from the education provided by SUHSD.

86.     GRUSZYNSKI's instructional materials were not properly approved or submitted for approval through the appropriate process.[54]  Instead, GRUSZYNSKI received tacit authorization to distribute his unapproved instructional materials from SUHSD administrators, who were long aware of GRUSZYNSKI's use of biased and antisemitic course materials but refused to intervene, even after receiving complaints from Woodside High School students and their parents.  L.K.'s father repeatedly requested that Vice Principal VELSCHOW prohibit distribution of these biased, inaccurate, and unapproved materials by other teachers and warn parents of Woodside students who were taught antisemitic lies by GRUSZYNSKI and other teachers.  VELSCHOW refused.

87.     Rather than fulfilling their constitutional and moral obligation to protect Jewish students from rampant antisemitism, SUHSD administrators actively concealed GRUSZYNSKI's biased and antisemitic instructional materials from concerned parents.  On or about December 9, 2023, Plaintiff SAM KASLE ("KASLE") requested copies of GRUSZYNSKI's World History instructional

---

[53]   This ahistorical view is belied by the actual conduct of Arab inhabitants of the region, who did not begin to refer to themselves as Palestinians until the 1960s.  *See* Daniel Grynglas, *Debunking the Claim That "Palestinians" are the Indigenous People of Israel*, Jerusalem Post (May 12, 2015), https://www.jpost.com/blogs/why-world-opinion-matters/are-arabs-the-indigenous-people-of-palestine-402785 ("We first hear of Arabs referred to as "Palestinians" when Egypt's President Nasser, with help from the Russian KGB, established the "Palestine Liberation Organization" in 1964. It was only during the 1970s that the newly minted "Palestinians" began to promote their narrative through murder and assassination.").

[54]   *See, e.g.*, Cal. Educ. Code § 51501 (prohibiting "[t]he state board and any governing board shall not adopt any textbooks or other instructional materials for use in the public schools that contain any matter reflecting adversely upon persons on the basis of race or ethnicity, gender, religion, disability, nationality, or sexual orientation, or because of a characteristic listed in Section 220."); *id.* § 51500 ("A teacher shall not give instruction and a school district shall not sponsor any activity that promotes a discriminatory bias on the basis of race or ethnicity, gender, religion, disability, nationality, or sexual orientation, or because of a characteristic listed in Section 220.").

materials and citations to the source documents from SUHSD administrators, including Vice Principal VELSCHOW.  The administrators refused to provide them, however.  Instead, on December 15, VELSCHOW emailed KASLE, claiming that GRUSZYNSKI had informed VELSCHOW that "approximately 75% of the curriculum for the unit was handed back to students . . . in their binders," and that KASLE had no right to the remaining materials or the citations identifying the sources.  This was false.  The California Education Code requires that "[a]ll primary supplemental instructional materials and assessments, including textbooks, teacher's manuals, films, audio and video recordings, and software shall be compiled and stored by the classroom instructor and made available promptly for inspection by a parent or guardian in a reasonable timeframe." [55]  GRUSZYNSKI and VELSCHOW undoubtedly refused to disclose the underlying sources of the instructional materials because, as both well knew, the instructional materials were incorrect and had been developed by MECA or other openly anti-Israel and antisemitic advocacy groups.

**F.**  **GRUSZYNSKI Enforces His Antisemitic and Anti-Israel Teachings Through Tests and Quizzes**

88.  As further evidence of his antisemitism, GRUSZYNSKI enforced his antisemitic and anti-Israel teachings using tests and quizzes designed to coerce students, including L.K., to repudiate their religious views and historical facts in favor of GRUSZYNSKI's antisemitic and ahistorical narratives.  For example, a so-called "vocabulary" quiz required students to match terms with GRUSZYNSKI's preferred definitions.  GRUSZYNSKI graded as "correct" the following pairings: "Palestine" defined as "Arab lands . . . currently occupied by Israel"; and "Hamas" defined as a "Palestinian political party which is continuing to fight against Israel."  (Ex. 3.)

89.  GRUSZYNSKI's final exam in his World History class likewise included three questions designed to enforce GRUSZYNSKI's biased and ahistorical views of the Israel-Palestine conflict and alienate Jewish students or other supporters of Israel.  (Ex. 4.)

(a)  "What were the events that led to the formation of the state of Israel, the Nakba, and the beginning of the conflict between Israel and Palestine?  Explain in your opinion how much

---

[55]  Cal. Educ. Code § 49091.10.

responsibility European colonial powers and specifically the United Kingdom have for causing this conflict."

(b)    "Describe the Occupied Territories, who is occupying these territories and who is living under this occupation.  Describe what life is like for the people living under occupation, giving at least 3 specific examples."

(c)    "What is the separation wall?  Why did the Israeli government build the separation wall?  How does the separation wall affect the lives of Palestinians?  What did the International Court of Justice say about the separation wall?  How did the Israeli government respond to the International Court of Justice's decision?"

90.    To receive a passing grade, L.K. understood that she needed to answer GRUSZYNSKI's test questions according to GRUSZYNSKI's skewed and antisemitic ideology. GRUSZYNSKI's test questions effectively required L.K. to describe her co-religionists as evil "occupiers" oppressing the Palestinian people, and thus deserving of Hamas's savagery.  L.K. understood that if she had instead responded to GRUSZYNSKI's test questions with factually accurate information, GRUSZYNSKI would have marked those answers as incorrect, resulting in a low or even failing grade.  In this way, GRUSZYNSKI forced L.K., a Jewish student, to condemn Israel and disavow her beliefs in order to receive a passing grade.  This abhorrent conduct went unchecked and unremedied by SUHSD administrators.

### G.    GRUSZYNSKI Refuses to Meet with KASLE and L.K.

91.    Concerned about L.K.'s treatment in GRUSZYNSKI's class, on or about December 9, 2023, KASLE alerted VELSCHOW to the issue and as detailed above, in this same email, requested to review GRUSZYNSKI's course materials, which was improperly denied.  *See supra* ¶ 87.  KASLE also agreed to a meeting with GRUSZYNSKI and VELSCHOW.

92.    GRUSZYNSKI repeatedly evaded attempts to meet to address the concerns raised by the KASLE family, however.  A meeting was scheduled for January 8, 2024, but GRUSZYNSKI did not show up, seemingly unwilling or unable to discuss his conduct with an adult rather than bully a 15-year-old high school student.  VELSCHOW then rescheduled the meeting for January 16, 2024, but canceled it the day before.  In his email to KASLE communicating the last-minute cancelation,

VELSCHOW said that he was unsure whether the meeting would ever be rescheduled. No explanation was provided for the cancellation, and no meeting ever occurred. No disciplinary action appears to have been taken against GRUSZYNSKI for his refusal to meet or for his antisemitic conduct.

93.    On or about January 8, 2024, KASLE escalated the issue to Principal VAN PUTTEN, who responded with dismissive indifference. VAN PUTTEN downplayed the severity of GRUSZYNSKI's antisemitic teachings, comparing them to instruction on other "sensitive" topics, such as sex education. VAN PUTTEN also justified GRUSZYNSKI's false claim that Palestine was recognized as a nation in 1947, incorrectly asserting that there could be "multiple perspectives" on the issue. Like VELSCHOW, VAN PUTTEN deliberately avoided taking any action to address GRUSZYNSKI's antisemitic conduct. GRUSZYNSKI continues to teach World History at Woodside High School.

**H.    SUHSD Fails to Address Concerns Raised in KASLE's Formal Complaints**

94.    From December 9, 2023, to January 19, 2024, KASLE sent Principal VAN PUTTEN and Vice Principal VELSCHOW at least 17 emails expressing his concerns about GRUSZYNSKI's pedagogy and antisemitism.[56] VAN PUTTEN and VELSCHOW largely ignored KASLE's emails, never substantively or effectively addressing any of KASLE's concerns. Left with no other recourse, and following VELSCHOW's and SUHSD policy guidance on written complaints, on or about January 27, 2024, KASLE filed a formal Request for Reconsideration of Instructional Materials ("RFR"), and on or about February 1, 2024, KASLE filed a Uniform Complaint Process ("UCP") complaint against GRUSZYNSKI.

