1  Ryan H. Weinstein (Cal. Bar No. 240405)
   ryan.weinstein@ropesgray.com
2  ROPES & GRAY LLP
   10250 Constellation Boulevard
3  Los Angeles, California 90067
   Telephone: +1 310 975 3310
4  Facsimile: +1 310 975 3400

5  Lori Lowenthal Marcus*
   lorilowenthalmarcus@deborahproject.org
6  Jerome M. Marcus*
   jmarcus@deborahproject.org
7  THE DEBORAH PROJECT
   P.O. Box 212
8  Merion Station, Pennsylvania 19066
   Telephone: +1 610 880 0100
9  Facsimile: +1 610 664 1559

10  *[Additional counsel on next page]*

11  Attorneys for Plaintiffs

12  * admitted pro hac vice

13              UNITED STATES DISTRICT COURT

14            NORTHERN DISTRICT OF CALIFORNIA

15                SAN FRANCISCO DIVISION

16  CONCERNED JEWISH PARENTS OF            )   Case No. 3:24-cv-08015-MMC
    SEQUOIA UNION HIGH SCHOOL DISTRICT;    )
17  L.K., a minor, by and through her Guardians ad  )   **PLAINTIFFS' OPPOSITION TO**
    Litem, Sam and Andrea Kasle; S.B., a minor, by  )   **DEFENDANTS' MOTION TO DISMISS**
18  and through her Guardians ad Litem, Igor and   )
    Marina Bershteyn; W.K., a minor, by and through )
19  his Guardian ad Litem, Margarette Kesselman;    )   Hearing Date:  February 20, 2026
    ADAM LYLE; OLIVIA REIF; DINA BERG;     )   Time:  9:00 a.m.
20  OMER BECK; SAM KASLE; ANDREA           )   Courtroom:  7
    KASLE; SCOTT LYLE; and LORI LYLE,       )
21                                          )
            Plaintiffs,                      )
22                                          )
            v.                               )
23                                          )
    SEQUOIA UNION HIGH SCHOOL DISTRICT,    )
24  GREGORY S. GRUSZYNSKI, ABDULHADI       )
    "HADI" KADDOURA, KARL LOSEKOOT,        )
25  CRYSTAL LEACH, BONNIE HANSEN, TODD     )
    BEAL, RICHARD GUNN, AMY KOO, each in   )
26  their official and personal capacities; and      )
    CARRIE DU BOIS, and SHAWNEECE          )
27  STEVENSON, in their personal capacities,        )
                                            )
28          Defendants.                      )

Amy Jane Longo (Cal. Bar No. 198304)
ROPES & GRAY LLP
Three Embarcadero Center
San Francisco, California 94111-4006
Telephone:  +1 415 315 2301
Facsimile:  +1 415 315 6350
amy.longo@ropesgray.com

David B. Hennes*
Gregg L. Weiner*
Alexander B. Simkin*
Elana M. Stern*
Hannah Shapiro*
Luke Colle*
Lauren Brady*
Laura Medina*
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, New York 10036
Telephone:  +1 212 596 9000
Facsimile:   +1 212 596 9090
david.hennes@ropesgray.com
gregg.weiner@ropesgray.com
alexander.simkin@ropesgray.com
elana.stern@ropesgray.com
hannah.shapiro@ropesgray.com
luke.colle@ropesgray.com
lauren.brady@ropesgray.com
laura.medina@ropesgray.com

* admitted pro hac vice

# <u>TABLE OF CONTENTS</u>

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................1

PRELIMINARY STATEMENT .....................................................................................................1

ARGUMENT ..................................................................................................................................3

I.   PLAINTIFFS STATE A CLAIM FOR VIOLATION OF TITLE VI
     (COUNT 1) ...............................................................................................................3

     A.   The Amended Complaint Pleads a Pervasive Hostile Environment............3

     B.   The Amended Complaint Pleads Notice and a Failure to Take
          Reasonable Steps to Eliminate the Hostile Environment ...........................5

     C.   Defendants' Attempt to Disaggregate the Numerous Antisemitic
          Incidents Is Contrary to Law.......................................................................8

     D.   Plaintiffs Have Standing to Assert Their Claims.......................................10

II.  PLAINTIFFS STATE CLAIMS FOR VIOLATIONS OF SECTION 1983
     (COUNTS 2–4)........................................................................................................12

     A.   The Amended Complaint States an Equal Protection Claim (Count 2).....12

          1.   District Staff Intentionally Targeted Jewish Students and
               Responded to Antisemitic Harassment with Deliberate
               Indifference ...................................................................................13

          2.   Defendants' "Classroom Instruction" Arguments
               Misapprehend the Complaint's Allegations and the Limits of
               Curricular Deference......................................................................14

          3.   Defendants' Factual Challenges are Unfounded and
               Premature .......................................................................................15

     B.   The Amended Complaint States a Free Exercise Claim (Count 3) ...........15

          1.   The District Exerted Coercive Pressure By Penalizing
               Students for Declining to Affirm Propositions that
               Contravene their Religious Beliefs .................................................16

          2.   The District's Broader Conduct Created a Non-Neutral
               Environment that Penalized Religious Identity ..............................17

3.     Defendants' Reliance on "Mere Exposure" Cases Is Misplaced ................................................................................18

C.     The Amended Complaint States a Free Speech Claim (Count 4) ..............19

III.    PLAINTIFFS HAVE SUFFICIENTLY ALLEGED PERSONAL-CAPACITY LIABILITY AGAINST THE INDIVIDUAL DEFENDANTS .......21

A.     Plaintiffs Have Alleged Personal-Capacity Liability Against Defendant Gruszynski ................................................................22

B.     Plaintiffs Have Alleged Personal-Capacity Liability Against Defendant Kaddoura ................................................................22

C.     Plaintiffs Have Alleged Personal-Capacity Liability Against the District-Level Administrator Defendants ..................................23

D.     Plaintiffs Have Alleged Personal-Capacity Liability Against the Trustee Defendants, Who are Not Entitled to Legislative Immunity ........24

IV.    PLAINTIFFS STATE A CLAIM FOR PUNITIVE DAMAGES UNDER SECTION 1983 ................................................................25

V.     IN THE ALTERNATIVE, PLAINTIFFS SHOULD BE GRANTED LEAVE TO AMEND ................................................................25

CONCLUSION ................................................................25

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)............................................................................................2

5

*B.S. by & through Smith v. Indep. Sch. Dist. No. 623*,
6    2021 WL 1985973 (D. Minn. May 18, 2021).....................................................13

7    *Bart v. Telford*,
677 F.2d 622 (7th Cir. 1982) ...............................................................................8

8

*Bell Atl. Corp. v. Twombly*,
9    550 U.S. 544 (2007)............................................................................................2

10   *Boyd v. Feather River Cmty. Coll. Dist.*,
2011 WL 5024547 (E.D. Cal. Oct. 20, 2011) ......................................................5

11

*Brown v. Sweetwater Union High Sch. Dist.*,
12   2025 WL 525111 (S.D. Cal. Feb. 18, 2025) ......................................................24

13   *California Parents for the Equalization of Educ. Materials v. Torlakson*,
973 F.3d 1010 (9th Cir. 2020) ......................................................................15, 18

14

*Roe ex rel. Callahan v. Gustine Unified Sch. Dist.*,
15   678 F. Supp. 2d 1008 (E.D. Cal. 2009)................................................................5

16   *Celebrity Chefs Tour, LLC v. Macy's, Inc.*,
16 F. Supp. 3d 1123 (S.D. Cal. 2014) ...............................................................25

17

*Comm. Concerning Cmty. Improvement v. City of Modesto*,
18   583 F.3d 690 (9th Cir. 2009) .............................................................................14

19   *Concerned Jewish Parents & Tchrs. of Los Angeles v. Liberated Ethnic Stud. Model*
*Curriculum Consortium*,
20   2024 WL 5274857 (C.D. Cal. Nov. 30, 2024)...............................................15, 20

21   *Crandell v. N.Y. Coll. of Osteopathic Medicine*,
87 F. Supp. 2d 304 (S.D.N.Y. 2000) ....................................................................8

22

*Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*,
23   526 U.S. 629 (1999).....................................................................................1, 3, 5

24   *DiStiso v. Cook*,
691 F.3d 226 (2d Cir. 2012)............................................................................6, 7

25

*Edwards v. MUBI, Inc.*,
26   773 F. Supp. 3d 868 (N.D. Cal. 2025) .................................................................2

27   *Ellins v. City of Sierra Madre*,
710 F.3d 1049 (9th Cir. 2013) ...........................................................................21

28

II

*Ellis v. Houston,*
   742 F.3d 307 (8th Cir. 2014) .......................................................................4, 8

*Ellison v. Brady,*
   924 F.2d 872 (9th Cir. 1991) ...........................................................................8

*C.F. ex rel. Farnan v. Capistrano Unified Sch. Dist.,*
   654 F.3d 975 (9th Cir. 2011) .........................................................................11

*Flores v. Morgan Hill Unified Sch. Dist.,*
   324 F.3d 1130 (9th Cir. 2003) ............................................................7, 12, 13

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,*
   528 U.S. 167 (2000) ...............................................................................12, 18

*Grimes v. Bd. of Trs. for Northcentral Univ.,*
   2024 WL 150724 (S.D. Cal. Jan. 12, 2024).....................................................5

*Grove v. Mead Sch. Dist. No. 354,*
   753 F.2d 1528 (9th Cir. 1985) .......................................................................16

*Harlow v. Fitzgerald,*
   457 U.S. 800 (1982) ......................................................................................21

*Harris v. Forklift Sys., Inc.,*
   510 U.S. 17 (1993) ..........................................................................................8

*Hazelwood Sch. Dist. v. Kuhlmeier,*
   484 U.S. 260 (1988) ......................................................................................19

*Head v. Bd. of Trs. of California State Univ.,*
   315 F. App'x 7 (9th Cir. 2008) ......................................................................20