95.    The UCP complaint detailed GRUSZYNSKI's biased and antisemitic teaching and its harm to L.K. (*See* Ex. 5.) In the RFR, KASLE asked Woodside High School to remove the "multi-media materials and oral lessons [GRUSZYNSKI] developed, curated, self-approved and presented to his 10th grade World History class in the fall of 2023 relating to Judaism, Christianity, Islam, the

---

[56]    KASLE expressed his concerns via email to Vice Principal VELSCHOW on December 9, 2023, December 12, 2023, December 17, 2023, December 19, 2023, December 20, 2023, December 22, 2023, January 8, 2024, January 9, 2024, January 10, 2024, January 11, 2024, January 15, 2024, January 16, 2024, and January 19, 2024. Likewise, KASLE emailed concerns to Principal VAN PUTTEN on January 11, 2024, January 16, 2024, and January 19, 2024.

history of the Middle East and the current Hamas-Israeli war." (*See* Ex. 6.)  As examples, KASLE's RFR pointed to GRUSZYNSKI's biased "vocabulary test." *See supra* ¶¶ 79(d), 88.  Neither the UCP complaint nor the RFR resulted in any concrete or effective action by SUHSD or its administrators.

96.    On or about March 7, 2024, VELSCHOW responded to the UCP complaint with an "investigation findings" letter on behalf of Woodside High School, Principal VAN PUTTEN, trustees DU BOIS, GINN, KOO, NORI, and STEVENSON, and Superintendent LEACH.  (*See* Ex. 7.)  In the letter, VELSCHOW concluded that KASLE's allegations had been "substantiated in part," conceding that GRUSZYNSKI had branded Israel an "apartheid" state, and that L.K. had challenged GRUSZYNSKI's anti-Israel spin on Israel's border security checkpoints.  The letter likewise admitted that KASLE had requested to meet with GRUSZYNSKI, but GRUSZYNSKI refused.

97.    The balance of the letter merely credited GRUSZYNSKI's statements and uncorroborated "sense" that L.K. was neither "uncomfortable" nor "browbeaten" by GRUSZYNSKI's antisemitic hectoring.  L.K.'s own views were not considered; she was not even interviewed.  The letter concluded by stating that GRUSZYNSKI's "actions were addressed with the school administration in accordance with District policies and procedures," but provided no details about what specific measures were taken, if any.  VELSCHOW refused to disclose any further information, effectively closing the case.  The letter urged KASLE to "accept the school's decision as final," even though no clear decision had been made or action taken.  It is evident that SUHSD failed to take appropriate remedial action against GRUSZYNSKI to address his inaccurate and biased instructional materials, or to impose any disciplinary measures.

98.    GRUSZYNSKI's views were accepted without scrutiny by SUHSD.  The District's response to this incident was no more effective that its previous sham "investigation" into the appearance of swastikas on school grounds, demonstrating a consistent pattern of deliberate indifference and ineffectual responses that were clearly unreasonable in light of the known circumstances.

99.    SUHSD's response to the RFR was more of the same.  On April 24, 2024, SUHSD sent a letter that misconstrued and improperly narrowed KASLE's RFR, addressing only certain allegations while leaving the vast majority unaddressed and unremedied.  Associate Superintendent

HANSEN later admitted that SUHSD's response to KASLE's RFR was "incomplete." Yet a complete response was never provided. This response, too, was deficient and ineffectual.

100. KASLE also sent multiple emails on these issues to Defendant LEACH, who never responded. The SUHSD Superintendent considered KASLE's overwhelming evidence of GRUSZYNSKI's antisemitic teaching and mistreatment of L.K. as unworthy of a single response, let alone an effort to address KASLE's concerns in accordance with LEACH's professional obligations and state and federal law.

101. On or about April 19, 2024, KASLE emailed Defendants DU BOIS, GINN, KOO, NORI, and STEVENSON to express his frustration that none of his complaints had been addressed and to ask to meet with them. None responded. Like LEACH, the SUHSD Board of Trustees considered KASLE's evidence of GRUSZYNSKI's antisemitic teaching and mistreatment of L.K. as unworthy of a single response, let alone a concerted effort to address the concerns in accordance with their professional obligations and state and federal law.

I. **Menlo-Atherton Teacher Gives "Ethnic Studies" Presentation That Depicts Antisemitic Tropes and Recites Unfiltered Pro-Hamas Propaganda**

102. On November 3, 2023, Chloe Gentile-Montgomery, then an ethnic studies and U.S. history teacher at Menlo-Atherton High School, delivered a purported ethnic studies presentation that, in reality, was Hamas propaganda, complete with ancient antisemitic tropes depicting Jews as secret puppet masters who dictate so-called "dominant narratives." (*See* Ex. 8.) Gentile-Montgomery's biased presentation promoted the idea that the actual truth about the Middle East lies only in so-called "counter narratives" free from influence by "people in power," by which she meant Jews. Gentile-Montgomery's presentation included the following slide:

COMPLAINT



103.    The claim that Jews are secret puppet masters controlling world economies and governments is a centuries-old antisemitic trope.  Such myths have been used to scapegoat Jews for wars and other global events, fueling anti-Jewish violence.  Indeed, cartoon depictions of Jewish leaders pulling the strings of marionette politicians were commonplace in Nazi propaganda during the 1930s.

104.    Among other historical inaccuracies in Gentile-Montgomery's presentation was the assertion, presented as fact, that "Israel is a country created on Palestinian land.  The United Nations says this is illegal."  As detailed above, this is unequivocally false.  The United Nations voted in 1947 to establish a Jewish state in Israel.[57]  Before its existence as a Jewish state, the territory comprising present-day Israel was under British mandatory rule recognized by the United Nations, and before that, for over 400 years, it was part of the Ottoman Empire.

105.    As detailed above (*see* ¶ 84, *supra*), the Jewish people are indigenous to the land of Israel, and identification with the land of Israel constitutes an integral part of Plaintiffs' and their minor children's ethnic identities and shared ancestry, as well as a fundamental element of their religious consciousness.

106.    The instructional materials assembled and presented by Gentile-Montgomery (and GRUSZYNSKI) completely ignored and implicitly denied these objective and undisputed facts.  They

---

[57]    G.A. Res. 181 (Nov. 29, 1947), https://avalon.law.yale.edu/20th_century/res181.asp.

1  also failed to recognize that Jews, including Plaintiffs and their minor children, hold these

2  commitments and beliefs.

3      107.    Similar to GRUSZYNSKI's lectures, Gentile-Montgomery repeated the falsehood that

4  Gaza is an "open air prison" controlled by Israel. *See supra* ¶ 79(b).  The presentation concluded with

5  a propaganda video, "Israeli Air Strikes Kill Palestinian Children," produced by the Turkish Radio

6  and Television Corporation, a state-run broadcaster and anti-Israel propaganda arm of the Turkish

7  government.[58]  The relevance of this content to "ethnic studies"—a subject created to discuss

8  marginalized ethnic groups in the United States, specifically Black Americans, Hispanic and Chicano

9  Americans, Native Americans, and Asian Americans/Pacific Islanders—remained unexplained.

10     108.    Jewish students and their parents at Menlo-Atherton High School were outraged by

11  the openly antisemitic views and factually false information presented in Gentile-Montgomery's slide

12  deck.  On November 21, 2023, parents submitted a petition to Superintendent LEACH demanding

13  that the school address the biased ethnic studies materials and lessons.  The petition called for SUHSD

14  to ensure that students are not subjected to discrimination and indoctrination and demanded the

15  immediate termination of Gentile-Montgomery.  The petition garnered widespread support, receiving

16  hundreds of signatures.