*Henry A. v. Willden,*
   678 F.3d 991 (9th Cir. 2012) .........................................................................21

*Holloman ex rel. Holloman,*
   370 F.3d 1252 (11th Cir. 2004) .....................................................................23

*Honig v. Doe,*
   484 U.S. 305 (1988) ......................................................................................11

*Hunt v. Wash. State Apple Advert. Comm'n,*
   432 U.S. 333 (1977) ................................................................................11, 12

*J.G. on behalf of K.C. v. Hackettstown Pub. Sch. Dist.,*
   2018 WL 3756952 (D.N.J. 2018) ....................................................................5

*Johnson v. Duffy,*
   588 F.2d 740 (9th Cir. 1978) ...................................................................23, 24

*Johnson v. Poway Unified Sch. Dist.,*
   658 F.3d 954 (9th Cir. 2011) .........................................................................22

III

*Kaahumanu v. Cnty. of Maui*,
   315 F.3d 1215 (9th Cir. 2003) ...................................................................................24

*Katchur v. Thomas Jefferson Univ.*,
   354 F. Supp. 3d 655 (E.D. Pa. 2019) ..........................................................................5

*Kennedy v. Bremerton Sch. Dist.*,
   597 U.S. 507 (2022).............................................................................................15, 16

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018) ..................................................................................2, 3

*Knievel v. ESPN*,
   393 F.3d 1068 (9th Cir. 2005) ....................................................................................2

*L.E. v. Lakeland Joint Sch. District #272*,
   403 F. Supp. 3d 888 (D. Idaho 2019) ......................................................................7, 8

*L.T. v. Eleanor Murray Fallon Middle Sch.*,
   2024 WL 3678014 (N.D. Cal. Aug. 5, 2024) ......................................................*passim*

*Laborers Int'l Union Loc. 261 v. City & Cnty. of San Francisco*,
   2022 WL 2528602 (N.D. Cal. July 6, 2022)..............................................................12

*Landau v. Haverford Coll.*,
   780 F. Supp. 3d 548 (E.D. Pa. 2025) ..........................................................................9

*Larez v. City of Los Angeles*,
   946 F.2d 630 (9th Cir. 1991) ....................................................................................21

*Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*,
   507 U.S. 163 (1993).................................................................................................12

*Lopez v. Smith*,
   203 F.3d 1122 (9th Cir. 2000) (en banc) ..................................................................25

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992).................................................................................................10

*Mahmoud v. Taylor*,
   606 U.S. 522 (2025).............................................................................................16, 17

*Martinez-Serrano v. I.N.S.*,
   94 F.3d 1256 (9th Cir. 1996) ....................................................................................22

*Mayer v. Monroe Cnty. Cmty. Sch. Corp.*,
   474 F.3d 477 (7th Cir. 2007) ....................................................................................22

*Memphis Cmty. Sch. Dist. v. Stachura*,
   477 U.S. 299, 307 (1986). .........................................................................................11

*Methelus v. Sch. Bd. of Collier Cnty.*,
   243 F. Supp. 3d 1266 (M.D. Fla. 2017).....................................................................13

IV

*Monteiro v. Tempe Union High Sch. Dist.*,
  158 F.3d 1022 (9th Cir. 1998) ...................................................................................*passim*

*O'Connor v. City of Newark*,
  440 F.3d 125 (3d Cir. 2006).................................................................................................8

*Or. Advoc. Ctr. v. Mink*,
  322 F.3d 1101 (9th Cir. 2003) ...........................................................................................11

*Parents Involved in Comm. Schs. v. Seattle Sch. Dist. No. 1*,
  551 U.S. 701 (2007)....................................................................................................11, 12

*Preschooler II v. Clark Cnty. Sch. Bd. of Trs.*,
  479 F.3d 1175 (9th Cir. 2007) ...........................................................................................23

*Roberts v. Madigan*,
  921 F.2d 1047 (10th Cir. 1990) (*see* Mot. ) ....................................................................10

*Sabra v. Maricopa Cnty. Cmty. Coll. Dist.*,
  44 F.4th 867 (9th Cir. 2022) ..............................................................................................17

*Sch. Dist. of Abington Twp. v. Schempp*,
  374 U.S. 203 (1963)............................................................................................................16

*Shaare Tefila Congregation v. Cobb*,
  481 U.S. 615 (1987)......................................................................................................3, 13

*Smith v. Wade*,
  461 U.S. 30 (1983)..............................................................................................................25

*Stanley v. Trs. of Cal. State Univ.*,
  433 F.3d 1129 (9th Cir. 2006) .............................................................................................3

*Starr v. Baca*,
  652 F.3d 1202 (9th Cir. 2011) .....................................................................................21, 24

*Students for Just. in Palestine v. Abbott*,
  756 F. Supp. 3d 410 (W.D. Tex. 2024)...............................................................................22

*T.V. v. Sacramento City Unified Sch. Dist.*
  2016 WL 397604 (E.D. Cal. Feb. 2, 2016)...................................................................4, 5, 6

*Taylor v. Yee*,
  780 F.3d 928 (9th Cir. 2015) ...............................................................................................2

*Tesoriero v. Syosset Cent. Sch. Dist.*,
  382 F. Supp. 2d 387 (E.D.N.Y. 2005) ..................................................................................7

*Thomas v. Rev. Bd. of Ind. Emp't Sec. Div.*,
  450 U.S. 707 (1981)......................................................................................................16, 17

*Trevino by & through Cruz v. Gates*,
  23 F.3d 1480 (9th Cir. 1994) .............................................................................................24

*W. Va. State Bd. of Educ. v. Barnette*,
   319 U.S. 624 (1943) ...............................................................................................19

*Walker v. Ford Motor Co.*,
   684 F.2d 1355 (11th Cir. 1982) ...............................................................................9

*Waltman v. Int'l Paper Co.*,
   875 F.2d 468 (5th Cir. 1989) .....................................................................................9

*Warth v. Seldin*,
   422 U.S. 490 (1975) ...............................................................................................12

*Weiss v. Perez*,
   635 F. Supp. 3d 930 (N.D. Cal. 2022) ....................................................................2

*West v. Atkins*,
   487 U.S. 42 (1988)..................................................................................................12

*West v. City & Cnty. of San Francisco*,
   2022 WL 1556415 (N.D. Cal. May 17, 2022) .........................................................3

*Where Do We Go Berkeley v. Cal. Dept. of Transp.*,
   32 F.4th 852 (9th Cir. 2022) ..................................................................................11

*Williams v. Jersey Shore Area Sch. Dist.*,
   2023 WL 8703402 (M.D. Pa. Dec. 15, 2023) .........................................................7

*Wood v. Arnold*,
   915 F.3d 308 (4th Cir. 2019) .................................................................................19

*Zeno v. Pine Plains Cent. Sch. Dist.*,
   2009 WL 1403935 (S.D.N.Y. May 19, 2009) ........................................................7

*Zeno v. Pine Plains Cent. Sch. Dist.*,
   702 F.3d 655 (2d Cir. 2012)...................................................................................11

**Statutes**

Title VI of the Civil Rights Act of 1964 ...............................................................*passim*

42 U.S.C. § 1983 ...................................................................................................*passim*

**Rules**

Fed. R. Civ. P. 8 ......................................................................................................2, 5

Fed. R. Civ. P. 12(b)(6) ...........................................................................................2, 7

Fed. R. Civ. P. 17(c) ..................................................................................................11

## MEMORANDUM OF POINTS AND AUTHORITIES

### Preliminary Statement

This action arises from the Sequoia Union High School District's ("District") failure to address a pervasive environment of antisemitic harassment and discrimination within its schools. As alleged in the Amended Complaint, Jewish students have been subjected to a sustained pattern of discriminatory conduct—including physical threats, the use of hate symbols, and the dissemination of instructional materials that promote antisemitic tropes—perpetrated by both peers and District faculty. Despite receiving actual notice of these conditions, District officials responded with deliberate indifference, effectively denying Jewish students equal access to educational opportunities.

Defendants' motion to dismiss rests on a fundamental misapprehension of the governing legal standards. First, Plaintiffs have stated a cognizable claim under Title VI of the Civil Rights Act of 1964. Contrary to Defendants' attempt to disaggregate individual incidents, a hostile educational environment claim must be assessed based on the totality of the circumstances.[1] Courts consistently reject the "atomization" of hostile-environment claims, recognizing that the actionable wrong is the environment itself, not any single constituent act. Defendants also err in suggesting that every Plaintiff must have witnessed or been the direct target of every instance of harassment; the law imposes no such requirement. As the Ninth Circuit has explained, discriminatory acts "need not be directed at the complainant in order to create a hostile educational environment."[2] And the same is true for standing purposes: a plaintiff has standing to sue based on all antisemitic acts that are part of the hostile educational environment, even if they did not personally witness or experience every act.

Second, the Amended Complaint plausibly alleges violations of the First and Fourteenth Amendments. The allegations describe not a mere pedagogical dispute, but intentional antisemitic hostility by state actors and the unconstitutional conditioning of academic success on students' affirmation of antisemitic and anti-Israel ideological viewpoints. Defendants' assertion that classroom instruction is immune from constitutional scrutiny finds no support in controlling precedent. The District's discretion does not authorize the discriminatory application of its policies or the use of its

---

[1] *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 651 (1999); *infra* n.3.
[2] *Monteiro v. Tempe Union High Sch. Dist.,* 158 F.3d 1022, 1033 (9th Cir. 1998).

1

1  authority to coerce students into ratifying views at odds with their religious beliefs.

2  Finally, Defendants' repeated arguments inviting the Court to weigh the severity of the

3  harassment and the purported reasonableness of Defendants' responses are improper at this stage. These

4  are fact-intensive questions reserved for summary judgment or trial, not a motion to dismiss. That

5  Defendants' arguments are prematurely fact-based is evidenced by their improper submission of

6  declarations and exhibits that go far beyond the pleadings. Because the Amended Complaint pleads

7  specific facts that, if proven, establish violations of federal law, Plaintiffs have satisfied Rule 8's

8  pleading standard. Defendants' motion should be denied.