17     109.    The petition ignited a tempestuous debate at a January 17, 2024 meeting of the SUHSD

18  Board of Trustees, but the meeting ultimately yielded no concrete measures to address the increasingly

19  hostile educational environment faced by Jewish students.  Even the Sequoia District Teachers

20  Association President admitted that "it is difficult to be a Jewish student and a Jewish educator in this

21  school district."[59]  Rather than seize the opportunity to enact reforms to protect Jewish students,

22  however, SUHSD's trustees, administrators, and teachers circled the wagons.  The District's

23  intransigence was exemplified by GRUSZYNSKI, who, just days after refusing to meet with KASLE

24

---

25     [58] *See Turkish Radio & Television (TRT)*, State Media Monitor (Aug. 28, 2024),
26  https://statemediamonitor.com/2024/08/turkish-radio-and-television-trt/ (citing member of the
   Turkish Radio and Television Supreme Council (RTÜK) that one-quarter of the daily programming
27  time on TRT is dedicated to disseminating government propaganda).

28     [59] Arden Margulis & Ameya Nori, *Board Meeting Erupts Into Arguments Over Ethnic Studies
   Lesson*, M-A Chronicle (Jan. 22, 2024), https://machronicle.com/board-meeting-erupts-into-
   arguments-over-ethnic-studies-lesson/.

COMPLAINT

to discuss these issues, spoke in defense of Gentile-Montgomery, echoing her unfounded claims that the criticism of her stemmed from racism.  Perhaps most alarmingly, the presence of Nazi propaganda elements in Gentile-Montgomery's instructional materials elicited little concern from SUHSD trustees and administrators.  The Board's inaction was yet another stark indicator of its lack of concern for Jewish students, and unwillingness to confront the District's pervasive antisemitism.

110.   Like other Jewish students, W.K. was disturbed by the inaccuracies in Gentile-Montgomery's presentation and sought to engage her in a discussion.  Despite initially consenting, Gentile-Montgomery refused to listen to W.K.'s concerns, dismissing him as a "biased Jewish freshman" and walking away.

**J.      Woodside High School Broadcasts Antisemitic "Call for Change" Video to Entire Student Body**

111.   The Board's persistent inaction allowed antisemitic incidents at SUHSD schools to continue unabated.

112.   In or around January or February 2024, S.B. had resumed wearing her Star of David necklace at school.  A computer science teaching assistant told S.B. to conceal her Star of David to avoid becoming a target of antisemitism, and that she would "get what she deserved" if she continued to wear it.  S.B. reported this incident to SUHSD administrators, including Vice Principal VELSCHOW.

113.   On or about March 19, 2024, a group of Woodside students called S.B. a "kike" as she was walking home from school.  S.B. informed SUHSD administrators, including Vice Principal VELSCHOW.  VELSCHOW asked S.B. if *she* wanted the school to intervene.  VELSCHOW also promised S.B. that the perpetrator—who had bullied S.B. previously—would not be in her classes in the future.  Despite VELSCHOW's promise, this student and S.B. are currently in some of the same 11th-grade classes.

114.   On March 21, 2024, Woodside High School aired a public video announcement as part of its "TV Live" program.  A segment titled "Call for Change" ostensibly addressed Islamophobia but quickly devolved into antisemitic and anti-Israel rhetoric.  Images in the video included signs reading "End all US aid to Apartheid Israel," "Stand with Palestine, End the Occupation Now," "End

the Occupation," and "There are no 2 sides to Genocide."  The video's unmistakable message was that opposing "hatred" requires opposing the State of Israel and its Jewish population.

115.    The video featured an adult anti-Israel activist who directly addressed the camera, urging Woodside High School students to become leaders of the anti-Israel movement.  The activist stated, "I'm going to do my part but I'm depending on the youth to be the leaders of this movement— I think it's your turn and I think you guys are killing it!"  The segment thus exhorted students to join the anti-Israel cause.

116.    A Woodside High School math teacher, Abdulhadi "Hadi" Kaddoura, also appeared in the anti-Israel video announcement.  He claimed to have been discriminated against due to his Palestinian Muslim identity and criticized diaspora Jews who claim a right to return to Israel. Kaddoura was among the SUHSD teachers who signed a letter in support of Gentile-Montgomery, the teacher who delivered an antisemitic and anti-Israel presentation at Menlo-Atherton High School. *See supra* ¶¶ 102-10.  The letter emphasized the importance of discussing Israel's "occupation" and using terms like "apartheid," "settler colonialism," and "ethnic cleansing" to describe Israel in ethnic studies and social studies classrooms.  In student newspapers, Kaddoura has expressed antisemitic views, including questioning the legal rights of Jews to live in Israel.

117.    On the same day the video aired, S.B. was waiting outside a classroom when Kaddoura approached her and asked why she was there.  When S.B. replied that she was "waiting for friends," Kaddoura responded with a sneer, "You have friends?"  He then asked S.B. if she was Jewish, claiming that he could tell by her nose.  The interaction left S.B. feeling humiliated and publicly shamed.

118.    Jewish students and their parents at Woodside High School were appalled by the airing of the "Call for Change" video as part of the school's daily announcements.  On March 25, 2024, a group of 10 parents, including the KASLES, the LYLES, the BERSHTEYNS, and ROSNER, requested more information about the video, such as whether it had been approved by teachers or administrators before its broadcast.

119.    Consistent with her previous and repeated failures to address antisemitic incidents, VAN PUTTEN remained unresponsive to the concerns raised by Jewish students and their parents

about the "Call for Change" video.  In a dismissive response on March 29, 2024, VAN PUTTEN refused to act to rectify the hostile educational environment.  (*See* Ex. 9.)  VAN PUTTEN wrote that the school "rel[ies] on instructors to provide guidance and oversight," that "Woodside [High School] administration is typically not directly involved in the review process for student projects," and that "Woodside TV Live daily announcements is a student-led and student-run organization."  VAN PUTTEN continued: "The Woodside HS admin team and I are not school leaders who would censor student produced news broadcast or publication; instead, we are committed to working on developing parameters around how we can be teaching and learning partners involved in offering feedback or suggestions to anticipate any potential problems or mitigate any misinformation."  What those parameters were, however, remained unexplained.  Ultimately, VAN PUTTEN's word-salad response demonstrated a complete lack of accountability and a continued failure to protect Jewish students from antisemitic harassment.

120.    The "Call for Change" video was the final straw for many Jewish families.  On or about April 22, 2024, Plaintiff LYLE filed a comprehensive UCP complaint on behalf of his minor son, A.L., detailing numerous antisemitic incidents at Woodside High School and Defendants' complete failure to address them.  Seven other Jewish families, including Plaintiffs JENNIFER and DANIEL REIF and IGOR and MARINA BERSHTEYN, signed the complaint.  (Ex. 10.)

121.    As detailed in the UCP complaint, pervasive discrimination against Jewish students at SUHSD schools has created a hostile learning environment.  This discrimination includes:

(a)      Teachers' offensive and derogatory remarks targeting Jewish students, including pointing out Jewish stereotypical physical characteristics;

(b)      The SUHSD administration's dismissal of swastika graffiti as "Buddhist anime" images and its refusal to correct its public announcement treating it as such, even when it was later revealed that the administration knew that the student responsible for drawing the swastikas was likely aware of the symbol's actual meaning;

(c)      Singling out Jewish students for debate about Israel in World History, ethnic studies, and other classes;

1        (d)      The broadcast of the "Call for Change" video segment, which featured

2  offensive imagery associated with the "Free Palestine" movement and attacked Jews and the Jewish

3  State; and

4        (e)      The complete failure of Defendants VAN PUTTEN and the SUHSD Board of

5  Trustees to take any meaningful action to address these incidents.

6      122.   On or about April 23, 2024, Defendant BEAL confirmed receipt of the UCP complaint.

7  Despite California law requiring SUHSD to investigate UCP complaints promptly and present written

8  findings within 60 days, *see* 5 CCR § 4631, the investigation of the complaint has dragged on for over

9  200 days.  Not only have no findings been disclosed to the complainants, but no action has been taken

10  in response.  SUHSD's disregard for Jewish families and its failure to address antisemitic incidents,

11  including the broadcast of the "Call for Change" video, have created a hostile environment for Jewish

12  students.  As of the date of this complaint, the offensive video remains publicly available online, and

13  SUHSD teachers, administrators, and trustees continue to evade responsibility for the rampant

14  antisemitism within the District's schools.