9  <u>**Legal Standard**</u>

10  To survive a motion to dismiss under Rule 12(b)(6), a complaint need only "contain sufficient

11  factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*,

12  556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is

13  plausible when the plaintiff pleads "factual content that allows the court to draw the reasonable inference

14  that the defendant is liable for the misconduct alleged." *Id*. Dismissal is appropriate "only where there

15  is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal

16  theory." *Taylor v. Yee*, 780 F.3d 928, 935 (9th Cir. 2015).

17  In evaluating a motion to dismiss, the court must "accept all factual allegations in the complaint

18  as true and construe the pleadings in the light most favorable to the nonmoving party." *Knievel v. ESPN*,

19  393 F.3d 1068, 1072 (9th Cir. 2005). This inquiry requires the court to assess the allegations collectively

20  rather than in piecemeal fashion. *Weiss v. Perez*, 635 F. Supp. 3d 930, 938–39 (N.D. Cal. 2022). Rule

21  12(b)(6) does not permit the resolution of factual disputes, *Edwards v. MUBI, Inc*., 773 F. Supp. 3d 868,

22  879 (N.D. Cal. 2025), nor does it allow for the consideration of materials outside the four corners of the

23  complaint unless those materials are incorporated by reference or subject to judicial notice. *Khoja v.*

24  *Orexigen Therapeutics, Inc*., 899 F.3d 988, 998 (9th Cir. 2018). Indeed, the Ninth Circuit has cautioned

25  against the "unscrupulous use of extrinsic documents to resolve competing theories against the

26  complaint." *Id*. Defendants here employ precisely such a tactic, submitting declarations and exhibits that

27  are neither incorporated in the complaint nor judicially noticeable. Because these materials invite a

28  premature adjudication of the merits, they are not properly before the Court and should be

2

1 disregarded. *Id.*

2 **Argument**

3 **I.     PLAINTIFFS STATE A CLAIM FOR VIOLATION OF TITLE VI (COUNT 1)**

4        Title VI of the Civil Rights Act of 1964 prohibits discrimination based on actual or perceived

5 shared ancestry or ethnic characteristics, a protection that encompasses antisemitic harassment. *See*

6 *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 617–18 (1987) (holding that Jews may state a claim

7 of racial discrimination under federal civil rights statutes because they were among the groups within

8 the statutes' protection). Under the framework established in *Davis*, a funding recipient is liable under

9 Title VI when it is "deliberately indifferent to known acts of" "harassment" that is "so severe, pervasive,

10 and objectively offensive that it effectively bars the victim's access to an educational opportunity or

11 benefit." 526 U.S. 629, 633, 641 (1999).[3] To state a claim, a plaintiff must therefore allege that "(1)

12 there is a [] hostile environment; (2) the district had notice of the problem; and (3) it failed to respond

13 adequately to redress the [] hostile environment." *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d

14 1022, 1033 (9th Cir. 1998) (internal citations omitted); *see Davis*, 526 U.S. at 633, 642, 648–50. The

15 Amended Complaint satisfies each element.

16        **A.     The Amended Complaint Pleads a Pervasive Hostile Environment**

17        Defendants' assertion that Plaintiffs allege no "conduct that creates a hostile educational

18 environment" (Mot. at 20) simply ignores the Amended Complaint's detailed allegations. The Amended

19 Complaint describes a persistent, years-long pattern of antisemitic harassment and school-sponsored

20 discrimination that cumulatively deprived Jewish students of equal access to the District's programs.

21 The allegations include not only peer-to-peer harassment—such as slurs and explicit death threats (AC

22 ¶ 80)—but also intentional conduct by District staff that exacerbated the hostile atmosphere.

23        For example, Plaintiffs allege a Jewish student at Menlo-Atherton was called a "kike," told that

24 "all Jews should die," and threatened that "all Israel supporters should get killed," with administrators

25 blaming the victim and discouraging transparency about the incident. *Id.* ¶ 80(a). Another student who

26 ─────────────────────

27        [3] Courts apply the same analysis to harassment claims under Title VI and Title IX. *Stanley v. Trs. of Cal. State Univ.*, 433 F.3d 1129, 1134 (9th Cir. 2006); *see also West v. City & Cnty. of San Francisco*,

28 2022 WL 1556415, at *10 (N.D. Cal. May 17, 2022) ("To state a prima facie case of deliberate indifference under Title VI, courts borrow from the standard under Title IX").

3

wore a Star of David necklace was told to conceal it to avoid being targeted and that she would "get what she deserved" if she continued to wear it. *Id.* ¶ 122. The Amended Complaint details recurring incidents of swastika graffiti at multiple schools, which administrators trivialized as "Buddhist anime"— despite knowing the perpetrator understood that he had drawn a notorious symbol of Jewish hatred— and falsely claimed to have involved law enforcement. *Id.* ¶¶ 61, 69–79, 81. The hostile environment was further compounded by staff conduct: Teachers made Holocaust jokes, singled out Jewish students with demeaning comments about Jewish identity and appearance (*id.* ¶ 127 (*e.g.,* "you have friends?" and asking if the student was Jewish, which he "could tell by her nose")), taunted and ridiculed Jewish students for challenging antisemitic classroom instruction (*id.* ¶¶ 61(f), 89, 141–42 (*e.g.,* singling out a Jewish student by telling the class, "[L.K.] is someone who doesn't think Israel is an apartheid state. . . . Maybe now others will think differently")), and taught ahistorical, anti-Jewish lessons under the guise of world history, ethnic studies, and even *geometry* instruction, all without District oversight. *Id.* ¶¶ 80(b), 93–99, 111–20. A schoolwide video disseminated antisemitic and anti-Israel messages, and yet the principal responded by shifting blame and refusing "to act to rectify the hostile educational environment." *Id.* ¶¶ 124–29. A teacher later removed a Jewish and Israeli-American student from what was required to be a *student-run* club for taking notes and questioning the instructor's antisemitic viewpoints. AC ¶¶ 133–49. Viewed in their totality, these numerous incidents demonstrate a pervasively hostile environment meeting the *Davis* standard. *See, e.g.*, *T.V. v. Sacramento City Unified Sch. Dist.* 2016 WL 397604, at *5 (E.D. Cal. Feb. 2, 2016) (denying motion to dismiss Title VI hostile educational environment claims where plaintiffs alleged numerous incidents of racial animus).[4]

These incidents also demonstrate a "concrete, negative effect" under *Davis*. The Amended Complaint details systemic injuries, including chilled speech, exclusion from school programming, recurring exposure to antisemitic epithets and graffiti, and psychological distress. *See, e.g.,* AC ¶¶ 80, 114 (antisemitic slurs and death threats); *id.* ¶ 122 (student stopped wearing Star of David to avoid being

---

[4] These numerous incidents must be viewed as merely illustrative, not exhaustive. When a plaintiff sets forth "[s]pecific examples cited as discriminatory and alleged to be part of a pattern of hostile treatment," courts are to view these as "'examples of the offensive racial incidents . . . not as 'an exhaustive litany of every offensive racial slur or incident' which occurred." *Ellis v. Houston*, 742 F.3d 307, 319 (8th Cir. 2014) (citation omitted).

targeted); *id*. ¶¶ 89, 127, 134 (taunts and humiliation by teachers); *id*. ¶¶ 133–49 (student excluded from school club for questioning teacher's antisemitic viewpoints); *id*. ¶¶ 85, 99 (students feared for their safety); *id*. ¶ 89 (student reduced to tears and experienced anxiety); *id*. ¶ 89 (teacher chilled student's classroom participation); *see also id*. ¶ 174 (alleging that the hostile educational environment collectively denied Plaintiffs "equal access to educational opportunities and benefits"). These allegations comfortably satisfy Rule 8's "short and plain statement" requirement. [5]

Finally, Defendants' invitation to weigh the severity of the individual antisemitic incidents is premature at best. *See, e.g.*, Mot. at 17–18. Whether an environment is sufficiently hostile is "a question of fact that must be determined based on the totality of the circumstances," not based on the pleadings. *L.T. v. Eleanor Murray Fallon Middle Sch.*, 2024 WL 3678014, at *6 (N.D. Cal. Aug. 5, 2024) (denying motion to dismiss Title VI hostile-environment claim and explaining that the district's "argument is more appropriate at a later stage in the proceedings"); *Boyd v. Feather River Cmty. Coll. Dist.*, 2011 WL 5024547, at *3 (E.D. Cal. Oct. 20, 2011) (denying motion to dismiss Title VI hostile-environment claim; defendants' arguments that the alleged discrimination was not sufficiently severe or pervasive were "premature"); *T.V.*, 2016 WL 397604, at *6 ("Whether the environment is in fact racially hostile is a question of fact not appropriate for resolution on a motion to dismiss.").[6] The Amended Complaint's allegations are more than sufficient to satisfy *Davis's* first element.

### B.    The Amended Complaint Pleads Notice and a Failure to Take Reasonable Steps to Eliminate the Hostile Environment

The Amended Complaint likewise sufficiently pleads *Davis's* second and third elements: notice and deliberate indifference. A school district has a "legal duty to take reasonable steps to eliminate a

---

[5] *See, e.g.*, *Roe ex rel. Callahan v. Gustine Unified Sch. Dist.,* 678 F. Supp. 2d 1008, 1028 (E.D. Cal. 2009) (identifying "being diagnosed with behavioral or anxiety disorders" as a concrete negative effect); *Katchur v. Thomas Jefferson Univ.,* 354 F. Supp. 3d 655, 664 (E.D. Pa. 2019) (conduct is hostile where it is physically threatening or humiliating); *J.G. on behalf of K.C. v. Hackettstown Pub. Sch. Dist.*, 2018 WL 3756952, at *5 (D.N.J. 2018) (denying motion to dismiss where defendants used slurs).