**FIRST CLAIM FOR RELIEF**

**Violation of Title VI of the Civil Rights Act of 1964**

**42 U.S.C. § 2000d *et seq.***

**(Against All Defendants)**

19      123.   Plaintiffs reallege and incorporate by reference paragraphs 1 through 122 above.

20      124.   Title VI provides that "[n]o person in the United States shall, on the ground of race,

21  color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected

22  to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C.

23  § 2000d.

24      125.   Defendants are recipients of federal financial assistance and are therefore subject to

25  the requirements of Title VI.

126.    Plaintiffs and their children are members of a protected class based on their Jewish ancestry, race, ethnic characteristics, and/or national origin.  *Cf. Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 616 (1987).[60]

127.    As alleged herein, Defendants engaged in a pattern and practice of intentional discrimination and harassment against Plaintiffs and their children based on their Jewish ancestry, race, ethnic characteristics, and/or national origin.  This conduct includes, but is not limited to: (i) repeatedly refusing to conduct meaningful, unbiased, and effective investigations or undertake discernible remedial action in response to numerous antisemitic incidents on SUHSD campuses; (ii) distributing (and allowing to be distributed) instructional materials to students that gratuitously invoke anti-Israel and antisemitic tropes and that baselessly cast Israel and Jews as "aggressors"; (iii) repeatedly imparting (and allowing to be imparted) antisemitic, ahistorical, and pro-Hamas narratives under the guise of teaching World History, ethnic studies, and geometry; (iv) taunting, ridiculing, and humiliating (and allowing such taunting, ridicule, and humiliation of) Jewish students who challenged their teachers' blatantly antisemitic lectures; (v) actively concealing antisemitic teaching materials from concerned SUHSD parents; (vi) enforcing (and allowing teachers to enforce) antisemitic and anti-Israel teachings through tests and quizzes designed to compel Jewish students to disavow their personal beliefs to receive passing grades; (vii) delivering (and allowing to be delivered) "ethnic studies" lessons presenting ahistorical anti-Israel falsehoods and depicting Jews as secret "puppet masters" influencing "dominant narratives," a once-common depiction in Nazi propaganda; and (viii) broadcasting (and allowing to be broadcast) schoolwide videos conveying the message that reducing "hatred" means opposing the State of Israel and its "genocidal" Jewish inhabitants.

128.    As alleged herein, Plaintiffs' children suffered harassment so severe, pervasive, and offensive that it effectively deprived them of the right of equal access to educational benefits and opportunities.

---

[60] *See also* Letter from Mia Karvonides, U.S. Dep't of Educ. to President Suresh V. Garimella, Univ. of Vt., at 13 (Apr. 3, 2023), https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/investigations/more/01222002-a.pdf ("OCR has concerns that the University's failure to investigate, consistent with Title VI, allegations of antisemitic harassment . . . may reflect University officials, acting within the scope of their official duties, treating individuals differently on the basis of national origin.").

129.    Defendants had actual notice of the discrimination and harassment, over which they had substantial control and the authority to remediate.  Defendants were aware that the discrimination and harassment were so severe, pervasive, and objectively offensive that they created a hostile environment for Plaintiffs and their children based on their Jewish ancestry, race, ethnic characteristics, and/or national origin that deprived Plaintiffs' children of full access to SUHSD's educational programs, activities, and opportunities.

130.    Defendants were deliberately indifferent to the harassment such that their response (or lack thereof) was clearly unreasonable in light of the known circumstances.

131.    As a result of Defendants' actions and omissions, Plaintiffs have been injured by being denied the opportunity to fully participate in, and deprived of full access to, the classroom, school-sponsored activities, educational programs, and other educational opportunities.

132.    Absent the injunctive and declaratory relief against Defendants requested herein, Plaintiffs will continue to be harmed by Defendants' actions.

133.    Plaintiffs are entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## SECOND CLAIM FOR RELIEF

### Violation of Fourteenth Amendment Equal Protection Clause

### 42 U.S.C. § 1983; U.S. Const. amend. XIV, § 1

### (Against All Defendants)

134.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 133 above.

135.    The Fourteenth Amendment to the United States Constitution guarantees all citizens equal protection of the laws.

136.    42 U.S.C. § 1983 provides a cause of action for individuals whose constitutional rights are violated by persons acting under color of state law.

137.    Defendants violated Plaintiffs' Fourteenth Amendment rights through a widespread or longstanding practice or custom that discriminates against Plaintiffs and their children based on their ethnic and religious identity as Jews, and their belief in Israel's right to exist as a Jewish nation, which they consider a fundamental aspect of their shared Jewish heritage.

COMPLAINT

138.    As alleged herein, Defendants intentionally failed to address antisemitic behavior by students and teachers, thereby depriving Plaintiffs and their children of equal protection under the law, including, without limitation, by: (i) repeatedly refusing to conduct meaningful, unbiased, and effective investigations or take discernible remedial action in response to numerous antisemitic incidents on SUHSD campuses; (ii) distributing (and allowing to be distributed) instructional materials to students that are both false and that gratuitously invoke anti-Israel and antisemitic tropes and that baselessly cast Israel and Jews as "aggressors"; (iii) repeatedly imparting (and allowing to be imparted) antisemitic, ahistorical, and pro-Hamas narratives under the guise of teaching World History, ethnic studies, and geometry; (iv) taunting, ridiculing, and humiliating (and allowing such taunting, ridicule, and humiliation of) Jewish students who challenged their teachers' blatantly antisemitic lectures; (v) actively concealing antisemitic teaching materials from concerned SUHSD parents; (vi) enforcing (and allowing teachers to enforce) antisemitic and anti-Israel teachings through tests and quizzes designed to compel Jewish students to disavow their personal beliefs to receive passing grades; (vii) delivering (and allowing to be delivered) "ethnic studies" lessons presenting ahistorical anti-Israel falsehoods and depicting Jews as secret "puppet masters" influencing "dominant narratives," a once-common depiction in Nazi propaganda; and (viii) broadcasting (and allowing to be broadcast) schoolwide videos conveying the message that reducing "hatred" means opposing the State of Israel and its "genocidal" Jewish inhabitants.

139.    Defendants had no legitimate, nondiscriminatory reasons for their decision to treat Jewish students differently from similarly situated SUHSD students.

140.    As alleged herein, (1) Defendants acted under color of state law in their individual capacities as District employees, administrators, and educators; (2) Defendants' acts, or failures to act, deprived Plaintiffs of their rights under the Equal Protection Clause of the United States Constitution; and (3) Defendants' conduct was the actual cause of the injuries to Plaintiffs.

141.    As further alleged herein, Defendants VAN PUTTEN, LOSEKOOT, VELSCHOW, PORTER, LEACH, HANSEN, and BEAL (the "Administrative Defendants"), and Defendants DU BOIS, GINN, KOO, NORI, and STEVENSON (the "Trustee Defendants") (collectively, the "Supervisory Defendants") knew that their subordinates, including Defendant GRUSZYNSKI,

Gentile-Montgomery, and Kaddoura, were engaged in the acts alleged herein, and each knew or reasonably should have known that their subordinates' conduct would deprive Plaintiffs of their rights under the Equal Protection Clause of the United States Constitution, but each Supervisory Defendant failed to act to prevent their subordinates from engaging in such conduct. The Supervisory Defendants' conduct was so closely related to the deprivation of Plaintiffs' rights as to be the moving force that caused the ultimate injury to Plaintiffs' Fourteenth Amendment rights.

142.    As further alleged herein, all Defendants deprived Plaintiffs of their rights under the Equal Protection Clause of the United States Constitution, while acting pursuant to an expressly adopted official policy or a widespread or longstanding practice or custom that caused the deprivation of Plaintiffs' rights; that is, the District's official policy or widespread or longstanding practice or custom was so closely related to the deprivation of Plaintiffs' rights as to be the moving force that caused Plaintiffs' ultimate injury.

143.    Defendants' actions, or deliberate inaction, were intentional and discriminatory, and they were not justified by any legitimate governmental interest.

144.    As a direct and proximate result of Defendants' actions, Plaintiffs have suffered and continue to suffer harm.

145.    Absent the injunctive and declaratory relief requested herein, Plaintiffs will continue to be harmed by Defendants' actions.