[6] *See also Monteiro v. Tempe Union High Sch. District*, 158 F.3d 1022, 1033 (9th Cir. 1998) ("Whether a hostile educational environment exists is a question of fact, determined with reference to the totality of the circumstances."); *Grimes v. Bd. of Trs. for Northcentral Univ.*, 2024 WL 150724, at *4 (S.D. Cal. Jan. 12, 2024) (reiterating that "the existence of a hostile educational environment is a question of fact that must be determined based on the totality of the circumstances," citing *Monteiro*).

racially hostile environment" once it has notice. *Monteiro*, 158 F.3d at 1034. Plaintiffs plead repeated notice to administrators—via incident reports, meetings, and formal Unified Complaint Procedures filings—that were met with dilatory or dismissive responses and no effective remedy. *See, e.g.*, AC ¶¶ 70, 76–79, 100–11, 128–32 (detailing emails, requests for materials, meetings, and UCP outcomes). Contrary to Defendants' mischaracterizations (*see* Mot. at 17–18, 22–23), the Amended Complaint does not merely allege that Plaintiffs disagreed with Defendants' responses to certain incidents, but that Defendants failed to respond in any meaningful way, lied about and obfuscated the purported remedial steps they claimed to take (but did not), shifted blame to student-victims, disclaimed responsibility, and suggested that the victims resolve the issue themselves by confronting their harassers. AC ¶¶ 69–79 (alleging sham investigation of swastika incident at Woodside, including Van Putten's lie about police involvement, and administrators' failure to act); 95–96, 100–11 (refusing to respond to parent complaints, produce teaching materials as required by law, or meet with concerned parents); 75, 78 (administrators shifting blame to student-victims to educate peers); 61(f) (administrators suggesting victims change classes to avoid harassment); 61(b) (administrators referring Jewish students to counselors after discovery of swastika graffiti, but taking no other action); 129 (disclaiming responsibility for anti-Jewish and anti-Israel video).

Such allegations of repeated notice followed by dilatory, dismissive, or sham responses plausibly plead Title VI notice and deliberate indifference under Ninth Circuit standards. *See, e.g.*, *L.T.*, 2024 WL 3678014, at *5 (denying motion to dismiss Title VI claim where, *inter alia*, "the District's decision makers were aware of numerous incidents that resulted in direct discrimination against [student], and they failed to take direct measures to combat these incidents and instead had [the victim] speak to the students about why their remarks were harmful."); *T.V.*, 2016 WL 397604, at *5 (denying motion to dismiss Title VI claims where plaintiffs alleged numerous incidents that demonstrated hostile environment); *Monteiro*, 158 F.3d at 1034–35 (complaint sufficiently alleged hostile-environment claim where parents and students repeatedly complained of harassment and district rebuffed those complaints).

Defendants' contention (Mot. at 17) that deliberate indifference requires an "official decision not to remedy the violation" finds no support in the law. As courts have repeatedly recognized, deliberate indifference is a fact-intensive inquiry that resists bright lines. *See DiStiso v. Cook*, 691 F.3d 226, 241–

6

43 (2d Cir. 2012). The mere "fact that individual responses were made . . . is not dispositive as to the question of deliberate indifference." *Zeno v. Pine Plains Cent. Sch. Dist.*, 2009 WL 1403935, at *2 (S.D.N.Y. May 19, 2009); *see also L.T.*, 2024 WL 3678014, at *6 (rejecting defendant's purported investigation defense on Rule 12(b)(6) motion). The governing standard is instead one of objective reasonableness: liability attaches where administrators respond to "known . . . harassment in a manner that is . . . clearly unreasonable." *Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1135–36 (9th Cir. 2003). District officials violate this standard where, as here, they "fail[ed] to take any further steps" after learning that their initial remedial measures were "inadequate" to stop harassment. *Id.* at 1135–36.

Defendants' remaining arguments rely on unfounded factual assertions improper for resolution on a motion to dismiss. *See, e.g.*, Mot. at 17–19 (claiming "[in]sufficient facts" to show that Defendants' responses were unreasonable). Whether a school district properly investigated instances of harassment is "a question to be resolved after fulsome discovery has taken place, not on a motion to dismiss." *Williams v. Jersey Shore Area Sch. Dist.*, 2023 WL 8703402, at *4 (M.D. Pa. Dec. 15, 2023) (denying Rule 12(b)(6) motion on Title VI deliberate-indifference claim); *L.E. v. Lakeland Joint Sch. Dist. #272*, 403 F. Supp. 3d 888, 906 (D. Idaho 2019) (deliberate-indifference inquiry "generally does not lend itself well" to judicial resolution at early stages); *Tesoriero v. Syosset Cent. Sch. Dist.*, 382 F. Supp. 2d 387, 398 (E.D.N.Y. 2005) ("Deliberate indifference will often be a fact-laden question, for which bright lines are ill-suited" (citation omitted)). This is particularly true where, as here, Defendants rely on a version of events that finds no support in the Amended Complaint. For example, while Defendants claim to have conducted a robust investigation into the "swastika incident," asserting they engaged in meaningful dialogue and provided pedagogical guidance (Mot. at 17), the Amended Complaint alleges—and the evidence will show—precisely the opposite: that the purported investigation was a cursory, two-day exercise that excluded relevant law enforcement (despite Defendants' representations about law enforcement's supposed involvement) and resulted in school leadership shifting the burden of peer education onto the victims themselves. AC ¶¶ 69–79. Similarly, Defendants' characterization of the "Call for Change" video rests on distortions of the record that attempt to interject documents far beyond the pleadings. *Compare, e.g.*, Mot. at 11 n.3 *with* AC ¶¶ 124–32. Because the Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the nonmoving

7

1   party, Defendants' competing factual accounts preclude dismissal. *See L.T.*, 2024 WL 3678014, at \*6.

2   **C.    Defendants' Attempt to Disaggregate the Numerous Antisemitic Incidents Is**

3   **Contrary to Law**

4        Defendants' pervasive contention—that antisemitic incidents must be assessed in isolation and

5   experienced personally by each plaintiff—rests on a fundamental misunderstanding of applicable law.

6   *See, e.g.*, Mot. at 17 (asserting that events "standing alone" are not severe or pervasive); *id.* at 19–20

7   (importing same analysis to Title IV claim). As the Supreme Court has explained, it is a bedrock

8   principle that "whether an environment is 'hostile' or 'abusive' can be determined *only by looking at all*

9   *the circumstances.*" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993) (emphasis added); *Monteiro*,

10  158 F.3d at 1033 ("Whether a hostile educational environment exists is a question of fact, determined

11  with reference to the totality of the circumstances"); *see also* I.A, *supra* (citing cases). Thus, "whether

12  each of Plaintiff's allegations, standing alone, states a hostile environment claim is beside the point,"

13  and "defendants' effort to disaggregate and thereby defeat plaintiff's allegations is contrary to law."

14  *Crandell v. N.Y. Coll. of Osteopathic Medicine*, 87 F. Supp. 2d 304, 319 (S.D.N.Y. 2000). By viewing

15  the incidents as discrete events, Defendants ignore the "substantial in gross" impact of a sustained

16  campaign of antisemitic harassment and discrimination. *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir.

17  1982); *see also Ellis v. Houston*, 742 F.3d 307, 319 (8th Cir. 2014) (evidence of hostile environment

18  "must be examined as a whole," and "the resulting harm cannot be measured by carving it into a series

19  of discrete incidents" (internal quotation marks and citation omitted)).

20       Indeed, courts consistently reject the "atomization" of hostile-environment claims, recognizing

21  that the actionable wrong is the environment itself, not any single constituent act. *See, e.g.*, *O'Connor*

22  *v. City of Newark*, 440 F.3d 125, 127–28 (3d Cir. 2006) (underscoring that hostile-environment claims

23  are not about "discrete acts," but about the cumulative conditions of the environment assessed together);

24  *L.E.*, 403 F. Supp. 3d at 900 ("In evaluating hostile environment claims, courts have adopted a 'totality

25  of the circumstances' approach that rejects the disaggregation of the allegations and requires only that

26  the alleged incidents cumulatively have resulted in the creation of a hostile environment."); *see also*

27  *Ellison v. Brady*, 924 F.2d 872, 878–79 (9th Cir. 1991) (emphasizing victim's perspective and a

28  cumulative assessment of hostility).

Defendants also err in suggesting that every plaintiff must have witnessed or been the direct target of every instance of harassment. Title VI imposes no such requirement. As the Ninth Circuit has explained, discriminatory acts "need not be directed at the complainant in order to create a hostile educational environment." *Monteiro*, 158 F.3d at 1033; *accord Walker v. Ford Motor Co.*, 684 F.2d 1355, 1359–60 (11th Cir. 1982) (holding that evidence of harassment directed at others is relevant to establish a hostile work environment); *Waltman v. Int'l Paper Co.*, 875 F.2d 468, 484 (5th Cir. 1989) (recognizing in the Title VII context that "graffiti not directed at [the plaintiff]" is relevant to show a hostile environment). Defendants' own cited cases make the same point. *See Landau v. Haverford Coll.*, 780 F. Supp. 3d 548, 559 (E.D. Pa. 2025) ( "[A] plaintiff does not need to be the target of or a witness to a specific instance of harassment for that instance to be considered."). A plaintiff's awareness of such harassment, even if not the direct target, contributes to the pervasiveness of the hostile environment. *See id.*; *Monteiro*, 158 F.3d at 1033. The relevant inquiry is whether the cumulative *environment*—not a specific subset of incidents—was sufficiently pervasive to deny students equal access to education.