146.    Plaintiffs are entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

### THIRD CLAIM FOR RELIEF

**Violation of the First Amendment Free Exercise Clause**

**42 U.S.C. § 1983; U.S. Const. amend. I**

**(Against all Defendants)**

147.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 146 above.

148.    The First Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, guarantees the right to free exercise of religion.

149.    The Free Exercise Clause of the First Amendment bars state actors from intentionally placing a substantial burden on any person's religious belief or practice.

45

150.    Such a burden is imposed if the challenged action has "a tendency to coerce individuals into acting contrary to their religious beliefs or exert[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Jones v. Williams*, 791 F.3d 1023, 1031-32 (9th Cir. 2015).

151.    Plaintiffs' Jewish identity, their sincerely held religious beliefs, and their ethnic identity as an integral part of their shared ancestry are all closely tied to Israel and Zionism.

152.    42 U.S.C. § 1983 provides a cause of action for individuals whose constitutional rights are violated by persons acting under color of state law.

153.    As alleged herein, Defendants, acting under color of state law, violated Plaintiffs' First Amendment rights by discouraging Jewish students from displaying outward signs of their Jewish identity or expressing their sincerely held beliefs during classroom discussion, thereby substantially burdening Plaintiffs' free exercise of religion.  Defendants did so, without limitation, by: (i) repeatedly refusing to conduct meaningful, unbiased, and effective investigations or undertake discernible remedial action in response to numerous antisemitic incidents on SUHSD campuses; (ii) distributing (and allowing to be distributed) instructional materials to students that gratuitously invoke anti-Israel and antisemitic tropes and that baselessly cast Israel and Jews as "aggressors"; (iii) repeatedly imparting (and allowing to be imparted) antisemitic, ahistorical, and pro-Hamas narratives under the guise of teaching World History, ethnic studies, and geometry; (iv) taunting, ridiculing, and humiliating (and allowing such taunting, ridicule, and humiliation of) Jewish students who challenged their teachers' blatantly antisemitic lectures; (v) actively concealing antisemitic teaching materials from concerned SUHSD parents; (vi) enforcing (and allowing teachers to enforce) antisemitic and anti-Israel teachings through tests and quizzes designed to compel Jewish students to disavow their personal beliefs to receive passing grades; (vii) delivering (and allowing to be delivered) "ethnic studies" lessons presenting ahistorical anti-Israel falsehoods and depicting Jews as secret "puppet masters" influencing "dominant narratives," a once-common depiction in Nazi propaganda; and (viii) broadcasting (and allowing to be broadcast) schoolwide videos conveying the message reducing "hatred" means opposing the State of Israel and its "genocidal" Jewish inhabitants.

154.    As alleged herein, (1) Defendants acted under color of state law in their individual capacities as District employees, administrators, and educators employed by the State of California;

(2) Defendants' acts, or failures to act, deprived Plaintiffs of their rights under the Free Exercise Clause of the United States Constitution; and (3) Defendants' conduct was the actual cause of the injuries to Plaintiffs.

155.    As further alleged herein, Defendants VAN PUTTEN, LOSEKOOT, VELSCHOW, PORTER, LEACH, HANSEN, and BEAL (the "Administrative Defendants"), and Defendants DU BOIS, GINN, KOO, NORI, and STEVENSON (the "Trustee Defendants") (collectively, the "Supervisory Defendants") knew that their subordinates, including Defendant GRUSZYNSKI, Gentile-Montgomery, and Kaddoura, were engaged in the acts alleged herein, and each knew or reasonably should have known that their subordinates' conduct would deprive Plaintiffs of their rights under the Free Exercise Clause of the United States Constitution, but each Supervisory Defendant failed to act to prevent their subordinates from engaging in such conduct. The Supervisory Defendants' conduct was so closely related to the deprivation of the Plaintiffs' rights as to be the moving force that caused the ultimate injury to Plaintiffs' rights under the Free Exercise Clause of the First Amendment.

156.    As further alleged herein, all Defendants deprived Plaintiffs of their rights under the Free Exercise Clause of the United States Constitution, while acting pursuant to an expressly adopted official policy or a widespread or longstanding practice or custom that caused the deprivation of Plaintiffs' rights; that is, the District's official policy or widespread or longstanding practice or custom was so closely related to the deprivation of Plaintiffs' rights as to be the moving force that caused Plaintiffs' ultimate injury.

157.    Defendants' actions were not justified by any compelling governmental interest and were not the least restrictive means of achieving any such interest.

158.    As a direct and proximate result of Defendants' actions, Plaintiffs have suffered and continue to suffer harm.

159.    Absent injunctive and declaratory relief requested herein, Plaintiffs will continue to be harmed by Defendants' actions.

160.    Plaintiffs are entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

**FOURTH CLAIM FOR RELIEF**

**Violation of the First Amendment Freedom of Speech Clause**

**42 U.S.C. § 1983; U.S. Const. amend. I**

**(Against Defendants GRUSZYNSKI, VAN PUTTEN, VELSCHOW, PORTER, LEACH,**

**HANSEN, BEAL, DU BOIS, GINN, KOO, NORI, and STEVENSON)**

161.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 160 above.

162.    "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

163.    Government efforts to regulate speech based on the "specific motivating ideology or the opinion or perspective of the speaker" are a "blatant" and "egregious" form of impermissible speech restriction. *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995). And the government cannot "coerce an individual to speak contrary to her beliefs on a significant issue of personal conviction, all in order to eliminate ideas that differ from its own." *303 Creative LLC v. Elenis*, 600 U.S. 570, 598 (2023).

164.    The First Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, guarantees the right to freedom of speech, including the right to refrain from speaking.

165.    Under the First Amendment of the United States Constitution, Plaintiffs have the right to be free from government coercion that compels Plaintiffs to speak contrary to their beliefs on an issue of significant personal conviction.

166.    Plaintiffs believe that Israel has the right to exist and maintain a Jewish state in the Jewish ancestral homeland.

167.    42 U.S.C. § 1983 provides a cause of action for individuals whose constitutional rights are violated by persons acting under color of state law.

168.    By coercing L.K. and others to adopt and profess a viewpoint contrary to their beliefs on an issue of significant personal conviction, Defendant GRUSZYNSKI, acting under color of state

law, compelled them to speak against their will in violation of the First Amendment of the United States Constitution.

169.    Defendant GRUSZYNSKI's actions against Plaintiffs would chill a person of ordinary firmness from continuing to engage in the protected activity because it required L.K. and others to profess or accept tenets deeply incompatible with their convictions, religious exercise, and cultural identity.

170.    Defendant GRUSZYNSKI demanded that students, including L.K., adopt his biased, antisemitic views about Zionists and Israel as the only acceptable responses on assessments he administered. As a result, in order to obtain a passing grade, students, including L.K., were compelled to speak contrary to their beliefs pertaining to Jewish history, culture, and identity.

171.    As alleged herein, (1) Defendants GRUSZYNSKI, VAN PUTTEN, VELSCHOW, PORTER, LEACH, HANSEN, BEAL, DU BOIS, GINN, KOO, NORI, and STEVENSON acted under color of state law in their individual capacities as District employees, administrators, and educators employed by the State of California; (2) Defendants' acts, or failures to act, deprived Plaintiffs of their rights under the Freedom of Speech Clause of the First Amendment of the United States Constitution; and (3) Defendants' conduct was the actual cause of the injuries to Plaintiffs.

172.    As further alleged herein, Defendants VAN PUTTEN, VELSCHOW, PORTER, LEACH, HANSEN, and BEAL (the "Administrative Defendants"), and Defendants DU BOIS, GINN, KOO, NORI, and STEVENSON (the "Trustee Defendants") (collectively, the "Supervisory Defendants") knew that their subordinate, GRUSZYNSKI, was engaged in the acts alleged herein, and each knew or reasonably should have known that GRUSZYNSKI's conduct would deprive Plaintiffs of their rights under the Freedom of Speech Clause of the First Amendment of the United States Constitution, but each Supervisory Defendant failed to act to prevent GRUSZYNSKI from engaging in such conduct.