Defendants' heavy reliance on *Landau* is misplaced. Unlike the plaintiffs in *Landau*, whose "conclusory assertions" of collective knowledge were deemed insufficient, Plaintiffs here have met their burden by pleading allegations of an interconnected District environment where antisemitic conduct was widely known, provoking broad public alarm. These allegations, which establish a pervasive awareness of the hostile environment, include: the discovery of and complaints about swastika graffiti (AC ¶¶ 69–70); the formation of District-wide community advocacy groups in response to antisemitic incidents (*id.* ¶ 9); the collective filing of UCP complaints by multiple Jewish parents detailing systemic antisemitism (*id.* ¶¶ 103–05, 130–32); and public protests and debate at Board of Trustees meetings (*id.* ¶ 119). For example, a November 21, 2023 petition regarding an antisemitic ethnic studies presentation garnered "hundreds of signatures" (AC ¶ 118), and a March 25, 2024 email regarding the "Call for Change" video was co-signed by 10 families, including Scott and Lori Lyle (Plaintiff Adam Lyle's parents); Daniel and Jennifer Reif (Plaintiff Olivia Reif's parents); Igor and Marina Bershteyn (Plaintiff S.B.'s parents); Sam and Andrea Kasle (Plaintiff L.K.'s parents); and Lisa Joy Rosner (Plaintiff Dina Berg's parents) (AC ¶ 128 & Ex. 9 at 9–11). Similarly, an April 22, 2024 UCP complaint regarding systemic antisemitism was signed by eight different families, including the Lyles, Reifs, and Bershteyns. AC Ex. 10 at 5–8.

9

1   The November 1, 2023 swastika incident was reported in the media and was the subject of numerous

2   parent and student emails—including from Plaintiff Dina Berg—as well as school-wide

3   communications. AC ¶¶ 69–78 & Ex. 1. Plaintiffs have thus alleged a sufficient factual basis for

4   awareness, and Defendants' attempt to disaggregate these incidents should be rejected.[7]

5           **D.      Plaintiffs Have Standing to Assert Their Claims**

6           Defendants' standing challenges are meritless. *See* Mot. at 5–7; 20. To establish Article III

7   standing, a plaintiff must demonstrate: (1) an "injury in fact" that is concrete, particularized, and actual

8   or imminent; (2) a causal connection to the challenged conduct; and (3) a likelihood that the injury will

9   be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Plaintiffs

10  satisfy this constitutional minimum.

11          **Current-Student Plaintiffs.** The Amended Complaint easily establishes standing for the

12  currently enrolled students (L.K., S.B., and W.K.) by alleging concrete, compensable injuries—

13  including emotional distress and loss of educational opportunity—stemming from the District's

14  systemic failures. *See, e.g.*, AC ¶¶ 186, 208, 235; *see also* ¶¶ 82, 85–100 (bullying, compelled answers

15  on assessments, and antisemitic classroom instruction as to L.K.); ¶¶ 122, 127 (targeted harassment,

16  including derogatory comments about Jewish identity and appearance, and pressure to conceal a Star of

17  David as to S.B.); ¶¶ 61(f), 80(a), (c), (d) (targeted harassment, including antisemitic epithets, jokes, and

18  taunts as to W.K.). These injuries, ranging from antisemitic instruction to derogatory taunts, are fairly

19  traceable to the District's deliberate indifference in failing to vet instructional materials, conduct

20  meaningful investigations, or curb known harassment. *See* AC ¶¶ 93–111, 117–20, 128–32. Because the

21  District's deficient policies remain operative across its schools, the requested relief would redress these

22  ongoing harms. Defendants' contention (Mot. at 20) that L.K. lacks standing because she is no longer

23  in Gruszynski's classroom is unavailing; a student's internal transfer does not eliminate the threat of

24

25          [7] Defendants' invocation of *Roberts v. Madigan*, 921 F.2d 1047 (10th Cir. 1990) (*see* Mot. at 19) is
26  even further afield. *Roberts* is a non-controlling Tenth Circuit case about parental standing to challenge
    the removal of a book from a school library under the Establishment Clause; it is unrelated to the
27  standards for a hostile-environment claim. Controlling Ninth Circuit law remains clear: a hostile
    environment is established by the totality of the circumstances, regardless of whether every act was
28  directed at every plaintiff. *See Monteiro*, 158 F.3d at 1033.

1  future injury where the underlying systemic indifference and hostile environment persists. *See, e.g.*,

2  *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 665 (2d Cir. 2012); *Parents Involved in Comm. Schs.*

3  *v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719–720 (2007).[8]

4      **Former-Student Plaintiffs.** The former-student Plaintiffs (Adam Lyle, Olivia Reif, Dina Berg,

5  and Omer Beck) likewise have standing to pursue damages under 42 U.S.C. § 1983. Although their

6  graduation moots claims for prospective relief, their claims for damages remain viable. *C.F. ex rel.*

7  *Farnan v. Capistrano Unified Sch. Dist.*, 654 F.3d 975, 983–84 (9th Cir. 2011) (where student's

8  "graduation mooted his claim for declaratory relief . . . his damages claim remain[ed] viable," and

9  "prevent[ed] dismissal for mootness." (internal quotations omitted)).[9] These Plaintiffs seek relief for

10 actual, concrete injuries—including mental anguish and reputational harm—caused by Defendants'

11 conduct and redressable through money damages. *See AC ¶¶ 185, 208; see also Memphis Cmty. Sch.*

12 *Dist. v. Stachura*, 477 U.S. 299, 307 (1986).

13     **CJP-SUHSD.** The organizational Plaintiff, CJP-SUHSD, possesses representative standing to

14 seek prospective relief under Title VI. An organization satisfies Article III when (1) "its members would

15 otherwise have standing to sue in their own right"; (2) "the interests it seeks to protect are germane to

16 [its] purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of

17 individual members." *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). CJP-

18 SUHSD meets each criterion. Its members include families with currently enrolled students (*see AC*

19 *¶ 9*) who possess standing to assert their minor children's rights in a representative capacity. *See Fed.*

20 *R. Civ. P. 17(c); see also Parents Involved*, 551 U.S. at 718–19 (parent group had standing to assert

21 claims where their children could be denied educational opportunities—admission to certain schools—

22

---

23  [8] *See also Honig v. Doe*, 484 U.S. 305, 318–23 (1988) (claim not moot where student demonstrated
24  likelihood of "be[ing] wronged in a similar way" again, "and that any resulting claim . . . will surely
    evade review"); *Or. Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1117–18 (9th Cir. 2003) (claims that are
25  "inherently transitory" such that they would evade review remain justiciable); *Where Do We Go*
    *Berkeley v. Cal. Dept. of Transp.*, 32 F.4th 852, 857–58 (9th Cir. 2022) (challenge to expired injunction
26  was not moot "because it is capable of repetition, yet evading review" where a "six-month preliminary
    injunction is too brief for an appeal to be fully litigated" and there was "reasonable likelihood" of future
27  injunctions).

    [9] Because they have graduated, the former-student plaintiffs withdraw their Title VI claim. They
28  assert no other claims for prospective relief.

in the future). Safeguarding the rights and well-being of Jewish students in District schools is plainly germane to CJP-SUHSD's mission. *See* AC ¶¶ 9, 66. Last, because the suit challenges a systemic "pattern and practice" of tolerating antisemitic harassment and discrimination (*see, e.g.*, AC ¶¶ 151, 157–58, 170–71, 196–97, 223) and seeks prospective relief, individualized participation is unnecessary. *See Warth v. Seldin*, 422 U.S. 490, 511, 515 (1975) ("Even in the absence of injury to itself, an association may have standing solely as the representative of its members," and such suits are particularly appropriate where, as here, the relief sought is primarily injunctive).[10]

**Parent Plaintiffs.** Finally, the parent plaintiffs have standing to bring Title VI and Section 1983 claims on behalf of their minor children in a representative capacity. *See, e.g., L.T.*, 2024 WL 3678014, at *5–6; *Monteiro*, 158 F.3d at 1033–35 (parent asserting violations of Title VI on behalf of child).[11]

## II.    PLAINTIFFS STATE CLAIMS FOR VIOLATIONS OF SECTION 1983 (COUNTS 2–4)

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). The Amended Complaint alleges that District personnel—including teachers, administrators, and trustees—intentionally targeted Jewish students for disparate treatment and responded to documented antisemitic harassment with deliberate indifference. These allegations satisfy the pleading standards for violations of the First and Fourteenth Amendments. *See Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 164 (1993).

### A.    The Amended Complaint States an Equal Protection Claim (Count 2)

An Equal Protection violation occurs when state actors discriminate against plaintiffs as members of an identifiable class through intentional conduct or "deliberate indifference." *Flores*, 324

---

[10] *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181–85 (2000) (recognizing organizations' representative standing to pursue civil penalties and prospective relief to deter and remedy ongoing violations); *Laborers Int'l Union Loc. 261 v. City & Cnty. of San Francisco*, 2022 WL 2528602, at *6 (N.D. Cal. July 6, 2022) (finding that *Hunt's* third prong is merely "prudential, rather than constitutional," and is generally satisfied when the plaintiff organization seeks declaratory or injunctive relief).

[11] Although they maintain they have personally suffered harm as a result of Defendants' conduct, parent Plaintiffs Sam Kasle, Andrea Kasle, Scott Lyle, and Lori Lyle voluntarily withdraw the Title VI and Section 1983 claims asserted in their individual capacities.

F.3d at 1134–35.[12] Plaintiffs have plausibly alleged both theories here, detailing a pattern of intentional targeting by faculty and a systematic failure to intervene by District administrators. Courts assess Equal Protection claims "under the same framework as [] Title VI claim[s]." *B.S. by & through Smith v. Indep. Sch. Dist. No. 623*, 2021 WL 1985973, at *4 (D. Minn. May 18, 2021); *see also Methelus v. Sch. Bd. of Collier Cnty.*, 243 F. Supp. 3d 1266, 1280 (M.D. Fla. 2017) ("Title VI and equal protection claims are considered under the same analytical framework"); *Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690, 702–03 (9th Cir. 2009) (Section 1983 "claims alleging violations of equal protection and Title VI require similar proofs—plaintiffs must show that actions of the defendants had a discriminatory impact, and that defendants acted with an intent or purpose to discriminate based upon plaintiffs' membership in a protected class."). Because, as shown, Plaintiffs have stated a Title VI claim, they also state an Equal Protection claim.