173.    As recipients of multiple complaints and as participants in multiple discussions where Plaintiffs expressed concerns with Defendant GRUSZYNSKI's conduct, Defendants Woodside Principal VAN PUTTEN; Woodside Administrative Vice Principals VELSCHOW and PORTER; SUHSD Superintendent LEACH; SUHSD Associate Superintendent of Educational Services

HANSEN; SUHSD Assistant Superintendent, Human Resources BEAL; and SUHSD Board of Trustees Members DU BOIS, GINN, KOO, NORI, and STEVENSON, in their individual capacities as Supervisory Defendants, knowingly refused to terminate a series of acts by subordinate Defendant GRUSZYNSKI, which the Supervisory Defendants knew or reasonably should have known would cause Defendant GRUSZYNSKI to deprive the Plaintiffs of the right to be free from compelled speech. The Supervisory Defendants' conduct was so closely related to the deprivation of the Plaintiffs' rights as to be the moving force that caused the ultimate injury to Plaintiffs' First Amendment rights.

174.    As further alleged herein, Defendants GRUSZYNSKI, VAN PUTTEN, VELSCHOW, PORTER, LEACH, HANSEN, BEAL, DU BOIS, GINN, KOO, NORI, and STEVENSON, deprived Plaintiffs of their rights under the Freedom of Speech Clause of the First Amendment of the United States Constitution, while acting pursuant to an expressly adopted official policy or a widespread or longstanding practice or custom that caused the deprivation of Plaintiffs' rights; that is, the District's official policy or widespread or longstanding practice or custom was so closely related to the deprivation of Plaintiffs' rights as to be the moving force that caused Plaintiffs' ultimate injury.

175.    Defendants' actions were not justified by any compelling governmental interest and were not the least restrictive means of achieving any such interest.

176.    As a direct and proximate result of Defendants' actions, Plaintiffs have suffered and continue to suffer harm.

177.    Absent the injunctive and declaratory relief against Defendants requested herein, Plaintiffs will continue to be harmed by Defendants' actions.

178.    Plaintiffs are entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## FIFTH CLAIM FOR RELIEF

### California Constitution Art. I, § 7(a)

### Violation of the Equal Protection Clause

### (Against all Defendants)

179.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 178 above.

180.     Article I, Section 7(a) of the California Constitution guarantees that "[a] person may not be . . . denied equal protection of the laws."  This Clause prohibits discrimination based on race, ethnicity, and religion.

181.     Defendants, acting under color of state law, have deprived Plaintiffs of equal protection of the laws, as secured by the California Constitution, through de facto policies and practices that treat Plaintiffs and their children differently than similarly situated individuals because Plaintiffs and their children are Jewish.  Defendants have discriminated against Jewish students by, without limitation, (i) repeatedly refusing to conduct meaningful, unbiased, and effective investigations or undertake discernible remedial action in response to numerous antisemitic incidents on SUHSD campuses; (ii) distributing (and allowing to be distributed) instructional materials to students that gratuitously invoke anti-Israel and antisemitic tropes and that baselessly cast Israel and Jews as "aggressors"; (iii) repeatedly imparting (and allowing to be imparted) antisemitic, ahistorical, and pro-Hamas narratives under the guise of teaching World History, ethnic studies, and geometry; (iv) taunting, ridiculing, and humiliating (and allowing such taunting, ridicule, and humiliation of) Jewish students who challenged their teachers' blatantly antisemitic lectures; (v) actively concealing antisemitic teaching materials from concerned SUHSD parents; (vi) enforcing (and allowing teachers to enforce) antisemitic and anti-Israel teachings through tests and quizzes designed to compel Jewish students to disavow their personal beliefs to receive passing grades; (vii) delivering (and allowing to be delivered) "ethnic studies" lessons presenting ahistorical anti-Israel falsehoods and depicting Jews as secret "puppet masters" influencing "dominant narratives," a once-common depiction in Nazi propaganda; and (viii) broadcasting (and allowing to be broadcast) schoolwide videos conveying the message that reducing "hatred" means opposing the State of Israel and its "genocidal" Jewish inhabitants.

182.     Defendants' actions were intentional and discriminatory, and they were not justified by any legitimate governmental interest.

183.     As a direct and proximate result of Defendants' actions, Plaintiffs have suffered and continue to suffer harm.

COMPLAINT

184.    Absent the injunctive and declaratory relief against Defendants requested herein, Plaintiffs will continue to be harmed by Defendants' actions.

## SIXTH CLAIM FOR RELIEF

### California Constitution Art. I, § 4

### Violation of the Free Exercise Clause

### (Against all Defendants)

185.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 184 above.

186.    Article I, Section 4 of the California Constitution guarantees the "[f]ree exercise and enjoyment of religion without discrimination or preference."

187.    Defendants, acting under color of state law, deprived Plaintiffs of the free exercise and enjoyment of religion without discrimination or preference, as secured by the California Constitution, through a policy and practice that substantially burdened Plaintiffs' free exercise of religion through antisemitic discrimination.

188.    As alleged herein, Jewish students were discouraged from displaying outward signs of their Jewish identity—including by wearing Star of David symbols—based on safety concerns or expressing their beliefs during classroom discussion.  Defendants did so by, without limitation, (i) repeatedly refusing to conduct meaningful, unbiased, and effective investigations or undertake discernible remedial action in response to numerous antisemitic incidents on SUHSD campuses; (ii) distributing (and allowing to be distributed) instructional materials to students that gratuitously invoke anti-Israel and antisemitic tropes and that baselessly cast Israel and Jews as "aggressors"; (iii) repeatedly imparting (and allowing to be imparted) antisemitic, ahistorical, and pro-Hamas narratives under the guise of teaching World History, ethnic studies, and geometry; (iv) taunting, ridiculing, and humiliating (and allowing such taunting, ridicule, and humiliation of) Jewish students who challenged their teachers' blatantly antisemitic lectures; (v) actively concealing antisemitic teaching materials from concerned SUHSD parents; (vi) enforcing (and allowing teachers to enforce) antisemitic and anti-Israel teachings through tests and quizzes designed to compel Jewish students to disavow their personal beliefs to receive passing grades; (vii) delivering (and allowing to be delivered) "ethnic studies" lessons presenting ahistorical anti-Israel falsehoods and depicting Jews as secret "puppet

masters" influencing "dominant narratives," a once-common depiction in Nazi propaganda; and (viii) broadcasting (and allowing to be broadcast) schoolwide videos conveying the message reducing "hatred" means opposing the State of Israel and its "genocidal" Jewish inhabitants.

189.    Defendants' actions were intentional and discriminatory, and they were not justified by any compelling governmental interest.

190.    As a direct and proximate result of Defendants' actions, Plaintiff has suffered and continues to suffer harm.

191.    Absent the injunctive and declaratory relief against Defendants requested herein, Plaintiffs will continue to be harmed by Defendants' actions.

<u>**SEVENTH CLAIM FOR RELIEF**</u>

**California Constitution Art. I, § 2**

**Violation of Freedom of Speech Clause**

**(Against Defendants GRUSZYNSKI, VAN PUTTEN, VELSCHOW, PORTER, LEACH, HANSEN, BEAL, DU BOIS, GINN, KOO, NORI, and STEVENSON)**

192.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 191 above.

193.    Article I, Section 2 of the California Constitution guarantees that "[e]very person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right." This includes "the right to speak and the right to refrain from speaking" or endorsing a particular message. *Beeman v. Anthem Prescription Mgmt., LLC*, 58 Cal. 4th 329, 342 (2013).

194.    "The [California] Constitution's free speech provision is 'at least as broad' as and in some ways is broader than the comparable provision of the federal Constitution's First Amendment." *Beeman*, 58 Cal. 4th at 341.    "Because speech results from what a speaker chooses to say and what he chooses not to say, the right in question comprises both a right to speak freely and also a right to refrain from doing so at all, and is therefore put at risk both by prohibiting a speaker from saying what he otherwise would say and also by compelling him to say what he otherwise would not say." *Gerawan Farming, Inc. v. Lyons*, 24 Cal. 4th 468, 491 (2000).