### 1. District Staff Intentionally Targeted Jewish Students and Responded to Antisemitic Harassment with Deliberate Indifference

The Amended Complaint details specific, intentional acts of antisemitic hostility and deliberate indifference by District personnel acting under color of state law. For example, the teacher in L.K.'s mandatory World History class mocked and bullied L.K.—the only openly Jewish student in the class—because she "doesn't think Israel is an apartheid state," taunted that he had previously "taught Jews in New York," and used assessments to enforce anti-Jewish and counterfactual narratives, regularly reducing L.K. to tears. *See* AC ¶¶ 85–90, 97–100 (describing taunts, ridicule, and assessment content). Another teacher delivered an ethnic studies presentation depicting antisemitic tropes of Jews as purported "secret puppet masters." *Id.* ¶¶ 112–16. A third teacher forcibly removed a Jewish student from a supposedly student-run school club for merely taking notes on the teacher's antisemitic and ahistorical lectures. *Id.* ¶¶ 133–48. Administrators denied a request to permit Israeli flags on campus while Palestinian flags remained displayed, signaling unequal treatment. *Id.* ¶ 136. They also minimized swastika graffiti (*id.* ¶¶ 71–74), blamed Jewish student-victims for provoking antisemitic harassment

---

[12] Discrimination based on Jewish ancestry and ethnicity qualifies as racial discrimination under the Equal Protection Clause. *See Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 617–18 (1987) (reversing dismissal and holding that Jews can "state a § 1982 claim of racial discrimination" because at the time of the Civil Rights Act of 1866, Jews were among groups considered "distinct races").

(*id.* ¶ 80(a)), refused to meet with concerned parents or address their complaints (*id.* ¶¶ 95, 100–11, 128–29), refused to timely investigate claims (*id.* ¶¶ 103, 119), refused to impose disciplinary measures (*id.* ¶¶ 103–07), and refused to take any concrete action at all to remedy pervasive and repeated antisemitic harassment and discrimination. *Id.* ¶¶ 64, 94–97, 103–11. Taken as true, these allegations describe a school environment in which the District not only tolerated religious and ethnic hostility, but actively facilitated it through its agents' affirmative conduct and sustained inaction.

## 2.   Defendants' "Classroom Instruction" Arguments Misapprehend the Complaint's Allegations and the Limits of Curricular Deference

Defendants' central defense—that "classroom instruction" is categorically insulated from challenge under the Equal Protection Clause (*see* Mot. at 2, 14–15)—misapprehends both the scope of Plaintiffs' allegations and the governing law. Plaintiffs do not seek to litigate abstract pedagogical questions. Rather, they allege specific instances of discriminatory taunting and instruction by faculty, the disparate application of school policies, and an official tolerance of antisemitic harassment that persisted despite actual notice. AC ¶¶ 86–100, 131.

Defendants' reliance on *Monteiro v. Tempe Union High Sch. District*, 158 F.3d 1022 (9th Cir. 1998), is misplaced. While *Monteiro* affords school districts discretion in selecting curriculum content, it expressly does not immunize "racist actions on the part of teachers *implementing a curriculum*" or school policies that "serve to promote racist attitudes among their students." *Id.* at 1032. Plaintiffs' allegations here fall squarely within that carve-out. This case is not a challenge to the "assignment of material deemed to have educational value by school authorities." *Id.* at 1028. Rather, Plaintiffs allege that teachers engaged in a campaign of discriminatory conduct in their implementation of instruction *without the approval of school authorities*, promoting antisemitic tropes and coercing students to adopt and regurgitate antisemitic viewpoints on graded assessments. AC ¶¶ 82–99, 112–20. The deference *Monteiro* accords to "duly authorized school authorities" is predicated on the exercise of that authority. 158 F.3d at 1032. Here, Plaintiffs allege the District abdicated its oversight role, admitting that the challenged instructional materials were "not formally vetted or approved." AC ¶ 111. A district cannot both disclaim responsibility for its curriculum and simultaneously seek shelter under the judicial deference afforded to curricular choices. Finally, unlike the mere exposure to offensive literary works

14

1   at issue in *Monteiro*, Plaintiffs allege affirmative coercion through graded assessments, compelling

2   students to profess ideological views contrary to their identity and beliefs. Such conduct goes far beyond

3   *Monteiro's* scope and states a clear Equal Protection violation.

4       Defendants' other cited authorities are likewise inapposite. In *California Parents for the*

5   *Equalization of Educ. Materials v. Torlakson* (*see* Mot. at 15), the challenged materials were "never

6   seen by students." 973 F.3d 1010, 1018 (9th Cir. 2020). Here, students were forced to interact with

7   antisemitic and anti-Israel classroom materials and to adopt anti-Jewish and anti-Israel viewpoints to

8   receive passing grades. AC ¶¶ 97–99, 112–20. Similarly, in *Concerned Jewish Parents & Teachers of*

9   *Los Angeles v. Liberated Ethnic Studies Model Curriculum Consortium*, the challenged curriculum had

10  not yet been adopted. *Cf.* 2024 WL 5274857, at *4 (C.D. Cal. Nov. 30, 2024) (granting motion to dismiss

11  where parent-plaintiffs' claims were premised on yet-to-be implemented school curriculum, without

12  alleging how parents were injured or that their children encountered or would encounter the curriculum).

13  Here, by contrast, students *have already* been subjected to "classroom instruction and programming" in

14  history and ethnic-studies courses that actively "impart[ed] antisemitic, ahistorical, and pro-Hamas

15  narratives." AC ¶¶ 97–99, 112–20, 170(c). And such instruction is likely to repeat, absent remedies that

16  the District has been unwilling to implement. *See, e.g.*, *id.* ¶¶ 100–11, 129, 132, 170–84.

### 3.    Defendants' Factual Challenges are Unfounded and Premature

18      Defendants' remaining arguments are unavailing for the same reasons discussed above. *See*

19  *supra* at 5–8. Defendants' argument that antisemitic incidents must be assessed in isolation and

20  experienced directly by each plaintiff misapprehends the law. A hostile environment claim is determined

21  by the "totality of the circumstances," and discriminatory acts need not be directed at a specific

22  complainant to be relevant. *See, e.g.*, *Monteiro*, 158 F.3d at 1033. Finally, defendants' fact-bound

23  challenges regarding the severity of the antisemitic incidents and the purported reasonableness of the

24  District's responses are premature, fact-intensive questions that are vigorously disputed and cannot be

25  resolved at this stage. *See L.T.*, 2024 WL 3678014, at *6.

### B.    The Amended Complaint States a Free Exercise Claim (Count 3)

27      Plaintiffs have also stated a § 1983 claim based on a violation of the Free Exercise Clause. The

28  Free Exercise Clause "protects not only the right to harbor religious beliefs inwardly and secretly," but

also the "ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through the performance of (or abstention from) physical acts." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022) (citations omitted). A plaintiff may establish a violation of this right by showing that the government has "burdened his sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'" *Id.* at 525. To state a cognizable claim, a plaintiff must allege that the challenged state action exerts a "coercive effect" that "operates against him in the practice of his religion." *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 223 (1963). Such an effect constitutes a burden where the state "conditions receipt of an important benefit upon conduct proscribed by a religious faith" or otherwise exerts "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas v. Rev. Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 717–18 (1981).

## 1.    The District Exerted Coercive Pressure By Penalizing Students for Declining to Affirm Propositions that Contravene their Religious Beliefs

The Amended Complaint describes a classic coercive burden: the conditioning of academic grades on the affirmation of propositions at odds with a student's religious identity. *See Thomas*, 450 U.S. at 717–18. L.K., a Jewish student, was compelled to furnish the teacher's "false responses" on an "Israel Palestine Vocabulary Quiz" to receive credit—e.g., defining "Palestine" as "Arab lands … currently occupied by Israel" and "Hamas" as a "Palestinian political party … continuing to fight against Israel"—and to take a final exam that required answers depicting Jews as "occupiers," such that "to receive a passing grade, L.K. understood that she needed to answer [the] questions according to [the teacher's] skewed and antisemitic ideology." AC ¶¶ 88, 97–99 & Ex. 3.

Contrary to Defendants' characterization, these allegations describe far more than mere "exposure" to disagreeable ideas. *Cf. Grove v. Mead Sch. Dist. No. 354*, 753 F.2d 1528, 1534 (9th Cir. 1985). Rather, they describe a choice between adherence to religious convictions and an important educational benefit— a burdensome, coercive choice recognized in Free Exercise doctrine. *See Thomas*, 450 U.S. at 717–18 (violation where state puts adherent to the choice between exercising religion and receiving an important benefit); *see also Mahmoud v. Taylor*, 606 U.S. 522, 550 (2025) ("A court must [] consider the specific context in which the instruction or materials at issue are presented. Are they presented in a neutral manner, or are they presented in a manner that is 'hostile' to religious viewpoints

16

and designed to impose upon students a 'pressure to conform'?"). Here, the District presented biased narratives as objective fact—for example, on a "vocabulary" quiz where the only "correct" answer defined Hamas simply as a "political party" (*see* AC ¶¶ 88(d), 97–99, Ex. 3)—and penalized students who declined to affirm them. By penalizing a student for declining to affirm propositions that contravene her religious identity, the District exerted the type of "substantial pressure" that the Free Exercise Clause forbids. *See Thomas*, 450 U.S. at 718.