195.    Plaintiffs believe that Israel has the right to exist and maintain a Jewish state in the Jewish ancestral homeland.

196.    Defendant GRUSZYNSKI, acting under color of state law, violated Plaintiffs' rights under Article I, Section 2 of the California Constitution by demanding that students, including L.K., adopt his biased, antisemitic views about Zionists and Israel as the only acceptable responses on assessments he administered.  As a result, students, including L.K., were forced to express views contrary to their beliefs about Jewish history, culture, and identity to obtain a passing grade.

197.    Defendants were made aware of GRUSZYNSKI's problematic conduct through numerous complaints made by Plaintiffs and others.

198.    Defendants' actions were not justified by any compelling governmental interest and were not the least restrictive means of achieving any such interest.

199.    As a direct and proximate result of Defendants' actions, Plaintiffs have suffered and continue to suffer harm.

200.    Absent the injunctive and declaratory relief against Defendants requested herein, Plaintiffs will continue to be harmed by Defendants' actions.

## EIGHTH CLAIM FOR RELIEF

### Cal. Educ. Code §§ 220, 262.4, 49091.12(a), 51500, 51501, 51513, 60044, and 60045

### Harassment in Educational Institutions

### (Against all Defendants)

201.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 200 above.

202.    Under California law, "[a]ll pupils have the right to participate fully in the educational process, free from discrimination and harassment," Cal. Ed. Code § 201(a), and "California's public schools have an affirmative obligation to combat racism, sexism, and other forms of bias, and a responsibility to provide equal educational opportunity" Cal. Educ. Code § 201(b).  As the California Legislature has recognized, "[h]arassment on school grounds directed at an individual on the basis of personal characteristics or status creates a hostile environment and jeopardizes equal educational opportunity as guaranteed by the California Constitution and the United States Constitution." Cal. Educ. Code § 201(c).

203.    Section 220 of the California Education Code provides that "[n]o person shall be subjected to discrimination on the basis of disability, gender, gender identity, gender expression,

nationality, race or ethnicity, religion, sexual orientation, or any other characteristic that is contained in the definition of hate crimes set forth in Section 422.55 of the Penal Code, including immigration status, in any program or activity conducted by an educational institution that receives, or benefits from, state financial assistance, or enrolls pupils who receive state student financial aid."

204.    "Race or ethnicity" includes "ancestry, color, ethnic group identification, and ethnic background." Cal. Educ. Code § 212.1(a).

205.    "Religion" includes "all aspects of religious belief, observance, and practice and includes agnosticism and atheism." Cal. Ed. Code § 212.3. Section 220 prohibits discrimination against Jews. *See* Cal. Educ. Code § 201(g) ("It is the intent of the Legislature that this chapter shall be interpreted as consistent with . . . Title VI of the federal Civil Rights Act of 1964"); *Shaare Tefila*, 481 U.S. at 616 (discrimination against Jews is discrimination based on race).

206.    Violations of Section 220 of the California Education Code may be "enforced through a civil action." Cal. Educ. Code § 262.4.

207.    Section 49091.12(a) of the California Education Code provides that: "A pupil may not be compelled to affirm or disavow any particular personally or privately held world view, religious doctrine, or political opinion."

208.    Section 51500 of the California Education Code provides that: "A teacher shall not give instruction and a school district shall not sponsor any activity that promotes a discriminatory bias on the basis of race or ethnicity, gender, religion, disability, nationality, or sexual orientation, or because of a characteristic listed in Section 220."

209.    Section 51501 of the California Education Code provides that: "The state board and any governing board shall not adopt any textbooks or other instructional materials for use in the public schools that contain any matter reflecting adversely upon persons on the basis of race or ethnicity, gender, religion, disability, nationality, or sexual orientation, or because of a characteristic listed in Section 220." "Instructional materials" means "all materials that are designed for use by pupils and their teachers as a learning resource and help pupils to acquire facts, skills, or opinions or to develop cognitive processes. Instructional materials may be printed or nonprinted, and may include textbooks, technology-based materials, other educational materials, and tests." Cal. Ed. Code § 60010.

210.    Section 51513 of the California Education Code provides that: "No test, questionnaire, survey, or examination containing any questions about the pupil's personal beliefs or practices in sex, family life, morality, and religion, or any questions about the pupil's parents' or guardians' beliefs and practices in sex, family life, morality, and religion, shall be administered to any pupil in kindergarten or grades 1 to 12, inclusive, unless the parent or guardian of the pupil is notified in writing that this test, questionnaire, survey, or examination is to be administered and the parent or guardian of the pupil gives written permission for the pupil to take this test, questionnaire, survey, or examination."

211.    Section 60044 of the California Education Code provides that:  "A governing board shall not adopt any instructional materials for use in the schools that, in its determination, contain: (a) Any matter reflecting adversely upon persons on the basis of race or ethnicity, gender, religion, disability, nationality, sexual orientation, occupation, or because of a characteristic listed in Section 220; (b) Any sectarian or denominational doctrine or propaganda contrary to law."

212.    Section 60045 of the California Education Code provides that: "All instructional materials adopted by any governing board for use in the schools shall be, to the satisfaction of the governing board, accurate, objective, and current and suited to the needs and comprehension of pupils at their respective grade levels."

213.    A.B 101, the legislation mandating use of an ethnic studies curriculum in California public schools, contains a series of provisions to bar from the curriculum any teaching material that is biased, racist, or discriminatory, including antisemitic, anti-Israel, and anti-Zionist materials.

214.    A.B. 101 explicitly mandates that all material used to teach ethnic studies "[b]e appropriate for use with pupils of all races, religions, nationalities, genders, sexual orientations, and diverse ethnic and cultural backgrounds, pupils with disabilities, and English learners" and that all such material "[n]ot reflect or promote, directly or indirectly, any bias, bigotry, or discrimination against any person or group of persons on the basis of any category protected by Section 220." This list of protected categories includes discrimination based on nationality, religion, and ethnicity.

215.    SUHSD receives state financial assistance and is therefore subject to suit under Section 220.

216.    Plaintiffs' children were harmed by being subjected to harassment at SUHSD schools based on their Jewish ethnic and religious identity, in violation of California Education Code § 220.

217.    As alleged herein, Plaintiffs' children suffered harassment so severe, pervasive, and offensive that it effectively deprived them of the right of equal access to educational benefits and opportunities.

218.    Defendants had actual knowledge of the harassment.

219.    Defendants violated Plaintiffs' rights under California Education Code § 220 by acting with deliberate indifference because their response—or lack thereof—to the harassment was clearly unreasonable in light of all the known circumstances.  Defendants' intentional malfeasance and deliberate indifference includes, without limitation, (i) repeatedly refusing to conduct meaningful, unbiased, and effective investigations or undertake discernible remedial action in response to numerous antisemitic incidents on SUHSD campuses; (ii) distributing (and allowing to be distributed) instructional materials to students that gratuitously invoke anti-Israel and antisemitic tropes and that baselessly cast Israel and Jews as "aggressors"; (iii) repeatedly imparting (and allowing to be imparted) antisemitic, ahistorical, and pro-Hamas narratives under the guise of teaching World History, ethnic studies, and geometry; (iv) taunting, ridiculing, and humiliating (and allowing such taunting, ridicule, and humiliation of) Jewish students who challenged their teachers' blatantly antisemitic lectures; (v) actively concealing antisemitic teaching materials from concerned SUHSD parents; (vi) enforcing (and allowing teachers to enforce) antisemitic and anti-Israel teachings through tests and quizzes designed to compel Jewish students to disavow their personal beliefs to receive passing grades; (vii) delivering (and allowing to be delivered) "ethnic studies" lessons presenting ahistorical anti-Israel falsehoods and depicting Jews as secret "puppet masters" influencing "dominant narratives," a once-common depiction in Nazi propaganda; and (viii) broadcasting (and allowing to be broadcast) schoolwide videos conveying the message that reducing "hatred" means opposing the State of Israel and its "genocidal" Jewish inhabitants.