Defendants' reliance on *Sabra v. Maricopa County Comm. College Dist.*, 44 F.4th 867 (9th Cir. 2022), is particularly misplaced. *Sabra* involved a college course where the professor sought to convey "what terrorists believe" to adult students. *Id.* at 876. Following prompt administrative review, the institution recognized the offending assessment questions as "inaccurate" and "inappropriate," re-credited the student for the missed questions, and removed the offending material from future quizzes. *Id.* at 876–77. Here, by contrast, the District presented a biased narrative as objective fact to minors in a mandatory K–12 setting, tested students on their adoption of that narrative, and then disclaimed responsibility for vetting the offending materials. AC ¶¶ 82–99, 104–08, 111. Because the District conditioned a young student's academic standing on the affirmation of propositions at odds with her religious identity, it violated the core tenets of the Free Exercise Clause.

### 2.    The District's Broader Conduct Created a Non-Neutral Environment that Penalized Religious Identity

The coercive burden alleged here extends beyond the grading of assessments. The Amended Complaint details a series of school-sponsored actions—including Ethnic Studies lessons, the teacher-dominated "Freedom Club," and the "Call for Change" video—that collectively exerted pressure on Jewish students to suppress their faith. For instance, an Ethnic Studies presentation deployed antisemitic tropes that stigmatized Jewish identity and Israel as inherently oppressive, delivered by a teacher wielding evaluative authority, thereby pressuring students to repudiate core beliefs to avoid academic penalties. AC ¶¶ 112–20.[13] In the "Freedom Club," a Jewish and Israeli-American student was forcibly

---

[13] Defendants' contention that the Court should dismiss claims arising from the antisemitic Ethnic Studies presentation—on the assertion that no named student-Plaintiff was present for a specific lesson (Mot. at 20–21)—is misguided. As an initial matter, this argument relies on extrinsic declarations that *(cont'd)*

1   removed for questioning antisemitic viewpoints and the same teacher's demeaning comment that he

2   could tell a student was Jewish "by her nose" communicated official disfavor. AC ¶¶ 126–27, 133–49.

3   A Jewish student attending the Freedom Club was not merely "exposed" to viewpoints to which he

4   disagreed; *he was ejected from the classroom by the teacher, merely for questioning the teachers'*

5   *views.*[14] *Id.* ¶¶ 133–49. The District also disseminated anti-Israel messages and failed to act when a

6   teaching assistant told a student to conceal her Star of David to avoid personal harm at school. AC ¶¶

7   122, 124–32. Taken together, these allegations describe non-neutral, non-generally applicable state

8   action that placed coercive pressure on Jewish students to alter or abandon religiously motivated

9   expression and identity in school, which is sufficient to plead a Free Exercise violation.

10              **3.**   **Defendants' Reliance on "Mere Exposure" Cases Is Misplaced**

11       Defendants' arguments to the contrary—that classroom materials are categorically immunized

12   and that mere "exposure" or "mere offense" to differing ideas is inactionable (Mot. at 11–15)—

13   misconstrue both the law and the allegations. Their reliance on *Torlakson* is particularly inapt. That case

14   addressed high-level state guidance that did not "*relate to material students actually see in the*

15   *classroom*" and involved "no penalty or coerced conduct." 973 F.3d at 1015 (emphasis added). Here,

16   Plaintiffs allege the opposite: direct, in-classroom implementation coupled with academic and social

17   penalties. Plaintiffs do not simply allege "exposure" to offensive or disagreeable viewpoints, but that

18   they were subject to conduct-based coercion. *See, e.g.*, AC ¶¶ 97–99, 196 (alleging penalties in grading

19   for failing to adopt anti-Israel answers on assessments); 133–49 (removal and exclusion from purported

20   student-run club after attempting to offer pro-Israel perspectives and take notes on anti-Israel biases).

21       Similarly, Defendants' invocation of the First Amendment to justify the "Call for Change" video

22

---

23   are not properly before the Court on a motion to dismiss. *See, e.g.*, *supra* at 1–2, 7. More fundamentally,
the argument misapprehends the nature of a hostile-environment claim. The Amended Complaint does

24   not seek relief for a single isolated lesson; rather, it alleges a hostile educational environment of which
the Ethnic Studies presentation was a representative and reinforcing component. AC ¶¶ 112–20.

25   Defendants' attempt to disaggregate these allegations ignores both the allegations in the complaint and
the governing law. *See Monteiro*, 158 F.3d at 1033.

26   [14] To the extent Defendants contend that Plaintiffs' claims should be dismissed because the Freedom

27   Club is no longer operating, this is not only a fact-bound argument improper for resolution on a motion
to dismiss, but Defendants fail to meet their "heavy burden" to establish that voluntary cessation of this

28   purportedly student-run club moots any claim asserted here. *Friends of the Earth*, 528 U.S. at 189.

(*see* Mot. at 12–14) inverts the relevant legal principles. While students possess speech rights, "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988). The District possessed the authority—and the obligation—to ensure that school-sponsored platforms were not used to facilitate the harassment or religious coercion of its students. Its failure to do so, in the context of the other alleged conduct, sufficiently pleads a Free Exercise violation.

Once more, Defendants' remaining contentions—which dispute the harassing nature of the alleged conduct and the reasonableness of the District's response (Mot. at 15–18)—are fundamentally misplaced at this stage of the litigation. These arguments invite the Court to resolve contested factual issues that are improper for determination on a motion to dismiss. *See supra* at 5–8. Because the Amended Complaint plausibly alleges a pattern of conduct that, taken together, created an environment of religious hostility, the District's request for a premature factual adjudication should be rejected.

## C.    The Amended Complaint States a Free Speech Claim (Count 4)

The First Amendment prohibits the State from compelling an individual to "declare a belief" contrary to conscience. *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 631 (1943). This principle remains a "fixed star in our constitutional constellation": no official "can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Id.* at 642. While educators may require students to demonstrate a *comprehension* of contested ideas, they may not force students to *profess* those ideas on pain of academic penalty. *Cf. Wood v. Arnold*, 915 F.3d 308, 319 (4th Cir. 2019) (assignment did not require plaintiff "to profess or accept the tenets of Islam," but "to write only two words of the *shahada* as an academic exercise to demonstrate her understanding of the world history curriculum.").

The Amended Complaint alleges that District personnel did not merely expose L.K. and her peers to disagreeable ideas, but "intentionally compelled" her to "adopt, profess, or accept" specific ideological viewpoints as the only acceptable responses on graded assessments. AC ¶¶ 99, 221. Plaintiffs allege that L.K. was required to furnish "false responses" on a vocabulary quiz—defining "Palestine," for instance, in a specific ideological manner—to receive credit. *Id.* ¶ 88(d) & Ex. 3. She further

19

understood that her final exam grade depended on her willingness to adopt a "skewed" narrative that contradicted her religious and ethnic identity. *Id.* ¶ 99. By conditioning an important educational benefit on the profession of a state-sanctioned viewpoint, the District exerted the type of coercive pressure that the First Amendment forbids.

Defendants contend that Plaintiffs plead only offense from ideas and that Free Speech rights are not violated by exposure to instructional materials or topics with which one disagrees (Mot. at 7). But Plaintiffs have alleged much more: that the teacher forced L.K. to furnish objectively false responses to receive credit on a quiz and to adopt the teacher's skewed ideological framing on the final exam, thereby coercing expression contrary to her beliefs. AC ¶¶ 97–99. Defendants themselves characterize the allegations as asserting compelled ideological answers "on a quiz" and "final exam," quibbling only over grading impact. Mot. at 16–17, 20–21. That framing reinforces that this case is about compulsion tied to assessment, not mere exposure.

Defendants' reliance on *Monteiro* and *Concerned Jewish Parents* is misplaced for the same reasons explained above: those cases address mere exposure to curricular materials approved by District authorities, not compelled speech in unapproved graded assessments, as alleged here. *See supra* at 14–17. This is not a case about the "assignment of material deemed to have educational value," *Monteiro*, 158 F.3d at 1028—indeed, Defendants have conceded that the at-issue materials were neither reviewed nor approved for use (AC ¶ 111)—but about the compelled ratification of specific viewpoints on pain of academic loss. Unlike the curricular choices protected in *Monteiro*, the conduct alleged here— unvetted, coercive, and targeted—finds no shelter in the doctrine of academic deference.[15] Because the Amended Complaint plausibly alleges that the District sought to prescribe a political and historical orthodoxy through coercive grading practices, the motion to dismiss the Free Speech claim should be denied.

---

[15] Defendants' reliance on *Head v. Bd. of Trs. of California State Univ.*, 315 F. App'x 7 (9th Cir. 2008), is similarly inapt. There, the plaintiff's claim failed because it recounted only that he was "sometimes not allowed to discuss issues" or was "criticized by the instructor." *Id.* at 8. It did not involve, as here, the systematic use of graded assessments to compel the regurgitation of ideological propositions.

III.    **PLAINTIFFS HAVE SUFFICIENTLY ALLEGED PERSONAL-CAPACITY LIABILITY AGAINST THE INDIVIDUAL DEFENDANTS**

Section 1983 authorizes suits against government officials in their personal capacities for conduct that violates "clearly established statutory or constitutional rights." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Personal-capacity liability attaches where an official, through their own individual actions, directly participated in the alleged constitutional deprivation, set in motion a series of acts by others that foreseeably led to the violation, or knowingly acquiesced in the unconstitutional conduct of subordinates. *See Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011). Thus, liability is not limited to direct participation—it extends to officials who, through "reckless or callous indifference," permit constitutional injuries to occur. *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991). In the supervisory context, "a supervisor can be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates." *Henry A. v. Willden*, 678 F.3d 991, 1004 (9th Cir. 2012).