220.    As a direct and proximate result of Defendants' conduct, omissions, and deliberate indifference, Plaintiffs and their children suffered severe, pervasive, and objectively offensive discrimination based on their Jewish ancestry, race, ethnic characteristics, and/or national origin that

deprived Plaintiffs' children of full access to SUHSD's educational programs, activities, and opportunities.

221.    Defendants' actions were intentional and discriminatory, and they were not justified by any legitimate educational interest.

222.    Absent the injunctive and declaratory relief against Defendants requested herein, Plaintiffs will continue to be harmed by Defendants' actions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A.    Declare that Defendants' actions constitute unlawful discrimination under Title VI of the Civil Rights Act of 1964, the First and Fourteenth Amendments of the United States Constitution, the California Constitution, and the California Education Code;

B.    Issue preliminary and permanent injunctive relief:

1.    prohibiting Defendants' discriminatory and harassing treatment of Plaintiffs in violation of Plaintiffs' constitutional and statutory rights;

2.    prohibiting the District, its employees, agents, and representatives from engaging in any form of antisemitic behavior or conduct, including, but not limited to, verbal, written, or physical actions that demean, harass, or discriminate against individuals based on their Jewish identity or their identification with and commitment to Israel;

COMPLAINT

3.    ordering the District to adopt and implement a clear and comprehensive policy specifically addressing antisemitism, as defined by the International Holocaust Remembrance Alliance's Working Definition of Antisemitism, that is widely disseminated and communicated to all students, faculty, staff, administrators, and other relevant stakeholders through various means, such as posting the policy on school and District websites, distributing it during orientation sessions, and incorporating it into student handbooks and code of conduct documents. The policy should include an explicit statement on the centrality of the Jewish State of Israel to Judaism, classify as antisemitic any statements or actions that demean this identification and commitment, provide examples of prohibited conduct, and outline the consequences for violations;

4.    ordering the District to provide mandatory training and education programs to all employees, including teachers, administrators, and staff, on the topic of antisemitism that include strategies for recognizing and addressing antisemitic incidents and that promote understanding, empathy, and respect for Jewish individuals and communities and their connection to Israel, as antisemitism is defined in § B.3, *supra*;

5.    ordering the District to enhance its student curriculum to include education about antisemitism, including by incorporating age-appropriate and accurate information about the history, causes, and consequences of antisemitism, as antisemitism is defined in § B.3, *supra*;

6.    ordering the District to establish clear reporting and response protocols for incidents of antisemitism, including mechanisms for students, parents, and staff to report such incidents, as well as procedures for ensuring confidentiality, prompt investigation, appropriate disciplinary actions, and support for affected individuals;

7.    ordering the District to promptly terminate any teachers or administrators who have been found to have engaged in antisemitic discriminatory or harassing

conduct, as defined in § B.3, *supra*, or to have exhibited deliberate indifference to such conduct, including, without limitation, VAN PUTTEN, GRUSZYNSKI, and Wilson;

8.  ordering the District to review and revise their hiring and screening practices to ensure that individuals with a history of antisemitic behavior, as defined in § B.3, *supra*, are not employed or retained as teachers or staff members;

9.  ordering the District to conduct a comprehensive review of all course materials, textbooks, and instructional resources to identify and remove materials that contain antisemitic content or that perpetuate antisemitic stereotypes or biases;

10. ordering the District to establish a process for public disclosure of course materials that ensures transparency and accountability, and which may include creating a publicly accessible online repository or database where students, parents, and the general public can review and assess the content of course materials;

11. ordering the District to take proactive measures to prevent and address religious and ethnic harassment and bullying, including, but not limited to, implementing anti-bullying policies that specifically address antisemitism, as defined in § B.3, *supra*, conducting investigations into reported incidents, and imposing appropriate disciplinary actions when necessary;

12. ordering the District to implement anti-retaliation measures to protect individuals who report antisemitic incidents, as defined in § B.3, *supra*, cooperate in investigations, come forward with information, or file complaints; and

13. ordering Defendants to establish a monitoring and reporting system to ensure compliance with non-discrimination policies and to promptly address any future complaints of antisemitic discrimination, as defined at § B.3, *supra*.

COMPLAINT

C.    Appoint a qualified and impartial Special Master to oversee and monitor the District's implementation of policies against antisemitism, as defined at § B.3, *supra*, and compliance with the Court's Orders for a period of three years.  The Special Master should provide regular, public reports to the Court on the progress made and any challenges encountered.  The Special Master should be granted the necessary authority and oversight to ensure Defendants' full cooperation and compliance with the Court's orders, including the ability to request information, interview relevant individuals, and take any other actions deemed necessary to fulfill the Special Master's responsibilities.  The Special Master may provide recommendations for remedial measures to address antisemitic discrimination and harassment, as defined at § B.3, *supra*, and to create a more inclusive and respectful educational environment.  These recommendations may include policy revisions, training programs, and other appropriate actions to prevent future instances of antisemitic discrimination or harassment, as defined at § B.3, *supra*.

D.    Award Plaintiffs all costs of suit, including attorney fees and costs under 42 U.S.C. § 1988 and any other applicable law; and

E.    Award such other and further relief as the Court deems equitable and just.

DATED: Nov. 15, 2024    ROPES & GRAY LLP

By: _Ryan H. Weinstein_

    Ryan H. Weinstein
    10250 Constellation Boulevard
    Los Angeles, California 90067
    Telephone:  +1 310 975 3310
    Facsimile:   +1 310 975 3400
    ryan.weinstein@ropesgray.com

By: _____

    Amy Jane Longo
    Three Embarcadero Center
    San Francisco, CA 94111-4006
    Telephone:  +1 415 315 2301
    Facsimile:  +1 415 315 6350
    amy.longo@ropesgray.com

    Gregg L. Weiner*
    Alexander B. Simkin*
    Elana M. Stern*
    Judy Faktorovich*
    Laura Medina*
    1211 Avenue of the Americas
    New York, New York 10036
    Telephone:  +1 212 596 9000
    Facsimile:   +1 212 596 9090
    gregg.weiner@ropesgray.com
    alexander.simkin@ropesgray.com
    elana.stern@ropesgray.com
    judy.faktorovich@ropesgray.com
    laura.medina@ropesgray.com


    Attorneys for Plaintiffs

   * pro hac vice application pending


THE DEBORAH PROJECT

By: _Lori Lowenthal Marcus_

Lori Lowenthal Marcus*
Jerome M. Marcus*
P.O. Box 212
Merion Station, PA 19066
Telephone:  +1 610 880 0100
Facsimile:  +1 610 664 1559
lorilowenthalmarcus@deborah
   project.org
jmarcus@deborahproject.org

62

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs respectfully demand a trial by jury on all issues triable thereby.

DATED: Nov. 15, 2024   ROPES & GRAY LLP                    THE DEBORAH PROJECT

By: _____              By: _____

Ryan H. Weinstein                                   Lori Lowenthal Marcus*
10250 Constellation Boulevard                       Jerome M. Marcus*
Los Angeles, California 90067                        P.O. Box 212
Telephone:  +1 310 975 3310                          Merion Station, PA 19066
Facsimile:   +1 310 975 3400                         Telephone:  +1 610 880 0100
ryan.weinstein@ropesgray.com                         Facsimile:  +1 610 664 1559
                                                     lorilowenthalmarcus@deborah
By: _____                            project.org
                                                     jmarcus@deborahproject.org
Amy Jane Longo
Three Embarcadero Center
San Francisco, CA 94111-4006
Telephone:  +1 415 315 2301
Facsimile:  +1 415 315 6350
amy.longo@ropesgray.com


Gregg L. Weiner*
Alexander B. Simkin*
Elana M. Stern*
Judy Faktorovich*
Laura Medina*
1211 Avenue of the Americas
New York, New York 10036
Telephone:  +1 212 596 9000
Facsimile:   +1 212 596 9090
gregg.weiner@ropesgray.com
alexander.simkin@ropesgray.com
elana.stern@ropesgray.com
judy.faktorovich@ropesgray.com
laura.medina@ropesgray.com


Attorneys for Plaintiffs

* pro hac vice application pending

COMPLAINT