The Amended Complaint meets this threshold. At the pleading stage, a plaintiff need only allege facts that, taken as true, establish a violation of a clearly established right to overcome a defense of qualified immunity. *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1064 (9th Cir. 2013). Here, Plaintiffs have alleged with specificity that the individual Defendants—including faculty, administrators, and trustees—directly engaged in discriminatory conduct or permitted such conduct to persist despite actual notice. Defendants' contention that the Amended Complaint lacks sufficient allegations of personal involvement (*see* Mot. at 20–25) ignores Plaintiffs' detailed allegations of specific conduct by individual actors, including, but not limited to, the teacher's direct taunting of students and use of "compelled-answer" assessments (AC ¶¶ 86–99); the principal's dismissive responses (*id.* ¶¶ 71–78, 102–03, 129); the vice principal's admissions and refusals (*id.* ¶¶ 101–03, 105–06); and District-level administrators' and trustees' roles in, and awareness of, the same facts, including via parent emails and the formal UCP process. *See, e.g.*, *id.* ¶¶ 86–96, 100–11.

A.    **Plaintiffs Have Alleged Personal-Capacity Liability Against Defendant Gruszynski**

The Amended Complaint sets forth ample allegations supporting personal-capacity liability against Defendant Gruszynski. Gruszynski was the "instrument" of constitutional deprivation: he

21

published, distributed, and enforced antisemitic instructional materials; compelled students to profess his discriminatory viewpoints through graded assessments; and publicly ridiculed dissenting students. AC ¶¶ 82–111, 213–39. These affirmative acts constitute a direct violation of Plaintiffs' rights to free speech and equal protection.

Gruszynski's contention that the First Amendment immunizes his conduct is fundamentally misplaced. Public school teachers are not free to use the classroom as a "pulpit from which to preach [their] own views" to a "captive" student audience. *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 957 (9th Cir. 2011). When performing the duties they are "paid to perform," teachers speak as not as private citizens but as public employees whose pedagogical discretion is subject to—not a license to violate—the constitutional rights of their students. *Id.*; *see also Mayer v. Monroe Cnty. Cmty. Sch. Corp.*, 474 F.3d 477, 480 (7th Cir. 2007) (explaining that the "First Amendment does not entitle primary and secondary teachers, when conducting the education of captive audiences, to cover topics, or advocate viewpoints, that depart from the curriculum adopted by the school system"). This principle carries particular force in the K–12 context, where the state's interest in protecting a captive audience is at its zenith. *Cf. Students for Just. in Palestine v. Abbott*, 756 F. Supp. 3d 410, 426 (W.D. Tex. 2024) (differentiating between less-restricted university speech and more-restricted K–12 speech). The First Amendment does not shield Gruszynski from liability.[16]

**B.    Plaintiffs Have Alleged Personal-Capacity Liability Against Defendant Kaddoura**

The Amended Complaint further establishes a basis for personal-capacity liability against Defendant Kaddoura by alleging that Kaddoura used his official authority to directly deprive Plaintiffs of their constitutional rights. As a faculty advisor, Kaddoura converted a school-sponsored club into a vehicle for discriminatory exclusion, forcibly removing a Jewish student from a meeting and closing proceedings to dissenters in violation of District policy. AC ¶¶ 138–49. Such conduct is not shielded by associational rights, as Defendants suggest. *See* Mot. at 21. While students may associate based on shared viewpoints, a state actor may not exercise official power to punish or exclude students based on

---

[16] The Court should decline to consider Gruszynski's entitlement to qualified immunity because Defendants offer no substantive argument in support. *See* Mot. at 20–21. "Issues raised in a brief that are not supported by argument are deemed abandoned." *Martinez-Serrano v. I.N.S.*, 94 F.3d 1256, 1259 (9th Cir. 1996).

their ancestry or protected expression. *Holloman ex rel. Holloman*, 370 F.3d 1252, 1268–69 (11th Cir. 2004). The claims against Kaddoura are reinforced by specific allegations of personal animus. Kaddoura is alleged to have disseminated antisemitic views through school media and targeted a Jewish student with vitriolic attacks. AC ¶¶ 126–27, 133–49. These facts describe the intentional, discriminatory targeting that lies at the heart of the Equal Protection Clause, rather than mere "generalized grievances." Because Kaddoura's affirmative acts were the moving force behind the alleged injuries, he is properly subject to personal liability.

### C. Plaintiffs Have Alleged Personal-Capacity Liability Against the District-Level Administrator Defendants

Plaintiffs also sufficiently allege personal-capacity liability against the District-level administrators: Superintendent Leach, Associate Superintendent Hansen, and Assistant Superintendent Beal.[17] The Amended Complaint specifies that these administrators were personally aware of and deliberately indifferent to ongoing anti-Jewish discrimination and harassment. AC ¶¶ 64, 103–09, 111, 118, 132. Leach received direct notice of antisemitic incidents but failed to act, ultimately disclaiming responsibility. *Id*. ¶¶ 63–65, 103–09, 111. Hansen acknowledged that the District's response to Kasle's complaint was "incomplete" but took no remedial action. *Id.* ¶ 108. Beal's conduct was particularly stark: as the official responsible for Plaintiffs' UCP filing, he violated statutory deadlines and withheld findings until after this litigation began, conducting a sham investigation that resulted in no concrete action. *Id.* ¶ 132.

These allegations describe a pattern of administrative abdication that was the moving force behind the violation of Plaintiffs' rights. *See Preschooler II v. Clark Cnty. Sch. Bd. of Trs.*, 479 F.3d 1175, 1183 (9th Cir. 2007); *Johnson v. Duffy*, 588 F.2d 740, 743–44 (9th Cir. 1978) ("The requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury."). Defendants' invocation of the rule

---

[17] Defendants' Motion does not contest—and thus concedes—the personal-capacity liability of the school-site administrator Defendants: Karen Van Putten, Charles Velschow, Wendy Porter, and Karl Losekoot. *Cf.* Mot. at 21–25.

1  against vicarious liability is misplaced; Plaintiffs seek to hold these officials liable not for the acts of

2  subordinates, but for their own conscious disregard of ongoing discrimination. Because the Amended

3  Complaint alleges that each administrator's failure to act directly caused Plaintiffs' injuries to persist

4  unremedied, the personal-capacity claims against them are well-pleaded.

### D. Plaintiffs Have Alleged Personal-Capacity Liability Against the Trustee Defendants, Who are Not Entitled to Legislative Immunity

7      Plaintiffs allege that the Trustees were repeatedly notified of the hostile environment through

8  direct communications and public testimony but failed to intervene. In April 2024, the Board received

9  grievances from Plaintiff Sam Kasle regarding antisemitic instructional materials but did not respond.

10  AC ¶ 110. A year later, CJP-SUHSD contacted the Trustees about reviewing these materials and taking

11  corrective action; the Board again did not respond. *Id.* ¶ 111. The Trustees were also aware of the

12  antisemitic Ethnic Studies presentation—discussed at a January 2024 Board meeting—but took no

13  remedial action. *Id.* ¶¶ 118–19. This sustained inaction despite known risks satisfies the "reckless or

14  callous indifference" required for liability. *Starr v. Baca*, 652 F.3d 1202, 1206–07 (9th Cir. 2011).

15      Legislative immunity is inapplicable. For such immunity to attach, an act must be "formally

16  legislative" and bear the "hallmarks of traditional legislation." *Kaahumanu v. Cnty. of Maui*, 315 F.3d

17  1215, 1220 (9th Cir. 2003). None of the four *Kaahumanu* factors support immunity here. First, the

18  specific complaints—failing to respond to specific complaints and address antisemitic instructional

19  materials—are administrative, not legislative. *See Brown v. Sweetwater Union High Sch. Dist.*, 2025

20  WL 525111, at *6–7 (S.D. Cal. Feb. 18, 2025). Second, the Board's omissions directly affected a

21  discrete group—Jewish students and families—and did not involve formulating broad policy. *See*

22  *Trevino by & through Cruz v. Gates*, 23 F.3d 1480, 1482 (9th Cir. 1994). Third, rather than challenging

23  a formal vote, the claims target a failure to remedy known abuses, an executive function. Fourth, and

24  relatedly, inaction in the face of civil rights grievances does not involve budgetary priorities or policy-

25  setting functions typical of the legislative process. *Kaahumanu*, 315 F.3d at 1223. Because this

26  deliberate indifference was the "moving force" behind the alleged violation, the Trustees are subject to

27  personal-capacity liability.

28

IV.     **PLAINTIFFS STATE A CLAIM FOR PUNITIVE DAMAGES UNDER SECTION 1983**

Punitive damages under Section 1983 are available upon a showing of "evil motive or intent" or "reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). The Amended Complaint plausibly alleges such indifference by detailing a sustained pattern of intentional misconduct and willful indifference to documented antisemitism. AC ¶¶ 71–75, 86–99, 101–02. Plaintiffs allege that administrators and faculty, despite actual knowledge of ongoing constitutional injuries, deliberately abdicated their remedial duties. *Id.* ¶¶ 86–95, 100–11. Because a determination of "callous indifference" is inherently fact-intensive, resolution of this issue is improper at the pleading stage. *See Celebrity Chefs Tour, LLC v. Macy's, Inc*., 16 F. Supp. 3d 1123, 1133 (S.D. Cal. 2014). At this juncture, Plaintiffs have more than sufficiently alleged that Defendants acted with reckless or callous indifference for their constitutional rights.

V.      **IN THE ALTERNATIVE, PLAINTIFFS SHOULD BE GRANTED LEAVE TO AMEND**

Leave to amend should be granted "freely" unless a pleading cannot possibly be cured by the allegation of other facts. *See Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc); Fed. R. Civ. P. 15(a)(2). Accordingly, if the Court finds any portion of the pleading deficient, Plaintiffs respectfully request leave to amend.

### Conclusion

For the reasons stated, Plaintiffs request that the Court deny Defendants' motion in its entirety or, in the alternative, grant Plaintiffs leave to amend.

1    DATED: January 16, 2026          ROPES & GRAY LLP
2                                     THE DEBORAH PROJECT

3
                                      By: /s/ Ryan H. Weinstein
4                                         Ryan H. Weinstein (Cal. Bar No. 240205)
                                          Elana M. Stern*
5                                         Lori Lowenthal Marcus*
                                          Jerome M. Marcus*
6
                                      Attorneys for Plaintiffs
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                         26